# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIGITTE HAWKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civ. Act. No. 07-0010 (CKK)** |
| | ) |
| **MICHAEL B. MUKASEY,** | ) |
| **ATTORNEY GENERAL DEPT. OF** | ) |
| **JUSTICE,** | ) |
| | ) |
| **Defendant** | ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and LCvR 56.1, Defendant[1] respectfully moves for summary judgment. Defendant is entitled to summary judgment because it has a legitimate, non-discriminatory reason for the action it took vis-a-vis Plaintiff, and Plaintiff cannot show pretext. In support of this motion, Defendants respectfully refer the Court to the attached Statement of Material Facts Not In Genuine Dispute and to the attached Memorandum of Points and Authorities. For the reasons provided in the attached Memorandum of Points and Authorities, there are no material facts in dispute and the facts in this case establish that summary judgment should be granted in the Defendant's favor as a matter of law.

Because this is a dispositive motion, Defendant has not sought Plaintiff's consent. See LCvR 7.1(m).

Respectfully submitted,

_____
/s/
JEFFREY A. TAYLOR, DC Bar #498610

---

[1] Attorney General Michael B. Mukasey is substituted for former Attorney General Alberto Gonzales as the Defendant herein, pursuant to Fed. R. Civ. P. 25(d).

United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4808
Washington, D.C. 20530
(202) 305-1334

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIGITTE HAWKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civ. Act. No. 07-0010 (CKK) |
| | ) |
| MICHAEL B. MUKASEY, | ) |
| ATTORNEY GENERAL DEPT. OF | ) |
| JUSTICE, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

In compliance with Local Rule 7(m), Defendant submits that the following facts are not in genuine dispute and they demonstrate that defendant is entitled to summary judgment:

1.    On January 26, 2005, a desk audit was performed at Plaintiff's work station.  See December 12, 2005, Barbara Blackwood's affidavit, Exhibit A.  The audit was conducted by Barbara Blackwood, a contract position classification specialist in ATF's Human Resources Department ("HRD").  See Exhibit A and November 27, 2006, Deposition of Diane Filler, 37: 1-4.

2.    Prior to Ms. Blackwood interviewing the Plaintiff, she was told by Vivian White, a management official, not to interview the plaintiff's new supervisor, Diane Filler.  See May 7, 2008, Affidavit of Barbara Blackwood, Exhibit B.

3.    Ms. Blackwood prepared a draft Position Description and Evaluation Statement, without any discussion with the manager, Ms. Diane Filler.  See Id.

4.    The draft Position Description and Evaluation Statement indicated that the position was a GS-12.   December 12, 2005, Barbara Blackwood's affidavit, Exhibit A.  As supervisor, Ms. Filler had the right to comment and the new position description was not official unless the

supervisor certified that she is in agreement with it as indicated by her signature.  Id. ; and Exhibit B.

5.      The draft Position Description (PD) and Evaluation Statement was dated February 10, 2005 and concluded that Plaintiff's position should be upgraded to a GS-12, from her actual classification of a GS-11.  See December 12, 2005, Barbara Blackwood's affidavit, Exhibit A. The draft was provided to Ms. Filler on February 10, 2005.  See Exhibit A.  Ms. Filler first commented on the written draft on June 21, 2005.  See Exhibit A.  Thereafter, Ms. Fuller asked Ms. Blackwood and the plaintiff specific questions about the Plaintiff's actual and expected duties.  See Exhibit A.   Ms. Filler requested that certain changes be made to the draft Position Description based upon what she knew the position to be.  November 27, 2006, Filler Depo. 40: 9-13.

6.      It is within management's prerogative to comment and make assignments as they see fit. Exhibit B.  The final Evaluation Statement indicated that the position was still a GS-11. Declaration of Kathryn Greene at 6.

7.      The plaintiff left the Human Resources Division in 2006 and went to the Safety Programs Division within ATF.  Plaintiff Deposition, p. 109.  Plaintiff voluntarily took a downgrade to a GS-9 when she went to the Safety Programs Division.  Id., at 110.  She was in the Safety Programs Division for one month when she was promoted back to a GS-11.  Id.  Plaintiff was in the Safety Programs Division for a total of three months.  Id., at 110.  Thereafter, she applied and received a GS-12 position with the Information Services Division.  Id.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney



_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney




_____/s/_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4808
Washington, D.C. 20530
(202) 305-1334

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIGITTE HAWKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civ. Act. No. 07-0010 (CKK)** |
| | ) |
| **MICHAEL B. MUKASEY,** | ) |
| **ATTORNEY GENERAL DEPT. OF** | ) |
| **JUSTICE,** | ) |
| | ) |
| **Defendant.** | ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant respectfully submits this memorandum of points and authorities in support of his motion for summary judgment. Plaintiff alleges that she was the victim of race discrimination when the Defendant failed to promote her from a GS-11 to a GS-12, based on her accretion of duties as a Management Analyst in the Personnel Division of the Office of Management at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), a component of the Department of Justice.

