## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRIGITTE HAWKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civ. Act. No. 07-0010 (CKK)** |
| | ) |
| **MICHAEL B. MUKASEY,** | ) |
| **ATTORNEY GENERAL DEPT. OF** | ) |
| **JUSTICE,** | ) |
| | ) |
| **Defendant** | ) |

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANT'S MOTION TO FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Now comes the Defendant, the Bureau of Alcohol, Tobacco, Firearms and Explosives

(ATF), a component of the Department of Justice, in opposition to the Plaintiff's Cross-Motion

for Summary Judgment.[1]  Plaintiff's Cross-Motion for Summary Judgment should be denied and

Defendant's Motion for Summary Judgment granted because Plaintiff has failed to show that she

was discriminated against on the basis of race when she was not promoted to a GS-12 as a result

of an accretion of duties.

Where the agency has articulated a legitimate, nondiscriminatory reason for the personnel

---

[1]  The Plaintiff designated his Pleading as a Cross-Motion for Summary Judgment and not an Opposition to the Defendant's Motion for Summary Judgment, which was filed on May 7, 2008.  In plaintiff's Cross-Motion for Summary Judgment, she did not specifically respond to the Defendant's Facts not in Genuine Dispute.  Defendant's Statement of Material Facts not in Genuine Dispute should therefore be considered as admitted.  "[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." (Emphasis added) LCvR 7(h).

action at issue, the factual inquiry proceeds directly to the third step of the McDonnell Douglas[2] analysis, the ultimate issue of whether complainant has shown by a preponderance of the evidence that the agency's actions were motivated by discrimination. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 713-714 (1983); George v. Leavitt, 407 F.3d 405, 411 (D.C. Cir. 2005) (where the employer articulated a legitimate non-discriminatory reason for its decision, the case proceeds to the ultimate question of discrimination vel non); accord, Brady v. Office of the Sargeant at Arms, No. 06-5362, slip op. at 7 (D.C. Cir. 2008).

Notably, a Defendant is not required to prove that the Agency made the wisest choice. See Davis v. State University of New York, 802 F.2d 638, 641 (2d Cir. 1986) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 258-59 (1981). In fact, Defendant "need not prove that the tendered reason actually motivated [his] behavior, as the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994); accord St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993) (holding that a complainant "at all times bears the ultimate burden of persuasion") (internal quotation marks and citations omitted). Moreover, Title VII does not authorize a federal court to become a super-personnel department that reexamines an entity's business decision. Barbour v. Browner , 181 F.3d 1342, 1346 (D.C. Cir. 1999) (internal quotation marks and citation omitted). In the instant case, Plaintiff is unable to establish that Defendant's action in maintaining her as a GS-11 was due to intentional discrimination.

---

[2] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

## II. <u>ARGUEMENT</u>

### I.  <u>ATF's Legitimate Non-Discriminatory Reason For The Challenged Personnel Decision Was Not Pretextual.</u>

Contrary to Plaintiff's assertions, Ms. Filler's actions were not "arbitrary and capricious." Rather, Ms. Filler's actions were based on her professional observations and her division's personnel needs.  Filler January 17, 2008 Deposition, pp. 35-40.  It is undisputed that Managers have the authority to assign work.  <u>See</u> 5 U.S.C. § 7106(a)(2)(B).  As part of the desk audit process, it is management's right to agree with the duties as stated or add or remove duties and responsibilities.  The results of a desk audit are not official until the manager certifies the results. Barbara Blackwood June 20, 2008 declaration, ¶ 2.  Managers must determine whether a position is properly structured to meet its intended purpose.  That is exactly what Ms. Filler did.

> "As I became more familiar with what Brigitte was doing and what I needed her to do and what I observed by way of things that she was performing, you know, with every day, I became more familiar.  In May 2004 when I arrived, I really didn't know what exactly she was doing.  By the time the desk audit was launched, I was becoming more intimately familiar with that.  In addition to that, as Barbara prepared what I considered to be the first initial draft of a position description which was some time, I gather, in February, I knew right away when I saw the duties that were described on that paper that these were not accurate for what she was doing or what I needed her to do and the kinds of assignments I would direct for her to do."

Filler January 17, 2008 Deposition, p. 35.  Ms. Hawkins admits that while she was supervised by Ms. Filler, she met with her on a daily basis.  Hawkins June 8, 2008 affidavit, ¶ 17.  It is clear that prior to finalizing Ms. Hawkins' Position Description (PD), Ms. Filler met on two to three occasions with Ms. Hawkins and asked her to describe her job duties.  Filler November 27, 2006

deposition, p. 49: 4-20.  Furthermore, Ms. Filler observed Ms. Hawkins for over four months before finalizing Ms. Hawkins' PD.  Barbara Blackwood affidavit, p. 45, Exhibit A.  It is Ms. Filler's right and responsibility to direct the work of her subordinate employees.  She needed to determine what Ms. Hawkins should be doing to perform the operations in order to fulfill the mission of the organization.  Filler January 17, 2008 deposition, p. 38.