As the Defendant explains below, Plaintiff's claims are without merit because the final desk audit performed and signed by management pursuant to OPM's job classification standards revealed that her duties were properly classified as a GS-11, even though the Plaintiff desired a GS-12 classification. Prior to the desk audit, Plaintiff was a GS-11 and subsequent to the desk audit Plaintiff remained a GS-11. Hence no action was taken. Plaintiff is unable to establish that Defendant's action in maintaining her as a GS-11 was pretextual.

4

## I. FACTUAL BACKGROUND

### The Arrival of the Permanent Chief

In May of 2004, Ms. Diane Filler was hired as the Chief of the Human Resources Division of ATF.  November 27, 2006, Deposition of Diane Filler, 11: 18-23.  Prior to that time, Mr. John Duclous was the Chief of Human Resources.  Id., 19: 9-12.  He vacated that position in January of 2004. Id.  Until the position was filled permanently there was a series of rotating acting assignments.  Id., 30: 4-12.  Ms Vivian White and Ms. Jeanarta Lee, the two assistant Human Resource Officers, took turns at being the Acting Chief.  Id.  Not long after Ms. Filler arrived, the Plaintiff approached her with concerns about the grade of her position.  Id., 21: 8-12.  A few months into her tenure, the Plaintiff asked for a desk audit.  Id., 22: 4-6; 23: 4-8.  Ms. Filler conferred with Ms. White and it was decided that a desk audit would be performed to reflect the duties expected of Plaintiff's job and to be sure that the position was properly classified.  Id., 23: 22-25; 24: 1-4; 32: 4-11.

Plaintiff had responsibility for managing and tracking financial transactions for the Division, for property inventory and training coordination.  December 15, 2005,  Diane Filler Affidavit, p. 27.

In May 2005, Ms. Debra Gunther was hired as a GS-14 Management Analyst.  December 18, 2007, Deposition of Debra Gunther, 12: 15-22; 16: 2-6.  She came from the Bureau of Engraving and Printing (BEP) where she was a GS-13.  Id., at 12: 15-22.  Ms. Gunther is a white female.  Ms. Gunther was later assigned as a Supervisory Management and Program Analyst, GS-14 in December 2005 or January 2006 as a GS-14.  Id., at 21: 9-18.  Ms. Gunther did not take over the Plaintiff's duties.  Id., 42: 14-22; 43: 1-17.  It was not until the Plaintiff left that Ms.

Gunther took on the Plaintiff's budget responsibilities.  Id.; Gunther's July 17, 2008 Deposition, 11: 22; 12: 1-21; 15:11-22.  See Position Descriptions of Debra Gunther, attached as Exhibit C. Ms. Gunther became Plaintiff's supervisor after a reorganization change.  Brigitte Hawkins 2008 Deposition 83:24.  Ms. Gunther also did a "feedback" report, when the Plaintiff left for the new manager.  Gunther's July 17, 2008 Deposition, 16-18.  This report did not go into Plaintiff's OPF file and it was not an appraisal of her work.  Id.; See Report, Exhibit D.

### Plaintiff's Request For Promotion Based Upon Accretion Of Duties

On January 26, 2005, a desk audit was performed at Plaintiff's work station.  See Exhibit. The audit was conducted by Barbara Blackwood, a contract position classification specialist in ATF's Human Resources Department ("HRD").  See November 27, 2006, deposition of diane Filler, 37: 1-4 .  Prior to Ms. Blackwood interviewing the Plaintiff, she was told by Vivian White, a management official not to interview the plaintiff's new supervisor, Diane Filler.  See Exhibit B.  This effectively denied Ms. Blackwood the ability to obtain a "full picture" of Plaintiff's duties expected and required by the new manager.  Ms. Blackwood prepared a new draft position description, without any discussion or concurrence of the manager, Ms. Diane Filler.  Id.  The draft Position Description and Evaluation Statement indicated that the position was a GS-12.  See Exhibit A.  Upon review of the draft Position Description, Ms. Filler indicated that there were duties incorporated in the draft that she did not expect of the position as well as duties that the plaintiff was not actually performing.  December 15, 2005,  Diane Filler Affidavit, p. 29.  Ms. Filler sought an understanding of how the Plaintiff interfaced with the financial system (FRED) that she utilized, she was shown financial reports and was provided copies of the reports for which Plaintiff was responsible.  Id.  Upon her review of this information, she