Ms. Filler had a good faith belief that Ms. Hawkins' PD, as provided in the initial desk audit by Ms. Blackwood, did not accurately represent her job responsibilities.  An incorrect explanation for an adverse employment decision is not pretextual if there is a good faith belief in the explanation.  George v. EPA, 407 F.3d 405, 415 (D.C. Cir. 2005) ("an  employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false").  To demonstrate good-faith, the employer must have a reasonable belief in the validity of its explanation.  Id. at 415.  "Once [an] employer has articulated a non-discriminatory explanation for its action, … the issue is not the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers." Fischbach v. D.C. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotations omitted).

Ms. Filler had a good faith belief that the PD that was finally created correctly documented the duties that were necessary for Ms. Hawkins to perform successfully in the job that she occupied.  Ms. Filler reasonably believed that Ms. Hawkins did not perform some of the duties contained in Ms. Hawkins' proposed PD because she never observed Ms. Hawkins perform those tasks.  Filler January 17, 2008 Deposition, p. 30: 4-9.  For instance, the proposed PD stated that Ms. Hawkins analyzed budget operations and long range plans.  Filler January 17, 2008

4

deposition, p. 37: 7-9. "Analysis" means - "method of studying the nature of something or of determining its essential features and their relations." See Random House Unabridged Dictionary. With respect to Ms. Hawkins' job duties, Ms. Filler acknowledges that the type of "analysis" the Ms. Hawkins would be doing was limited "to determin[ing] whether the Division was short in one category and high in another" and then to consider whether monies should be moved to cover the shortfall. Filler January 17, 2008 deposition, p. 84. Ms. Hawkins was not responsible for studying the long range plans of the Personnel Division's budget. Id. That was Ms. Filler's job. Moreover, although at the time of the desk audit, Ms. Hawkins' original PD stated that she was responsible for "projecting budget requirements and preparing justifications[3] as needed", Ms. Blackwood did not consider this to be a primary responsibility because it was on an as needed basis meaning it was not a regular and recurring task. Blackwood June 20, 2008 declaration. As a result, Ms. Blackwood did not bother getting a sample of any budget justifications from Ms. Hawkins. Additionally, Ms. Hawkins was not considered a budget analyst and the responsibilities she was performing concerning the budget were basic as they related tot he needs of HRD. The budget tasks were performed in conjunction with other administrative responsibilities. Id., at ¶ 3.

During the time that Ms. Hawkins reported directly to Ms Filler, she was expected to enter financial information into the FRED financial system; timely enter requests for travel

---

[3] The term "budget justification" is defined as documents submitted in support of a budget request. The justification typically explains changes between the current appropriation and the amounts requested for the next fiscal year. Blackwood June 20, 2008 declaration. Ms. Filler indicated that if a particular budget justification is needed in her Division it would come from the branch chief or the program manager responsible for that particular program. Filler January 17, 2008 deposition, p. 95.

authorizations for HRD staff members; input receipt of goods (receivers), and run routine spending line reports reflecting division expenditures. As expenditures were made, Ms. Filler expected Ms. Hawkins to tell her the amount of money left in each of HRD's operating accounts and to alert Ms. Filler to any overages or shortages. Those were the duties that Ms. Filler needed Ms. Hawkins to perform. Those duties are now being performed by Lesa Wood, who was later competitively selected to fill Ms. Hawkins' vacated position. Filler Supplemental Declaration, dated June 20, 2008.

Neither was Ms. Filler bound by Ms. Hawkins' performance appraisal job elements. The critical elements in Ms. Hawkins' performance appraisal were not considered by Ms. Blackwood as evidence of the work that she was doing. Blackwood January 17, 2008 deposition, p. 21.

> " I talked to [Ms. Hawkins] about what she did. I showed her what I had, which was her current position description, and asked her if that was her current position description, and then I asked her to explain to me what she does. We went through the position description that she had given me, I developed another position description which was inclusive of what she was currently doing.
>     I took that document. I evaluated it, and I sent it to Ms. Filler, along with the cover sheet, which is the optional form 8, and told her that I had performed the audit, and asked for her to review what I had done."

Blackwood January 17, 2008 deposition, pp. 24-25. The results of a desk audit are not official until the manager certifies the results on the form 8. Blackwood June 20, 2008 declaration, ¶ 2.

Further, contrary to Plaintiff's claims, there is nothing nefarious in requiring an employee to seek interpretation and guidance from the Financial Management Division (FMD) on budgetary issues. The financial budgetary function itself is in FMD and according to Ms. Blackwood,

everyone would go to FMD if they had issues that they couldn't resolve within their own organization. Blackwood January 17, 2008 deposition, p. 20. In fact, Ms Filler herself frequently seeks advise from FMD. Filler January 17, 2008 deposition, p. 51.

Ms. Filler did not approach the audit backwards. She did not make any preliminary decision as far as what the grade level should be, what the organizational title should be, or what the occupational description or series should be. She only directed and documented in the position description what duties she needed the position's incumbent to perform, so that the classifier could apply the duties against the standard. Filler January 17, 2008 deposition, p. 42. Finally, for Ms. Hawkins' current assignment in the Office of Science and Technology (OST), the GS-343-12 PD covers more complex duties than the position in HRD required her to perform. See attached current PD for Brigitte Hawkins, Exhibit C.[4] This position description does not even mention the FRED financial system. See id.; and Filler June 20, 2008, Supplemental Declaration. There is no evidence here that Ms. Filler's decision was made in bad faith or for a discriminatory reason. As a result, the Defendant's Motion for Summary Judgment should be granted.