6

determined that most of the reports were system generated in a format that did not require the

Plaintiff to perform any analysis or prepare a written narrative.  Id.  The Plaintiff was primarily

responsible for inputting numbers into the system based on invoices received.  Id.  There were

also duties listed in the draft description that Ms. Filler did not expect Plaintiff to perform as part

of her job function.  Id.  For example,  Ms. Filler did not expect Plaintiff to coordinate and

analyze financial operations and long range plans.  Id., at p. 32.  As supervisor, Ms. Filler had the

right to comment and the new position description was not official unless she was in agreement

with it as would be indicated by her signature.  Id.

The draft Position Description was provided to Ms. Filler on February 10, 2005.  See

Exhibit A.  Ms. Filler commented on the written draft on June 21, 2005.  Ms. Filler requested

certain changes be made to the draft Position Description based upon what she knew the position

to be.  November 27, 2006, Filler Depo. 40:9-13.  It is well within management's perogative to

make assignments as they see fit.  Exhibit B.  The final Evaluation Statement indicated that the

position was still a GS-11.  Declaration of Kathryn Greene at 6.

III.    ARGUMENT

A.    Legal Standards For Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows

that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the Court must view

7

all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-moving party. <u>Anderson</u>, 477 U.S. at 255. If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." <u>Id.</u> at 249-50. Indeed, in order to withstand summary judgment, the non-moving party may not rest solely upon allegations or denials. <u>Id.</u> at 248. The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact. <u>Id.</u> at 247-48. There is no genuine issue of material fact if the relevant evidence of record, taken as a whole, indicates that a reasonable factfinder could not return a verdict for the party opposing summary judgment. <u>Id.</u> at 248. If the submitted evidence is of such a character that it would not permit a reasonable fact finder to find in favor of the non-moving party, summary judgment is appropriate. <u>Id.</u> at 251.

Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. Rather, when the movant files a properly-supported summary judgment motion, the burden shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions," "or by only a 'scintilla' of evidence." <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).

**B.    Legal Standards Applicable To Claims Of Employment Discrimination**.

The ultimate issue in an employment discrimination case is whether the plaintiff has met his or her burden of demonstrating that the adverse employment action, if discrimination, or

materially adverse consequences, if retaliation, complained of was motivated, at least in part, by intentional discrimination or retaliation. Where, as here, a plaintiff offers no direct evidence of discrimination, plaintiff may create a triable issue of discrimination or retaliation by relying on the familiar framework first enunciated by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 803-805 (1973). <u>See also</u> <u>Cones v. Shalala</u>, 199 F.3d 512, 516 (D.C. Cir. 2000).

It should be remembered, however, that at all times the burden of proof remains with the plaintiff even when the plaintiff's case is built on inferential evidence under the <u>McDonnell Douglas</u> analysis. In the summary judgment context, the central inquiry remains the evidence, or lack thereof, of discrimination or retaliation in a particular case. The Court should weigh whether the plaintiff has proof that would permit a reasonable jury to conclude that discrimination was a motivating factor for the challenged action, looking to defendant's legitimate, non-discriminatory or non-retaliatory reasons for the challenged decision and the evidence as a whole, in order to determine whether there is a need for trial. <u>See, e.g.</u>, <u>Holcomb v. Powell</u>, 433 F.3d 889, 896-97 (D.C. Cir. 2006) (quoting <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003)). <u>See also</u> <u>Brown v. Small</u>, 2006 WL 1888562 at *5 (D.D.C. July 7, 2006) (RBW) (plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment action was made for a discriminatory reason).

Under the <u>McDonnell Douglas</u> test, Plaintiff has the initial burden of proving by a preponderance of the evidence a <u>prima facie</u> case of discrimination. <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981). If the Plaintiff is able to establish a <u>prima facie</u> case, then the Court should weigh Defendant's legitimate, nondiscriminatory reason or reasons

9

with any evidence plaintiff presents that defendant's stated reason merely was a pretext for discrimination.  Id.  At all times, plaintiff retains the ultimate burden of persuasion to demonstrate that she was in fact the victim of intentional discrimination or retaliation.  Burdine, 450 U.S. at 252-53.