## II.    Plaintiff's Disparate Treatment Claim Should Be Dismissed Because Ms. Hawkins and Ms. Gunther were not Similarly Situated.

Employees are "similarly situated" if their experience, position type, and other qualifications are all similar. See Taylor v. Small, 350 F.3d 1286, 1295 (D.C. Cir. 2003) (employees were not similarly situated because they had different experience levels); George v. EPA, 407 F.3d 405,

---

[4] As an example, Ms. Hawkins' current PD specifies that as a Major duty she "writes budget justifications and conducts cost analysis and conducts in-depth analyses of complex proposals involving significant utilization of information technology equipment, systems and services." Her current position is in the 343 series.

415 (D.C. Cir. 2005) ("probationary employees and permanent employees are not similarly

situated"); Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981) ("plaintiff's must show that

similarly qualified nondisadvantaged employees were promoted").

In Taylor, the court held that the plaintiff and other employees were not similarly situated

because they had different experience levels. Taylor, 350 F.3d at 1289. Taylor alleged

discrimination when her employer failed to promote her from GS-11 to GS-12. The plaintiff

worked with the defendant as an Administrative Assistant (GS-7) for five years before the

defendant promoted her to a GS-11. Id. at 1289. Thereafter, the plaintiff spent five years as a

GS-11 when she sought an accretion promotion to GS-12. Id. at 1289-90. The plaintiff did not

seek a promotion into a vacant position, but instead thought her current responsibilities deserved

a higher pay grade. Id. at 1294. The plaintiff based her allegation on the fact that four Caucasian

employees were promoted to higher pay grades. Id. at 1295. However, the four Caucasian

employees' qualifications were not similar to the plaintiff's because "three were archivists who

had spent over ten years in grade GS-11 before [the defendant] promoted them." Id. Also, "the

fourth employee was a supervisory archivist in a career ladder position GS-11/GS-12." Id. The

plaintiff in Taylor could not survive summary judgment because she fell "far short of showing

that [the defendant] promoted other employees of similar qualifications." Id.

Ms. Hawkins and Ms. Gunther were not similarly situated. Ms. Hawkins was a Management

Analyst, GS-11. Hawkins November 29, 2005 Affidavit, p. 1. Ms. Gunther was a GS-15. Filler

January 17, 2008 deposition, p. 20: 1. Additionally, Ms. Hawkins and Ms. Gunther had different

education and experience levels. See Exhibit 9. Furthermore, as mentioned above, they each had

different job responsibilities. "When Debbie [Gunther] first joined [the] organization, she had

8

nothing to do with anything financial. . .She . . .helped pull together PowerPoint presentations. She was responding to audit requests. . . .as a [GS-14] analyst, she did a lot of reporting for me, presentations.  We had just undergone an audit, so she was doing some analysis on our internal audit of our operations, so she was pulling together information in that regard, but she didn't do anything about property.  She was not responsible for anything financial.  That didn't occur until after she took responsibility for the human resources support staff during the reorganization." Filler January 17, 2008 deposition, p. 25 - 26.  During the time that Ms. Hawkins was supervised by Ms. Gunther, Ms. Gunther did not do any work on the budget.  Gunther January 17, 2008 deposition, p. 15.

Ms. Hawkins once reported to Ms. Yvette Ross.  When Ms. Ross retired from the ATF in January 2004 , Ms. Hawkins reported directly to Mr. Duclos, who at that time was the Chief of Personnel.  Filler June 20, 2008 declaration; Ross Affidavit attached to Plaintiff's Cross-Motion for summary Judgment.  Ms. Filler eventually replaced Mr. Duclos.  Ms. Blackwood in conducting the desk audit in the instant matter did not determine whether or not any of the duties performed by Ms. Hawkins had been performed by anyone else in the past, such as Ms. Ross. Such a determination was not germane to the auditing process.  Blackwood January 17, 2008 deposition, p. 28.

Ms. Ross, prior to her retirement, was performing a plethora of duties.  See Declaration of John Duclos.  Ms. Gunther is now performing a subset of the duties that Ms. Ross once performed, particularly as it relates to financial accounting, training coordination, property inventory and general administrative support that was needed division-wide.  Diane Filler Supplemental Declaration, dated June 20, 2008.  Ms. Hawkins a GS-11, once reported to Ms.

Ross, a GS-14.  In December 2005, after the Division's reorganization, Ms. Hawkins then reported to Ms. Gunther, also a GS-14.  Accordingly, Plaintiff has failed to demonstrate that similarly-situated employees outside her protected class were treated in anyway preferentially as compared to herself.