Before turning to the merits, a brief word is in order concerning the scope of review in employment discrimination cases.  Though Plaintiff might wish it otherwise, the employment discrimination statutes did not transform federal courts into review boards for local employment decisions.  "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'"  Barbour v. Browner 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986).  To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"  Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).  See also Barnette v. Chertoff, 453 F.3d 513, 517-18 (D.C. Cir. 2006).

### C.    Plaintiff Fails To Establish Discrimination With Respect To Her Accretion Of Duties Promotion Claim.

Plaintiff fails to establish race discrimination under Title VII, because she is unable to adduce evidence showing that Defendants' legitimate non-discriminatory reasons for not promoting her are pretextual, or that a reasonable jury could conclude from all of the evidence that the decision was made for a discriminatory reason.  See Holcomb, 433 F.3d at 897.

A desk audit is basically a data gathering event and is one aspect of the classification process.  A desk audit is performed when a position may have changed, a position is vacant for a

10

while, management wants to examine whether the position description is still accurate, or management wants to determine whether to change the position from one occupational series to another or change the grade level.  Declaration of Kathryn Greene, at 1.

More specifically, when management requests a desk audit, the auditor interviews an employee to determine what actual duties the employee is currently performing and the employee is permitted to offer work samples; future duties are not taken into account.   During the audit process, an auditor confers with managers to verify what the employee does and to verify whether the work the employee alleges she performs is indeed assigned to the employee. Management has the right to review the final product and state whether duties were assigned to the position or not as management has the right to assign work or limit the work assigned under a position description.  Management has the discretion to say whether or not duties are and were assigned to an employee.  The desk audit does not preempt management's right to assign work as it sees fit.  Accordingly, if a manager disagrees with the duties the employee alleges she performs, management has the right to assign or not assign those duties in its discretion.   The auditor is to explain to the employee that there is no guarantee as to the outcome of a desk audit; it can result in no change of grade or series, demotion, promotion, or change in series, and management can open up a position for competition.  Id., at 2.

Although at the beginning of the process, Ms. Filler was newly appointed to be the Director of Human Resources, she was well within her role as manager to determine the full scope of the plaintiff's position.  Id., at 4.  In the normal course of business, even if a manager is new, a manager would not have been excluded from the desk audit process.  Id., at 5.  This situation happened because of that exclusion and not because of discrimination.  It is highly

11

unusual for a recommendation to be made by an auditor before management is consulted as to the

duties that should be assigned.  Greene Declaration, at 3.  Barbara Blackwell will admit to

deviating from her normal protocol because she did not conduct the supervisory audit at the time

that she spoke to the Plaintiff.  Blackwood, May 7, 2008 Declaration at 5.

A desk audit is not considered an official document until a supervisor certifies that she/he

is in agreement with the duties delineated in the draft position description.  Id.  Thus, the draft

Position Description was not the final document and at that point no decision had been made.

After Ms. Filler's conversations with both the Plaintiff and Ms. Blackwood, the Position

description was re-drafted to more accurately delineate the functions assigned to the Plaintiff's

position.  December 15, 2005, Filler Declaration at p. 32 - 33.  Ms. Filler did not take away any

duties that the Plaintiff was performing in accordance with the functions properly assigned to her

position.  Id., at 34.  Ms. Filler was not wrong in asking questions of the classifier and employee,

and in disagreeing with the duties assigned to the employee.  Greene Declaration at 6.  The desk

audit does not preempt management's right to assign work as it sees fit.  Id., at 2.  Accordingly,

Ms. Filler remained within her managerial discretion to make the ultimate determination as to

what duties to assign.  Id., at 4 & 6.  The auditor is to explain to the employee that there is no

guarantee as to the outcome of a desk audit, it can result in no change of grade or series,

demotion, promotion, change in series, or management can open up a position for competition.

Id., at 2.

Plaintiff's non-promotion claim rests solely on her own speculation that her supervisor

discriminated against her because of her race.   However, there is no evidence that Ms. Filler's

role as manager was tainted by discriminatory animus.  Management has the right to assign or

limit the work assigned as he or she sees fit.  Greene Declaration, at 2.  Diane Filler was well

within her role as manager to determine the full scope of Plaintiff's position.  Id., at 3.