**III.      Ms. Hawkins was not Constructively Demoted**

Ms. Hawkins was not constructively demoted because her position was never reclassified as a GS-12.  Ms. Blackwood's initial PD was just a draft.  The final PD did not become effective until after Ms. Filler signed off.  The position remained as a GS-11.  To constitute constructive demotion an employee must be in a position that was classified at a lower grade as a result of an error in the classification and the position is then reclassified at a higher grade and awarded to a different employee.   Hogan v. Department of the Navy, 218 F.3d 1361, 1366 (Fed. Cir. 2000) ("definition of constructive demotion comprises only instances where a position has been upgraded to correct an error, not those in which an agency has added new duties to the position"). "An employee's argument that his position 'should have been reclassified' does not give rise to a constructive demotion claim."  Manlogon v. EPA, 87 M.S.P.R. 653 (2001) (quoting Hogan v. Department of the Navy, 218 F.3d 1361, 1366 (Fed. Cir. 2000)).

Ms. Hawkins was not constructively demoted because her position with the Personnel Division was never reclassified.  The position remained as a GS-11.  Currently, Lesa Woods, a GS-0301-11, performs Ms. Hawkins' previous duties.  Filler January 17, 2008 deposition, p. 27: 16.

**IV.    CONCLUSION**

For the foregoing reasons, the Plaintiff requests that this Court grant the Defendant's

10

Motion for Summary Judgment and deny the Plaintiff's Cross-Motion for Summary Judgment.

Respectfully submitted,

/s/
_____

JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney

/s/
_____

RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney

/s/
_____

HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 305-1334

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **BRIGITTE HAWKINS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Civ. Act. No. 07-0010 (CKK)** |
| | ) |
| **MICHAEL B. MUKASEY,** | ) |
| **ATTORNEY GENERAL DEPT. OF** | ) |
| **JUSTICE,** | ) |
| | ) |
| **Defendant** | ) |

**DEFENDANT'S RESPONSE TO**
**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

1. The first sentence is admitted to the extent that the agency hired Hawkins in November 2002 into a GS-343-11 management analyst position in the Personnel Division of BATF. See Plaintiff's Exhibit R, p. 54. The second sentence is disputed because the Defendant lacks sufficient knowledge or information of the budget duties assumed by Ms. Hawkins between 2002 and 2004.

2. The first sentence is disputed because the Defendant lacks sufficient knowledge or information of Ms. Hawkins' budget duties between 2002 and 2004. The second sentence is admitted to the extent that Ms. Hawkins' received an outstanding in the performance of her job duties. See Plaintiff's Exhibit V. The third sentence is undisputed.

3. Admit to the extent that much of the financial management of BATF's budget was conducted on FRED. See Plaintiff's Exhibit A, ¶ 21.

4. Undisputed.

5. The manual speaks for itself and no further answer to paragraph 5 is required. See Plaintiff's Exhibit Y.

6. The manual speaks for itself and no further answer to paragraph 6 is required. See Plaintiff's Exhibit Y.

7. Undisputed.

8. Admit to the extent that the "use of automation does not change the primary purpose of the work" and "knowledge of the principles, practices, and processes of the respective

occupation remains the paramount knowledge requirement." See Plaintiff's Exhibit X, p. 23.

9.  Admit to the extent that Ms. Filler was not adept with the FReD system when she became Chief of Personnel. See Plaintiff's Exhibit A, ¶ 18.

10. Disputed. Ms. Filler performed budget responsibilities in previous positions. See Filler November 27, 2006 deposition, p.13. Also, as Chief of Personnel, Ms. Filler's budget responsibilities were not limited to just ensuring the division did not overspend. See Plaintiff's Exhibit O, p. 12-14.

11. Disputed. The performance standards provide performance ratings for a list of productivity factors. See Plaintiff's Exhibit W, p. 6. However, the performance standards do not require Ms. Hawkins to perform any tasks. See id.

12. Disputed. One purpose of a desk audit is to determine whether the current duties of an employee are properly classified. See Plaintiff's Exhibit G, ¶ 2,3,5,6,7. Filler did not change the results of the desk audit until she had the opportunity to work with Ms. Hawkins for more than four months. See Plaintiff's Exhibit P, p. 47.

13. Ms. Filler used her twenty-four years of experience in human resources and her observation of Ms. Hawkins' duties to determine that a GS-343-12 was not the correct grade for Ms. Hawkins' position. See Plaintiff's Exhibit O, p. 43.

14. Dispute the first and third sentence. See PACER DKT. # 37, p. 9. Plaintiff's Exhibit A speaks for itself. No further answer to paragraph 14 is required.

15. Undisputed.

16. Admit but only to the extent that Ms. Blackwood deviated from her usual procedures by not consulting Ms. Filler prior to submitting her initial draft of Ms. Hawkins' desk audit. See Plaintiff's Exhibit M, p. 22-23.

17. Disputed. Ms. Blackwood did not receive documentary proof for all of Ms. Hawkins' duties. See Plaintiff's Exhibit C, p. 3-4.

18. Admit to the extent that Ms. Blackwood did assert that Ms. Hawkins did things "such as the supplies or she was involved in the moves, [and] furniture." See Plaintiff's Exhibit M, p. 29.

19. Disputed. This paragraph consists of Ms. Hawkins' contentions and arguments. Ms. Filler avers that Ms. Hawkins was not properly classified. See filler November 27, 2006

2

deposition, p. 53.