The only relevant and material inquiry is whether the classification decision was

motivated by a prohibited factor.  See e.g.  Kulumani v. Blue Cross-Blue Shield Assn., 224 F.3d

681 (7th Cir. 2000).  The Supreme Court has used words like "mendacity" and "dissembling" to

describe pretext.  See Reeves v. Sanderson Plumbing Products, Inc., 550 U.S. 133, 147 (2000);

St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).  These words are indicative of deceit

or a cover-up.  Such "pretext" is not demonstrated by any facts in this case.  Plaintiff's reliance

on speculation and guesswork is not enough to create a genuine dispute of material fact.

See Schumann v. O'Keefe, 314 F.Supp.2d 515, 529 (D.Md. 2004) ("Schamann's own statements

as to the duties he had accreted . . . are insufficient to create a material factual dispute").

In sum, there is no evidence to suggest that race was a factor in determining that

Plaintiff's position did not qualify for a GS-12 grade, and Plaintiff cannot "show that a

reasonable jury could conclude from all of the evidence that this determination was made for a

discriminatory reason."  Holcomb v. Powell, supra, 433 F.3d 889 (D.C. Cir. 2006).

## CONCLUSION

Based upon the foregoing, Defendant respectfully requests that the Court grant it

judgment on all claims herein and dismiss Plaintiff's complaint with prejudice.

Respectfully submitted,

/s/

_____

JEFFREY A. TAYLOR, DC Bar #498610

13

United States Attorney


                    /s/
_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

                    /s/
_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-1334

14

## EXHIBIT A

### AFFIDAVIT

DISTRICT OF COLUMBIA

CITY OF WASHINGTON

I, BARBARA BLACKWOOD (African American), Contractor, Personnel Division, Office of Management, Bureau of Alcohol, Tobacco, Firearms and Explosives, make the following statement to Larry Brantley who has identified himself to me as an EEO Contract Investigator for ATF, investigating the discrimination complaint filed by Brigitte Hawkins, knowing this statement may be used in evidence. I understand that this statement is not confidential and may be shown to any interested party. I hereby solemnly swear:

Q1: What is your full name and race?

A1: Barbara Blackwood. I am African American.

Q2: Identify your current position.

A2: I am a contract employee working in the ATF Personnel Division.

Q3: When did you take on the duties of the above position?

A3: March 2002

Q4: Who do you report to?

A4: Helen Oates, Assistant Chief of the Personnel Division. When I first reported I reported to Vivian White who was in the position at the time.

Q5: The Complainant has alleged that she was discriminated against based on her race when on May 27, 2005 she was not promoted to a GS-12 Management Analyst as a result of a desk audit. What was your role in conducting the desk audit?

1 of 11

42

<u>*BB*</u>
Initials

## EXHIBIT A

A5:   I was responsible for conducting the desk audit in its entirety.

Q6:   Who requested the desk audit and under what circumstances?

A6:   Vivian White who was the Assistant Chief at the time, asked me to conduct the desk audit in October 2004. She is no longer with ATF.

Q7:   Did she indicate to you that she had any conversations with others who were involved in requesting the audit?

A7:   She did not and I did not ask for that information. She did tell me that in conducting the audit I would not need to contact Diane Filler, the Division Chief and the Complainant's supervisor, because she was new at the time and would not be of much help since she did not know the duties and responsibilities involved.

Q8:   What background experience did you have in performing desk audits and classification?

A8:   I have 20 years of government experience in classification.

Q9:   Did Ms. White give you a reason for conducting the desk audit?

A9:   Only that she and Ms. Filler were not certain what duties and responsibilities the Complainant was performing.


Initials

43

## EXHIBIT A

Q10: Did you have any conversations with the Complainant prior to Ms. White's request about a desk audit? If so, what did you discuss?

A10: No.

Q11: Did you at any time compare her position to a GS-13 Management Analyst position in the Office of Management? If so what was the result of the comparison?

A11: I did not look at a GS-0343-13 Position Description to make any such comparison with the Complainant's position or Position Description. In conducting the audit, I was only concerned with the duties the Complainant was performing.

Q12: Describe the process you used in conducting the desk audit.