20. The first sentence is disputed.  Ms. Filler spoke to Ms. Hawkins and Ms. Blackwood before finalizing the desk audit.  Filler January 17, 2008 deposition, p. 30.  The second sentence is undisputed.  The third sentence is admitted to the extent that Ms. Filler told Ms. Hawkins that her position was not a GS-12.  See Plaintiff's Exhibit A, ¶ 18.

21. Admit to the extent that Ms. Filler was concerned because the desk audit misclassified Ms. Hawkins' position as a GS-12.  See Plaintiff's Exhibit R, p. 48.

22. Disputed. Ms. Filler never refused to discuss her reasons for changing Ms. Hawkins' position description ("PD").  See Plaintiff's Exhibit M, p. 10.

23. Admit only that Ms. Filler met with Ms. Blackwood twice and Ms. Filler re-described certain duties in Ms. Hawkins' position description.  See Filler January 17, 2008 deposition, p. 45.

24. Dispute.  Ms. Filler's future expectations were not her only criteria for modifying Ms. Hawkins' PD.  See Filler November 27, 2006 deposition, p. 41.

25. Undisputed.

26. Disputed.  Ms. Filler was surprised when Ms. Hawkins' series changed to a 301.  See Filler December 15, 2005 Affidavit, p. 12.

27. Disputed.  The performance standards contract only applied to how Ms. Hawkins' performance would be rated in her prior GS-0343-11 position.  See Plaintiff's Exhibit W, p.6.

28. Disputed.  The performance standards provided a standard for how to rate Ms. Hawkins' productivity, but they did not create duty requirements.  See Plaintiff's Exhibit W, p. 7.

29. Disputed.  The performance standards provided a standard for how to rate Ms. Hawkins' productivity, but they did not create duty requirements.  See Plaintiff's Exhibit W, p. 7.

30. Admit to the extent that Ms. Filler required Ms. Hawkins to seek direction from the FMD for budget analysis.  See Blackwood January 17, 2008 deposition, p. 19.

31. Disputed.  Barbara Blackwood stated that she never experienced a supervisor change a PD after an audit was completed.  See Plaintiff's Exhibit R, p. 65.  Kathryn Greene stated that she has experienced a supervisor change a PD during an audit.  Greene January 17, 2008, deposition, p. 27.  These statements are essentially the same because the audit is not official until the supervisor certifies the results.  Blackwood June 20, 2008

3

declaration, ¶ 2.  In the instant case, Ms. Hawkins' audit was not official until Ms. Filler certified the results.

32. Admit only that Ms. Filler gave Ms. Gunther the responsibility for overseeing the budget. See Filler December 18, 2007 deposition, p. 35

33. Disputed.  Ms. Filler did not give any of Ms. Hawkins' duties to Ms. Gunther.  See Filler November 27, 2006, deposition, p. 72.  Instead, Ms. Gunther was Ms. Hawkins' supervisor and she oversaw the budget.  Id.

34. Admit but only to the extent that Ms. Filler told Ms. Blackwood that Ms. Hawkins would not perform certain management analyst duties related to the budget.  See Plaintiff's Exhibit R, p. 54-55.

35. The first sentence is disputed because it consists of Ms. Hawkins' contentions and arguments.  For the second sentence, admit only that after Ms. Hawkins' desk audit Ms. Gunther wrote a close out memo indicating that Ms. Hawkins' budget analysis caused the division to return money to OM that the division needed.  See Plaintiff's Exhibit T, p. 2.

36. Admit only that Ms. Hawkins' position was reclassified as a GS-301 management support specialist.  This was not an adverse action.  Blackwood January 17, 2008 deposition, p. 12.  The 343 series is not a higher standard than the 301 series.  They are both professional series.  To be in the 301 series is not adverse in terms of comparing it to the 343 series.  There are 301s that can perform budgetary type duties.  It is a position series that is involved in conducting analytical studies.  Blackwood January 17, 2008 deposition, p. 45, 47, 52, 57.

37. The first sentence is undisputed.  The second sentence is disputed because Ms. Filler communicated with Ms. Blackwood at least two and perhaps three times during the audit. See Filler November 27, 2006, deposition, p. 38.

38. The first sentence is admitted to the extent that Ms. Gunther was told that she would have oversight of the budget.  See Plaintiff's Exhibit F, p. 15. The second sentence is admitted to the extent that Ms. Filler was unaware of any budget experience or training in Ms. Gunther's background.  See Plaintiff's Exhibit P, p. 70.

39. The first sentence is disputed.  Ms. Gunther had budget duties when she arrived at her new position.  See Plaintiff's Exhibit F, p. 15.  Admit the second sentence only to the extent that Ms. Gunther was unfamiliar with the FRED system.  See id.

40. The first sentence is undisputed.  The second sentence is disputed because the Defendant does not have knowledge or information of the budget duties Ms. Hawkins performed before Ms. Filler arrival.

41. Admit to the extent that as the result of a Division reorganization, Ms. Gunther a GS-14 was given supervisory responsibilities of a support unit.  See Filler December 18, 2007 deposition, p. 11-12.