A12: I contacted the Complainant in October of 2004 soon after the request. I asked her to give me a draft Position Description that would show the duties and responsibilities she was performing that were not in her current position description. She did not respond to this request until December 29, 2004 and at the time just provided me a list of the additional duties. I then set up a time to meet with her to discuss her duties and to see samples of her work. This took place on January 26, 2005. I made notes of the meeting and I



Initials

14

## EXHIBIT A

am providing a copy of my notes to the Investigator. I used my notes, her current Position Description and the list of duties that the Complainant gave me to develop a draft position description. I submitted this draft to the Complainant(without indicating the grade) to see if she agreed with the new draft. On February 10, 2005, I gave Ms. Filler documents resulting from the desk audit.   The documents included a new draft position description; evaluation of the position description with the final grade determination; a copy of the Complainant's current position; and a new cover sheet for Ms. Filler's signature if she was in agreement with the new position description. The draft Position Description and Evaluation Statement I gave to Ms. Filler indicated that the position was a GS-0343-12. I told Ms. Filler that I did not interview her because Ms. White told me not to, but as supervisor, she could still comment and the position description was not official unless she was in agreement with it as would be indicated by her signature in block 20 (Supervisory Certification)on the cover sheet. I did not hear anything from Ms. Filler until I sent her an email on June 21, 2005 telling her I was going on vacation and I asked her if she wanted to discuss the audit. She

Initials

## EXHIBIT A

returned the email asking me to meet with her later that day.

Q13: Did you know anything about a May 27, 2005 meeting that the Complainant had with Ms. Filler or any other discussions the two may have had during this period?

A13: I did not have any information about such meetings.

Q14: What occurred in the June 21, 2005 meeting and afterward in terms of the desk audit process?

A14: In the June 21 meeting Ms. Filler and I went over the draft Position Description line by line and I made notes based on her comments and questions. Ms. Filler said that she did not understand the grade 12 level because the only difference between the current duties and the draft that she saw were her responsibilities related to the FRED Financial automated system. Ms. Filler also stated that the Complainant did not generate reports as stated in the new position description. I told Ms. Filler that in the audit the Complainant showed me copies of reports she generated from the FRED Financial System. Ms. Filler asked me specific questions about the Complainant's work that I could not answer so I suggested that she talk to the Complainant because she could clearly answer questions and show Ms. Filler what she was doing. I told Ms. Filler that in evaluating the position it was not any



Initials

EXHIBIT A

one thing added to the position description, it was the evaluation of the information in the nine classification factors that determined the grade. As a result of the audit and the information I was provided, I identified additional knowledge required to perform the work. The additional knowledge, complexity of the assignments and guidelines used did have an impact on the grade which I determined to be a GS-12. On June 23, 2005 I emailed the changes Ms. Filler requested on a new draft of the Position Description. I took out wording that Ms. Filler wanted out. I did not at this time do a new evaluation statement but it was evident to me that the things she actually took out would impact the grade. The position still classified as a GS-0343, but I did not give it a grade because I wanted to be sure Ms. Filler was satisfied with the changes she made; so it was not a final product. On July 13, 2005 I sent Ms. Filler another copy of the revised Position Description with the changes she requested. On July 18, Ms. Filler sent me a version of the Position Description with more changes that she wanted to make. These new changes diluted the duties pertaining to the budget. She told me that her rationale for this was that the Complainant received interpretations and guidance for these activities from

B.B.
Initials

## EXHIBIT A

the Financial Management Division and that she does not make these decisions. The duties/activities that Ms. Filler took out impacted not only the grade but the title and series as well. She took out statements regarding independent judgment and decision making about the budget and other administrative responsibilities. The new changes indicated that the Complainant did not perform studies to evaluate and recommend ways to improve the effectiveness and efficiency of work operations; did not project budget requirements and prepare justifications; did not take necessary action to reprogram funds following managerial approval. These changes took the position out of the GS-0343 series making it more in line with a GS-0301. I made these changes and prepared a new classification evaluation statement which resulted in the position being classified as a GS-0301-11. The final version was emailed to Ms. Filler on August 2, 2005.

Q15: What guidelines did you use in conducting the audit?

A15: The desk audit was conducted in accordance with the Principles and Policies of Position Classification (part of the Classifier's Handbook). The classification standards used, based upon the work of the position audited, were the Classification Standard for

48


Initials

## EXHIBIT A

Miscellaneous Administration and Program Series, GS-301; the Job Family Position Classification Standard for Professional and Administrative Work in the Accounting and Budget Group; and the Administrative Analysis Grade Evaluation Guide.

Q16: What was the product of your desk audit?

A16: The product is the position description which is technically a draft until the supervisor certifies it as an accurate statement of the major duties and responsibilities of the position and the evaluation statement.