42. Disputed.  Ms. Filler assigned budget oversight responsibilities to Ms. Gunther.  See id. at 13.

43. Admit only that Ms. Gunther, as support supervisor, coordinated training and oversaw space moves.  See Plaintiff's Exhibit B, p. 7.

44. Undisputed.

45. The first sentence is admitted to the extent that Ms. Filler placed a mandate in Ms. Hawkins' position description which required her to seek guidance and counseling from the Financial Management Division (FMD) relative to complex budget issues.  See Plaintiff's Exhibit M, p. 20-21.  The second sentence is disputed.  See id.

46. Admit only to the extent that Ms. Hawkins continued to perform her budget responsibilities and Ms. Gunther oversaw those responsibilities.  See Plaintiff's Exhibit F, p. 33.

47. Admit only to the extent that Ms. Gunther did not feel comfortable approving Ms. Hawkins' work until she had more budget training.  See Plaintiff's Exhibit F, p. 34-35.

48. The first sentence is admitted to the extent that Ms. Filler was unaware of Ms. Gunther's previous budget experience.  See Plaintiff's Exhibit P, p. 73.  The second sentence is undisputed.

49. Disputed.  Ms. Gunther was responsible for overseeing Ms. Hawkins' budget duties. See Plaintiff's Exhibit F, p. 33.

50. Undisputed.

51. The first sentence is undisputed.  The second sentence is disputed because the Defendant lacks sufficient knowledge or information about Ms. Hawkins' duties at the Information Services Division.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 4TH Street, N.W. Rm. E-4808
Washington, D.C. 20530
(202) 305-1334

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIGITTE HAWKINS,                              )
                                               )
                Plaintiff,                     )
                                               )
v.                                             )        07CA0010 (CKKK)
                                               )
MICHAEL MUKASEY,                               )
                                               )
DEPARTMENT OF JUSTICE,                         )
                                               )
                Defendant.                     )
                                               )

## DECLARATION OF BARBARA BLACKWOOD

I, BARBARA BLACKWOOD, hereby declare, as provided that:

1.  The term "budget justification" is defined as documents submitted in support of a
    budget request. The justification typically explains changes between the current
    appropriation and the amounts requested for the next fiscal year. (This definition
    was found in a GAO publication - Glossary of Terms Used in the Federal Budget
    Process. GAO-05-734SP dated September, 2005).

2.  It is within management's discretion to assign work. As part of the desk audit
    process it is management's right to agree with the duties as stated or add or
    remove duties and responsibilities. The results of a desk audit are not official
    until the manager certifies the results.

3.  At the time of Ms. Hawkins desk audit, she was responsible for "projecting
    budget requirements and preparing justifications as needed." This was not
    considered a primary responsibility because it was on an as needed basis meaning

it was not a regular and recurring task and I did not get a sample of any budget

justifications. Also it should be noted that Ms. Hawkins was not considered a

budget analyst and the responsibilities she was performing concerning the budget

were basic as they related to the needs of the HR Division. The budget tasks were

performed in conjunction with other  administrative responsibilities.

I declare under penalty of perjury that the foregoing is true and correct.

_Barbara Blackwood_    _6/20/08_
Barbara Blackwood              Date

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIGITTE HAWKINS, )<br><br>Plaintiff, )<br><br>v. )<br><br>MICHAEL MUKASEY, )<br><br>DEPARTMENT OF JUSTICE, )<br><br>Defendant. ) | 07CA0010 (CKKK) |

## DECLARATION OF John Duclos

I, JOHN DUCLOS, hereby declare, as provided that:

1.      I am currently a private consultant working under contract to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  Between the years 2000 and 2004, I was the Chief of ATF's Personnel Division.

2. Ms. Yvette Ross worked for me as Chief, Policy, Planning and Special Projects Branch, GS-201-14.  Her duties were as follows: Functioned as the Division's chief of staff. In that branch level supervisory role, she was responsible for directing, overseeing and monitoring policy development, training, property and equipment management, budget, awards, and space management.  Other assignments included coordinating responses to Congressional inquiries, office inspections by the Office of Professional Responsibility and Security Operations, Freedom of Information Act and other external data requests, and other special or ad hoc projects (e.g., internal realignments) requiring the researching and assembling of materials and historical information, preparing briefing

materials, including reports and PowerPoint presentations, for my use in briefing higher level management. As the primary staff resource in the Division, Ms. Ross functioned as my primary troubleshooter for the many issues that arose during any given day. This included coordinating with all aspects and individuals involved with the human resources organization and functioning as a liaison with customers and other management officials to resolve complaints and concerns. Ms. Ross supervised a small staff composed of one or more human resource specialists (GS-13 level) and a management analyst (GS-9/11).

I declare under penalty of perjury that the foregoing is true and correct.