Q17: What was your understanding about the promotion potential under the Complainant's current Position Description?

A17: I had no understanding about any promotion potential. If a position has promotion potential it is noted on the coversheet of the position and an incumbent can be automatically promoted if the supervisor feels that the duties of that position are being performed satisfactorily and the incumbent is ready to be promoted. When a position has promotion potential, there is no need for a desk audit.

Q18: When you presented your recommended classification of a GS-12 to Ms. Filler, what were her prerogatives as a manager?

49



Initials

## EXHIBIT A

A18: As the manager of record she has the right to determine the duties for the position in her organization. However, it is unusual for the supervisor to significantly modify an encumbered position when it is audited. Managers usually modify positions when they are vacant; therefore there is no adverse impact on the incumbent.

Q19: The Complainant alleges that if the GS-0301 classification was adopted for her position, it would have placed her in a dead end situation as far as promotion potential. What is your understanding about this?

A19: In the normal scheme of things, positions are established based upon the needs and requirements of the organization in which they are located. The GS-301 series is used to classify work that involves a variety of administrative duties and responsibilities. Anyone classified in this series can apply for positions in the GS-343 series based upon their experience; GS-341 series; or other GS-301 type work, depending what their experience is. However, within the Personnel Division, it is likely that she would be in a dead-ended position.

Q20: Do you have any reason to believe race was a factor in Ms. Filler's decisions related to the desk audit and



Initials

## EXHIBIT A

not promoting the Complainant? Explain why you believe this.

A20: I do not know if race was a factor. I do believe that from the beginning Ms. Filler did not feel that a promotion was warranted. I believe this because of the time lapse (4 months) before she discussed the results of the audit and classification of the position to the GS-12 level with me. It was also evident that the Complainant and Ms. Filler were not on the same page about the duties of the position. I would like to stress that supervisors don't always know everything an employee does to accomplish assigned duties and responsibilities. They don't know the judgment and initiative involved in accomplishing administrative responsibilities or the guidelines the employee uses and various steps required to perform a task. That's why I said it is unusual for duties and responsibilities to be taken away when the position is occupied.

Q21: Have you observed Ms. Filler to communicate with the Complainant differently than white personnel?

A21: I have not had the opportunity to observe them communicating with each other.

Q22: Did you do any other desk audits for Ms. Filler? If so, please identify the name of the employee involved,

10 of 11

Initials

# EXHIBIT A

race, title of the position and the result of the desk

audit.

A22: No

I HAVE READ THE ABOVE STATEMENT CONSISTING OF 11 PAGES AND IT IS TRUE AND COMPLETE TO THE BEST OF MY KNOWLEDGE AND BELIEF. I UNDERSTAND THAT THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED PARTIES.

_Barbara Blackwood_
AFFIANT'S SIGNATURE

SUBSCRIBED AND SWORN
BEFORE ME AT _ATF_
ON THIS _12_ DAY OF _December_ , 2005

District of Columbia : SS
Subscribed and Sworn to before me, in my presence,
this _12_ day of _December_ , _2005_
_Quintell J. Williams_
Notary Public, D.C.
My commission expires _May 14 2009_

_Quintell J. Williams_
WITNESS

_BB_
Initials

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIGITTE HAWKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.                                    ) | 07CA0010 (CKKK) |
| ) | |
| MICHAEL MUKASEY, ) | |
| ) | |
| DEPARTMENT OF JUSTICE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### DECLARATION OF BARBARA BLACKWOOD

I, BARBARA BLACKWOOD, hereby declare, as provided that:

1.      I worked in personnel in the federal government since 1970 at the District of

Columbia Government, Department of Human Resources, as a Position Classification

Specialist. I retired in 2001 and became an employee of McCarthy Robert Francis

Consulting ("MRF") that provides contract services to the Bureau of Alcohol, Tobacco,

Firearms, and Explosives ("ATF"). As a contract employee to ATF, I work in position

classification, staffing, and recruitment. Accordingly, I have approximately 30 years

experience in total working in position classification.

2.      In my past experience in position classification, I have performed approximately

50 to 60 desk audits. In performing such audits I typically received the employee's

current position description, information regarding organizational structure, the mission

and function of the organization, and I request a statement from the employee as to what

# EXHIBIT B

work the employee claims he/she is performing that is not in the current position description.