John G. Duclos                    Date 6/19/2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BRIGITTE HAWKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    07CA0010 (CKKK) |
| | ) |
| MICHAEL MUKASEY, | ) |
| | ) |
| DEPARTMENT OF JUSTICE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>DECLARATION OF DIANE FILLER</u>

I, DIANE FILLER, hereby declare, as provided that:

     In December 2005, I effectuated the new Human Resources Division structure. This structure was recommended by an outside contractor by the name of LMI. Based upon one of LMI's management models, I opted to create a support section within the HR Division. I transferred Ms. Debbie Gunther into that position in late December 2005 or early January 2006. Ms. Gunther was then and is now a GS-14. Prior to my reporting to ATF in May 2004, I believe the former Chief, John Duclos, had two Assistant Human Resources Officers as well as a Chief, of what was then called the Policy and Special Programs Branch. The Chief of the Policy and Special programs Branch was Yvette Ross.

     I have reviewed the Declaration of John Duclos, the former Chief of Personnel. He was my predecessor. Brigitte Hawkins reported to the Chief, Policy and Special Programs Branch, which was Yvette Ross. When Ms. Ross left ATF, Ms Hawkins reported to Mr. Duclos, the Chief of Personnel or the Acting Chief of Personnel after Mr. Duclos retired. Upon my arrival in May 2004, the Chief, of the Policy and Special Programs Branch position was vacant, and for the interim, Brigitte was a direct report to me. The position of Chief, Policy and Special Programs remained unfilled until I effectuated the Human Resources reorganization in December 2005. Under my structure, I divided the "policy" from the "special program" operations. The "policy" portion became "Policy and Human Capital Planning Branch" with responsibility for preparing Human Resources related policies and directives, as well as supporting the Human Capital Plan and other Presidents Management's initiatives. The "special program" portion became the "Human Resources Support Staff" with responsibility for division

financial accounting, training coordination, property inventory, and general administrative support that was needed division-wide. Thus, Ms. Gunther is now performing a subset of the duties that Ms. Ross once performed. Brigette Hawkins reported to Ms. Ross (GS-14) and after my reorganization, was reporting to Ms. Gunther (GS-14).

During the time when Brigitte reported directly to me from May 2004 until about December 2005, I expected her to enter financial information into the FRED financial system. I expected her to timely enter requests for travel authorizations for HRD staff members, input receipt of goods (receivers), and run routine spending line reports reflecting division expenditures. As expenditures were made, I expected her to tell me the amount of money left in each of our operating accounts and to alert me to any overages or shortages. Those are the duties I needed for her to perform. Those duties are now being performed in that same way by Lesa Wood, who was competitively selected as the GS-301-9/11 in the Human Resources Support Staff.

Brigitte Hawkins had brought to me samples of other position descriptions other employees were assigned to, who also had the responsibility of using FRED in their position. I reviewed those positions descriptions as well as the one Brigitte is currently assigned to, 98-262, and those descriptions do not nor did not fit the duties and responsibilities I needed her to perform in her position in the Human Resources Division. In fact, for her current assignment in OST, the GS-12 position description covers more complex duties she is required to perform (and does not even mention the FRED financial system). Again, those are not duties I expected or needed her to perform while working in the Human Resources Division.

Declaration of Diane Filler (cont'd)

I declare under penalty of perjury that the foregoing is true and correct.

_____   6/20/08
Diane Filler                                      Date

Exhibit C

## POSITION DESCRIPTION *(Please Read Instructions on the Back)*

| | | |
|---|---|---|
| 1. Agency Position No. | | 98-262 |
| 6. OPM Certification No. | | |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station |
|---|---|---|---|
| ☐ Redescription  [X] New | [X] Hdqrts.  ☐ Field | Washington, D.C. | Washington, DC |
| ☐ Reestablishment  ☐ Other | | | |

· ion (Show any positions replaced)

| 7. Fair Labor Standards Act | 9. Financial Statements Required | | 8. Subject to IA Action |
|---|---|---|---|
| [X] Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interests | | [X] Yes  ☐ No |
| 10. Position Status | 11. Position Is: | 12. Sensitivity | 13. Competitive Level Code |
| [X] Competitive | ☐ Supervisory | ☐ 1. Non Sensitive  ☐ 3. Critical Sensitive | 0000 |
| ☐ Excepted *(Specify in Remarks)* | ☐ Managerial | | 14. Agency Use |
| ☐ SES (Gen.)  ☐ SES (CR) | [X] Neither | ⊠ 4. Non-critical Sensitive  ☐ 4. Special Sensitive | 8888 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | Management Analyst | GS | 343 | 12 | *[signature]* | 26 Aug 98 |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position (if different from official title) | 17. Name of Employee (if vacant, specify) |
|---|---|
| | |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| Department of the Treasury | Information Services Division |
| a. First Subdivision | d. Fourth Subdivision |
| Bureau of Alcohol, Tobacco and Firearms | |
| b. Second Subdivision | e. Fifth Subdivision |
| Office of Science and Technology | |

Signature of Employee (optional)

·ployee Review—This is an accurate description of the major duties and responsibilities of my position.

| 20. Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* | knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations. |
|---|---|
| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager (optional) |
| Laurence R. Jurcich  Chief, Information Services Division | |
| Signature                  Date | Signature                  Date |
| *[signature]*            8/24/98 | |

| 21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.* | 22. Position Classification Standards Used in Classifying/Grading Position |
|---|---|
| | OPM PCS Management and Program Analysis Series, GS-343, 8/90; OPM Administrative Analysis Grade Evaluation Guide, 8/90 |
| Typed Name and Title of Official Taking Action | |
| David A. Dottin  Personnel Management Specialist | Information for Employees. *The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.* |
| Signature                  Date | |
| *[signature]*            26 Aug 98 | |