3.    Specifically, regarding desk audits I have performed for ATF, I have performed only three since coming on board with ATF in March 2002. Of those three desk audits, two resulted in promotion, and one resulting in the employee's grade remaining the same. The desk audit in which the person's grade remained that same was Brigitte Hawkins .

4.    Regarding Ms. Hawkin's desk audit, the Assistant Director of Personnel, Vivian White, asked me to perform an audit. In performing the desk audit, I contacted the plaintiff and asked her to provide me with a draft of her duties and responsibilities that she was performing that were not identified in her position description.

5.    Regarding the plaintiff's desk audit, I deviated from my normal protocols in performing the audit, because I did not conduct the supervisory audit at the time I spoke to the plaintiff. Typically, in performing the supervisory part of an audit I would typically speak to a supervisor to verify what an employee had told to me about the position by asking the same questions of the supervisor and employee. I did not ask those questions of the Director of Human Resources, Diane Filler, because the Assistant Director, Ms. White instructed me not to do so as the Director was new to her job. I had not previously received similar instructions with respect to any previous desk audits I had performed. I had never in my past experience of performing desk audits been instructed to perform one without supervisory input. A desk audit is not considered an official document until a supervisor certifies that he/she is in agreement with the duties delineated in a draft position description. I sought the supervisory input after the fact. In performing the plaintiff's desk audit there were classification factors I examined, most

# EXHIBIT B

notably those that carried the most weight: 1) the knowledge required by the position; 2)

the supervisory controls; 3) the scope and effect of the work; and, 4) the complexity of

the work. I made no determinations whether anyone else had ever performed the duties

and I did not talk to anyone else other than the plaintiff before talking with Diane Filler.

6.      The desk audit ultimately resulted in the plaintiff's position classification staying

the same, a GS-11, and a series change for the plaintiff's position from series 343 to

series 301. I did not consider that change to be adverse. Whether she was classified as a

301 or 343 she could still apply for the same positions because she had been a 343.

I declare under penalty of perjury that the foregoing is true and correct.

_Barbara Blackwood_    5/7/08

Barbara Blackwood        Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRIGITTE HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 07CA0010 (CKK ) |
| | ) | |
| MICHAEL MUKASEY, | ) | |
| | ) | |
| DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

DECLARATION OF KATHRYN GREENE

I, KATHRYN GREENE, hereby declare, as provided that:

1.      I am the chief of the Classification and Performance Management Branch, GS-14,
and have been in the position approximately a year and one month.  A desk audit is
basically a data gathering event and is one aspect of the classification process.  A desk
audit is performed when a position may have changed, a position is vacant for a while,
management wants to examine whether the position description is still accurate, or
management wants to determine whether to change the position from one occupational
series to another or change the grade level.

2.      More specifically, when management requests a desk audit, the auditor interviews
an employee to determine what actual duties the employee is currently performing and
the employee is permitted to offer work samples; future duties are not taken into account.
During the audit process, an auditor confers with managers to verify what the employee
does and to verify whether the work the employee alleges he performs was indeed

assigned to the employee. Management has the right to review the final product and state whether duties were assigned to the position or not as management has the right to assign work or limit the work assigned under a position description. Management has the discretion to say whether or not duties are and were assigned to an employee. The desk audit does not preempt management's right to assign work as it sees fit. Accordingly, if a manager disagrees with the duties the employee alleges he performs, management has the right to assign or not assign those duties in its discretion. The auditor is to explain to the employee that there is no guarantee as to the outcome of a desk audit, it can result in no change of grade or series, demotion, promotion, change in series, and management can open up a position for competition.

3.      I have never known a desk audit to be performed in which a position is audited and a recommendation is made by a desk auditor before management is consulted as to the duties that should be assigned.

4.      The Director of Human Resources, Diane Filler, was well within her role as manager to determine the full scope of plaintiff's position. Under the principles of management's discretion to assign work, Ms. Filler had the right to assign or not to assign work to the plaintiff's position.

5.      Although Ms. Filler was newly appointed to be the Director of Human Resources during the time relevant this matter, she was well within her role as manager to determine the full scope of the plaintiff's position. In the normal course of business, even if a manager is new, a manager would not have been excluded from the desk audit process.

6.      Ms. Filler was not wrong in asking questions of the classifier and employee, and in disagreeing with the duties assigned to the employee.  Accordingly, Ms. Filler remained within her managerial discretion to make the ultimate determination as to what duties to assign.


I declare under penalty of perjury that the foregoing is true and correct.

_____     _____
Kathryn Greene                              Date