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

Remarks

1 Performance Level

| 25. Description of Major Duties and Responsibilities (See Attached) | NCS-2 N | OF 8 (Rev. 1-85)  U.S. Office of Personnel Management  FPM Chapter 295 |
|---|---|---|

NSN 7540-00-634-4256            Previous Edition Usable            5096-156

Exhibit C

Job No. 98-262

Management Analyst, GS-343-12
Bureau of Alcohol, Tobacco and Firearms
Office of Science and Information Technology (OST)
Information Services Division (ISD)

Introduction

The incumbent of this position serves as a management analyst in the Information Services Division (ISD). The incumbent is responsible for reviewing, analyzing, coordinating and making recommendations involved in long range planning activities relating to the technological aspects of the Bureau programs.

Major Duties

Performs analytical and evaluative work in support of the strategic planning and budget processes pertaining to the Division's technology activities. The incumbent coordinates the development of ISD strategic planning goals to insure consistency with the long-range operational goals of the Bureau's managers for their respective programs.

Assists in the formulation and preparation of the Division's budget. Writes budget justifications and conducts cost analysis. Analyzes spending trends and expenditures and makes recommendations on spending/reprogramming actions as necessary to meet operating expenses. Provides financial and statistical reports in order to forecast fiscal year budgeting for the Division in areas such as hardware, software, contract support maintenance contracts, reimbursable agreements, equipment purchases, etc. Researches, develops, compiles, consolidates and summarizes budgetary data from a variety of sources for use in preparing budget estimates. Coordinates budgetary matters with analysts in the Financial Management Division and the Directorate Staff.

Plans and conducts projects and studies to evaluate and recommend ways to improve the effectiveness and efficiency of work operations with the Division. Develops new or modified work methods, organization structures, management processes, and procedures for delivering information system services efficiently. Prepares reports of findings that include identification of problems and proposed recommendations for problem resolutions and/or improvements. Performs post implementation and follow-up studies of established procedures and guidelines to ensure that all customers are being properly served.

Conducts in-depth analyses of complex proposals involving significant utilization of information technology equipment, systems and services. Provides guidance to the Customer Community on development of technology surveys and requirements documentation.

Exhibit C

**Factor 1. Knowledge Required by the Position**

Thorough knowledge of current and proposed Bureau operations and programs and their interrelationships, in order to perform a wide variety of analytical studies and projects in support of the planning and development of the science and information technology strategic plan.

Knowledge and skill in applying analytical and evaluative methods and techniques, and a comprehensive understanding of the program goals and operations carried out in all areas of OST, in order to assess program development, advise on management and methods improvement and proposed realignment functions, and to monitor long-range objectives.

Knowledge of qualitative and quantitative techniques for analyzing and measuring the effectiveness, efficiency, and productivity of ISD programs.

Ability to communicate effectively both orally and in writing in order to prepare financial and statistical reports and a variety of other papers designed to facilitate the decisions making process of superiors or high level managers.

**Factor 2. Supervisory Controls**

Within a framework of established priorities and overall project objectives, the incumbent and supervisor develop a mutually acceptable project plan that includes the identification of the work to be accomplished and the deadline for its completion. The incumbent independently devises methods for analyzing problems, tracks project activities, and develops analytical methods and approaches to the problems or issues studied. Work is reviewed for compatibility with and effectiveness in achieving goals and objectives.

**Factor 3. Guidelines**

Guidelines consistent of general administrative policy, program goals and objectives that provide a basic outline of the result desired, and broad regulatory guidelines. Primary constraints are those imposed by the need for compatibility with strategic goals and with existing plans or systems. The incumbent exercises considerable resourcefulness and judgment in developing plans and applying the guidelines to accomplish assignments.

**Factor 4. Complexity**

Assignments require the analysis and coordination of the long-range technology requirements to meet Bureau program requirements and to ensure consistency with the Strategic Bureau Plan. Decisions regarding what needs to be done require consideration of budgetary limitations, the dynamic nature of information technology, and the changing needs of Bureau programs.

Exhibit C

**Factor 5. Scope and Effect**

The purpose of the work is to analyze, coordinate and monitor long-range planning efforts involving the Bureau's science and information technology programs, equipment, systems and services. The incumbent's work affects the quality and quantity of services provided by the ISD and a wide range of agency activities that rely on information technology.

**Factor 6. Personal Contacts**

The incumbent has frequent contact with Bureau personnel at all levels, representatives of other Federal agencies, vendors, manufactures, and contract personnel.

**Factor 7. Purpose of Contacts**

The purpose of contacts is to coordinate major projects, brief managers and oversight officials, identify and resolve problems, and obtain agreement on recommendations, often with resistance due to competing objectives and resource problems.

**Factor 8. Physical Demands**

The work is mostly sedentary. No special physical demands are required in performing the work.

**Factor 9. Work Environment**

The work is performed in an office setting.