UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
BRIGITTE R. HAWKINS,                    )
                                        )
                    Plaintiff,          )
                                        )    CASE NO. 07CV00010 (CKK)
          v.                            )    REPLY TO OPPOSITION TO CROSS
                                        )    MOTION FOR SUMMARY JUDGMENT
MICHAEL B. MUKASEY,                     )
     ATTORNEY GENERAL,                  )
                                        )
                    Defendant.          )
_____/

**PLAINTIFF'S REPLY TO OPPOSITION
TO CROSS-MOTION FOR SUMMARY JUDGMENT**

NOW COMES PLAINTIFF, Brigitte R. Hawkins (hereinafter "Hawkins"), in reply to

Defendant's Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment.

**Introduction**

In Footnote # 1 of its "Memorandum in Opposition to Hawkins' Cross Motion for Summary

Judgment," the Defendant (hereinafter "**BATF**" for the subagency involved, i.e., Bureau of Alcohol,

Tobacco, Firearms and Explosives) announced that its reply is limited to Hawkins' Cross-Motion

for Summary Judgment inasmuch as Hawkins did not oppose its Motion for Summary Judgment.

It appears that BATF ignored Hawkins' Opposition to BATF's motion, filed on June 6, 2008, and

designated ECF Document #40.  ECF Document #41 is the separate Cross-Motion for Summary

Judgment.  Hawkins adopted by reference and incorporated in her Cross-Motion, her statement of

material facts in issue, as set forth in ECF Document # 40, as well as her argument thereto. 1st ¶

Cross-motion.  As the Court is aware, FRCivP 10(c) provides that statements in a pleading as well

as exhibits may be adopted by reference in another pleading or motion for all purposes.  We also

have included ECF document #40 as an attachment under FRCivP 10(c).  The Defendant's failure

to address the material facts in issue, incorporated by reference in Hawkins' Cross motion, or file

a reply to Hawkins opposition, must be viewed as an admission under the rules of the Court.

**BATF's Response to Hawkins' Statement of Material Facts Not in Issue.**

Because BATF's **primary** opposition to the Cross-Motion consists of challenges to the statement of material facts not in issue, Hawkins replies ad seriatim to BATF's admissions and concessions to her statement of material facts not in issue:

1.  BATF admits that in 2002 it hired Ms. Hawkins as a GS-343-11 Management Analyst.

2.  BATF admits that Hawkins was rated outstanding in her performance of the "budget duties" she assumed from Yvette Ross, as well as her other duties.

3.  BATF acknowledges the role that FRED plays in the BATF's budget.

4,5,6,7.  BATF admits that automation plays a key role in budget oversight for the agency.

8.  BATF admits part of the text from the Office of Personnel Management's (hereinafter "OPM") classification guide.

9.  BATF's statement that Filler was not "adept," suggests some competence with the FRED system, but nothing is offered by BATF to show any competence on Filler's part with FRED prior to her arrival in the personnel division.

10. BATF does not indicate what it means by "performed budget responsibilities in previous positions," where the fact asserted in the Cross-Motion shows minor or no real budget oversight.  Filler testified that she had no substantive budget experience prior to her appointment as chief of personnel. (Exh. O, Depo. Filler, pp.12-14). Further, the reference to overspending in Hawkins' "material facts not in dispute" related to Filler's prior positions, not to her current job as chief of personnel.  In BATF's answer to question #10 of its answers to Plaintiff's first interrogatories (Exh. Z, it noted that Filler had some responsibility for a budget at IRS in the late 1980s, which she fully explains at Exh. O, Depo. Filler, pp.12-14.

11. While performance standards do not include duties, Filler added p.7 of Plaintiff's Exhibit "W, p.7" as an addendum to Hawkins' **critical elements**. Under 5 CFR §432.103(b), a "critical element" is defined as "**a work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable**." (Emphasis supplied). Under 5 CFR §432.103(h), "unacceptable performance" is defined as "performance of an employee that fails to meet established standards in **one or more critical elements of such employee's position**." (Emphasis supplied). The

addendum was for a GS-343-11 management analyst and required Hawkins to "demonstrate accountability and cost-effective use of taxpayer funds, while operating within appropriated levels." The addendum stated "[t]his goal is directly linked to PMA, Budget and Performance Integration." It was signed by Filler and Hawkins **on 12/20/04,** and reaffirms Hawkins' GS-343 Management Analyst status, while the audit was ongoing.

12. While BATF's disputes the claim that Filler lacked sufficient knowledge to assist the auditor, BATF nevertheless concedes, by citing White's affidavit, that Filler lacked the requisite knowledge to have meaningful input in the audit. BATF's other reference to the record does not support its claim that Filler waited four months after the audit, in order to work with Hawkins, before she made changes to the desk audit.

13. The deposition cited by BATF, related to the questions posed to Filler regarding her understanding of what occurs in an audit, not how she concluded that the audit did not support a GS-12. No evidence is offered Filler to show how she knew when she met with Hawkins on May 26, 2005, that Hawkins' duties did not support a GS-12 rating, or how her 24 years of experience enabled her to judge Hawkins' competence on budget matters. Filler admitted that she never worked as a classifier or requested that an audit be conducted. (Exh. S. Depo. Filler, p. 40; Exh. H Affid. Filler pp. 13-14).

14. BATF admitted in its motion for summary judgment that Hawkins' job pertained to data entry. See, pp.6-7 of Memo. in support of motion (or ECF pages 8-9). Further, Filler testified several times that Hawkins' job was merely a data entry position. Exh. E, Depo. Filler pp. 40-42; Exh. O, Depo. Filler, p.55, lines 10-23; Exh. H, p.5. BATF does not deny that Hawkins was involved in budget justifications.

15. BATF does not challenge the experience of Blackwood to perform the audit.

16. While BATF admits that Blackwood deviated from her usual protocol by not interviewing Filler, it does not deny that Blackwood followed proper OPM protocols. Under the court's rules, this is an admission that proper OPM procedures were followed. BATF does not say how Blackwood otherwise deviated from OPM procedures with regard to part of the audit she finished. In the absence of any claim of impropriety or incompetence by Blackwood, other than the claim that Blackwood did not talk with Filler before turning in her report, we submit that it is conceded that Blackwood performed the audit in accordance with OPM guidelines.

17. BATF disputes the fact that Blackwood obtained sufficient documentary proof from Hawkins' as to her duties to perform the audit, by denying that Blackwood obtained copies of "all" of Hawkins' duties, a claim not made by Hawkins. No comment is offered relative to what was lacking in Hawkins' submission.

18. Hawkins had assumed furniture moves and supplies, which were a part of Yvette

Ross' duties.

19. The averments referred to in ¶ 19 of the Cross-Motion come from Blackwood, not Hawkins, as argued by BATF.  BATF has not offered any proof that the audit was flawed, except to say that Filler disagreed with it.  Hawkins was a management analyst when the audit began.  BATF never doubted the validity of her GS-343 management analyst classification until the desk audit.  No re-audit was performed to challenge the conclusions reached by Blackwood.  Duties were simply removed from Hawkins' position description ("PD") which changed her classification.  When BATF avers that "Mrs. Hawkins was not properly classified," it is unclear whether it means the pre-audit classification or post audit classification.  By condoning the removal of sufficient duties from Hawkins' PD to change her classification from a GS-343 Management Analyst to a GS-301 Management Support Specialist, BATF in effect contends that Hawkins was misclassified prior to the desk audit.

20. It is clear that "Filler spoke to Ms. Hawkins and Ms. Blackwood before finalizing the desk audit."  Hawkins' claim in the statement of material facts is that Filler never spoke to Hawkins or Blackwood regarding the merits of any matter raised in the audit to support the new grade. Exh. M, Depo. Blackwood, pp. 9-10.  Blackwood testified that although Filler had the factor sheets she used in arriving at the grade, Filler never discussed them. BATF concedes that Filler met with Hawkins on May 26, 2005, more than three and one-half (3 ½) months after the audit results were sent to Filler.  As stated by Hawkins, and admitted by BATF, Filler told Hawkins during their meeting and **without basis**, that her job was not a GS-12.

21. BATF admits that Filler expressed her concern to Blackwood that Hawkins' job was classified as a GS-12. Exh. R. Depo. Blackwood. p. 48.

22. Although Blackwood had given Filler all of the factor sheets used to rate the position, Filler showed no interest in discussing them with Blackwood or inquiring how Blackwood arrived at her conclusions. (Exh. M, Depo. Blackwood, pp. 9-10).

23. Blackwood states that duties were removed from Hawkins' PD at Filler's insistence. (Exh. C, Affid. Blackwood, pp. 3-7; Exh. R. Depo. Blackwood pp. 57-58). BATF claims the duties were re-described.  BATF does not tell us how a re-description process resulted in the duties being removed from the PD.  Moreover, there is no proof of any re-description.

24. BATF admits that Filler's "future expectations" **were a criterion** in her talks with Blackwood about the audit.  BATF does not cite any rule, regulation or statute which allows the use of a "future expectations" as a criterion for a desk audit.  Vivian White, the Chief of BATF's Classification Branch at the time of the audit, opined that "future expectations" cannot be taken into account as a part of an audit. See Exh. G, Affid. White ¶ 7.  Under FRCivP 10(c), White's Affidavit is a part of the Coss-Motion "for

4

all purposes."  BATF ignored the part of ¶ 24 which averred that Filler viewed Hawkins' job as a data entry position.  Under the rules, this fact must be taken as admitted, since it was not specifically denied by BATF, after a citation was made to the record. See, Exh.  E. Depo Filler, pp. 40-42; Exh. O, Depo. Filler, p. 55.

25.     BATF admits that no OPM regulation allows for a classification change because a job depends on automation.  However, Filler discussed ad nauseam how the data entry aspect of the position influenced her perspective of Hawkins' position. Exh. E, Depo. Filler, pp. 40-42, Exh. O, Depo. Filler, p. 55;  Exh. H, Affid. Filler p.5.

26.     BATF evades **admitting or denying**  Blackwood's claim that Blackwood warned Filler that the removal of the analyst duties from Hawkins' PD would adversely affect the classification, by merely claiming that Filler was "surprised" when the position was reclassified as a GS-301.  We submit that such an evasion constitutes an admission in the face of a clear statement from Blackwood that the warning was given. (Exh. R. Depo. Blackwood pp. 49-55; Exh.  N, Depo. Blackwood pp. 54-55).

27, 28, 29.
        The performance standards are clearly marked for a GS-343-11 management analyst. Filler and Hawkins signed them on December 20, 2004, in the midst of the desk audit. Since Filler would later assert that she did not want Hawkins to perform certain analyst functions regarding the budget, the re-issuance of performance standards for a GS-343 Management Analyst would constitute prior inconsistent conduct. Further, contrary to BATF's claims regarding the limited value of performance standards in proving a contract, Filler placed in the signed performance standards an addendum which modified Hawkins' critical elements for her budget work, and the law is clear that  **any failure of a critical element would result in an unsatisfactory rating**. (5 CFR §432.103(b)). See Exh. W, p.7. Thus, BATF's current position that Hawkins' PD is properly classified as a GS-301 is inconsistent with BATF establishing the position in 2002, and Filler's reaffirmation of that classification on 12/20/04.

30.     Filler's directive in the PD did not require Hawkins to seek guidance from FMD re budget analysis.  Rather, it clearly focused on any budget issue.

31.     On p.26, preceding the referenced cite, Greene states that she has never seen a situation where a manager has taken away duties at the end of an audit.  Exh. I, Depo. Greene, p.26, lines 10-14.  This is different from the scenario described by Greene, on p.27, where she says that a classification could be changed based on described duties.

32.     BATF evades the statement by claiming that Filler gave Gunther the responsibility of overseeing the budget, instead of admitting or denying Blackwood's claim that Filler told her that she (Filler) wanted the duties removed from Hawkins' PD and given to Gunther.  BATF does not refer to any competent evidence, wherein Filler refutes Blackwood's claim that she wanted only Gunther to have the duties.  Failure to deny

that Gunther would not assume the duties for another nine months constitutes an admission. The modifications to Hawkins' PD are circumstantial proof that Filler intended that the budget duties be taken from Hawkins and given to Gunther.

33. The material fact is that Filler was not concerned with Gunther's budget background when she hired Gunther to oversee the budget. Instead, BATF argues that Gunther did not obtain any duties at Hawkins' expense. BATF does not offer any proof to support its dispute that Filler did not examine Gunther's background to determine whether she was qualified to do the job. This fact must be taken as admitted, since the record clearly shows that Filler was not concerned with Gunther's budget background when she hired her to oversee the budget. (Exh. E, Depo. Filler, p. 13; Exh. P, Depo. Filler, p. 70). BATF provides no support for its dispute that Filler said she could "coach" Gunther in her budget duties. Despite its challenge to the "coaching" claim, BATF admits in ¶¶ 44 and 48. that Filler said she would "coach" Gunther.

34. BATF's admission that "Ms. Filler told Blackwood that Ms. Hawkins would not perform certain management analyst duties related to the budget" confirms Blackwood's claim that Filler told her to remove all management analytical duties from Hawkins' PD, because they were going to be performed by Gunther. Exh. R. Depo. Blackwood, pp. 49-55. In fact, BATF' cites Blackwood's testimony, that Filler told her that she wanted Gunther to have the duties, in support of its challenge.

35. The factual claim made in ¶ 35 of the motion did not come from Hawkins' testimony. Rather, it referred to a specific statement by Filler in her deposition. (Exh. S. Depo. Filler, pp. 26-28) This is not refuted by sworn testimony from Filler.

36. While BATF does not consider being placed in a miscellaneous series a demotion, Blackwood testified that "within the personnel division, it is likely that [the 301 position] would be a dead-ended position." ECF Doc # 40-6, Ans. 19. As Blackwood testified on the pages cited by BATF, the 301 position does not require any specialized knowledge, and is a catch-all series. Blackwood noted, Hawkins could only apply for a GS-343 position from a 301 because she had been a GS-343. ECF Doc#37-3, ¶ 6.

37. BATF admits that Gunther was hired in May 2005, and BATF does not offer any evidence to refute Blackwood's claim that she did meet with Filler until June 10, 2005. No party claims that Filler did not speak to Blackwood before the end of the audit. The fact that Gunther was hired to oversee the budget, in the wake of Filler learning of the audit results, shows that Filler set in motion a plan to reverse the audit results by taking from Hawkins the budget duties which would support a higher grade.

38. BATF admits that Gunther was informed during her job interview in May 2005 that she would have budget oversight responsibilities. This was before Filler met with Hawkins and Blackwood regarding the audit. In the second sentence, BATF confirms the claim made in ¶ 33 that Filler was unconcerned about Gunther's knowledge and

background in the budget area when she decided to give her certain budget duties.

39.    Although BATF disputes that Gunther did not have any budget duties when she reported for duty, its reference to the record relates to Gunther's comment that she was told that she would have oversight of the budget, not that she had it upon her arrival. Exh. F.,Depo Gunther, p.15.   At p.43, Exhibit F, Gunther concedes that she had no involvement in the budget while Hawkins was in the division.   This admission coincides with ¶ 40, wherein BATF concedes, without dispute, that only Filler and Hawkins had budget responsibilities between May 2004 and December 2005.

40.    BATF concedes that the first sentence is undisputed, i.e., that Hawkins and Filler were the only employees in the Personnel Division with budget responsibilities between June 2004 and December 2005.  This is noteworthy because of the controversy BATF created in its answer to ¶ 39, in which it said Gunther had budget responsibilities when she reported.  As we have established, that claim is untrue.

41.    BATF does not deny that all of the Black employees who previously reported to Filler were assigned to Gunther's unit.  This evasive answer must be deemed an admission since Filler does not specifically deny the claim and it is a matter which should be within the particular knowledge of Filler and BATF, i.e., the racial composition of her staff.   BATF's refusal to admit what it knows to exist strongly infers that this admission is true and somehow incriminating.

42.    BATF does not address the claim that when Gunther assumed the budget duties, her job was limited to insuring that Hawkins submitted her work on time. (Exh. P, Depo Filler, pp. 71-72).  Moreover, BATF does not respond to the statement of fact that Filler reassigned Hawkins' budget duties to Gunther.  (Exh. R. Blackwood, pp. 49-55). This is non-response to a statement of fact should be deemed admitted.

44.    BATF admits that Gunther was inexperienced in budget matters and expressed concern over her assignment to supervise Hawkins.  BATF acknowledges Filler's admission that Gunther was not up to the task of overseeing the budget, and that Filler decided that "coaching" Gunther would make up for Gunther's lack of experience.

45.    BATF admits that Filler set limits on Hawkins' independence in her PD.  Blackwood observed that the changes were "significant," since Hawkins was not allowed to exercise independent judgment concerning whether help was needed, as required by the cited statutes for the grade. Exh M, Depo Blackwood, pp. 20-21.

46.    BATF admits that no change occurred to Hawkins' budget duties and responsibilities after the reorganization of the personnel division, and that Gunther merely oversaw her performance.  This is significant in that, if Gunther's role was to be limited to oversight, there was no need to tamper with Hawkins' PD inasmuch as Gunther's duties would have been the same or similar to those carried out by Yvette Ross.

7

47.    BATF concedes that Gunther lacked the training necessary to oversee the budget process, when she was given the job. See, Exh. F Depo. Gunther, p. 34; Exh. L, Depo. Gunther p. 36, lines 6-12.

48.    BATF admits that Filler was unaware of any budget experience in Gunther's background which would have qualified Gunther to provide budget oversight.  BATF again admits Filler's declaration that she would "coach" Gunther relative to her budget duties.

49.    BATF does not support its denial of the claim that Gunther did not assume her budget duties until Hawkins left personnel. While Gunther had the responsibility of overseeing Hawkins' work after the reorganization, she testified that she did nothing along those lines while Hawkins was there.  See (Exh.  A, Affid. Hawkins ¶¶ 19, 27; Exh. F, Depo. Gunther, pp. 33-34, 41-42; Exh. L, Depo. Gunther pp. 15-16, 28-29).

50.    BATF concedes that Filler and Gunther had "very limited budget knowledge" and relied on Hawkins' budget expertise up and until Hawkins left the division. This concession undermines the reasonable nondiscriminatory basis for Filler's decision to tamper with Hawkins' PD, inasmuch as, Gunther did not have the expertise to assume Hawkins' duties, and she did not need them in order to provide managerial oversight, as Ross had done earlier.  The only thing that removal of the duties from Hawkins' PD accomplished was to ensure that Hawkins could not ask for a desk audit with any assurance that she would be promoted, since she was in a dead ended job. See ECF Doc. # 40-6. Ans. 19.

<u>Overview of BATF's Admissions and Concessions</u>[1]

BATF concedes it hired Hawkins as a GS-343-11 Management Analyst for the Personnel Division in 2002. ¶1.  **Prior** to Filler's challenge to the audit results, no one, including Filler, questioned Hawkins' GS-343 management analyst classification. ¶ 11.  In the addenda to Hawkins' December 20, 2004, GS-343 Management Analyst performance standards, Filler even added another budget component to Hawkins' GS-343 critical elements. Exh. W. Page 7.  Although BATF minimizes the addendum by suggesting that performance standards merely provide a means of measuring Hawkins' performance ¶28, this claim is irrelevant here, because the addendum, at p.7, modified Hawkins' **critical elements** with respect to her budget duties.  As the Court is aware, an

---

[1] The paragraphs indicate the material fact established or admitted..

employee's failure to perform satisfactorily any critical element will result in an overall unsatisfactory rating.  5 CFR § 432.103(b); see also 5 CFR §432.103(h).  No one has ever questioned Hawkins' performance of those duties, for which she received an outstanding rating. ¶ 2.  Hawkins even received a Special Act Award in September 2004, for having "done an exemplary job at maintaining the budget for Personnel during FY 2004." Exh. AA, Affid. Hawkins.  On February 10, 2005, Filler received the audit results, showing that Hawkins should be promoted to a GS-12.  Without responding to the audit or speaking with Hawkins or Blackwood, Filler posted a job notice for a GS-343-14 Management Analyst to oversee the budget.  The budget experience and qualifications of this person were unimportant, because   BATF concedes that Filler was unaware of Gunther's budget qualifications when she was selected for the job. ¶¶ 33, 38.  During her deposition, Gunther expressed surprise at having been called for an interview, because of the fact that she had never worked in personnel.  Exh. F. Depo. Gunther pp. 13-14.  BATF concedes at ¶¶ 44 and 48 that Filler believed that she could "coach" Gunther on her budget duties.  When Filler and Hawkins met on May 26, 2005, concerning the audit, Filler told her that she did not believe Hawkins' position merited a GS-12 rating. ¶ 20.  Filler made a similar comment to Blackwood when they met to discuss the audit. ¶ 21. Filler's perception of Hawkins' duties was colored by her view that what Hawkins did was akin to data entry and not analysis.  Exh. E, Depo. Filler, pp. 40-42, Exh. O, Depo. Filler, p. 55;  Exh. H, Affid. Filler, p.5.  Filler had no classification experience or training to make that determination. Exh. S. Depo. Filler p. 40.  Nor did Filler rely upon any document or advice from another person in arriving at her views on the GS-12. (See, Exh. Z,  BATF's Answers to first Interrogatories, Q & A #3 and #4).  Filler had never requested an audit.  Thus, it would have been difficult, or impossible, for Filler to determine with her nonexistent classification knowledge, prior to meeting with Blackwood, that Hawkins' duties did not warrant a GS-12.  When Filler finally met with Blackwood in June 2005, they did not discuss the factor levels which Blackwood used to reclassify Hawkins'

position as a GS-12.  Blackwood testified that although she provided Filler with the information showing she arrived at her conclusions, Filler showed no interest in discussing them.  Exh. M, Depo. Blackwood, pp. 9-10.  Blackwood said that Filler insisted on removing duties from Hawkins' PD. Exh, R Depo. Blackwood, pp. 49-55.  It is undisputed that duties were ultimately removed from Hawkins' PD, just as it is undisputed that Hawkins continued to perform the same budget duties as before.  Blackwood warned Filler that a change in classification would result from the removal of the duties from the PD.  Exh, R Depo. Blackwood, pp. 49-55.  Although Filler denies that Blackwood warned her of the consequences of removing duties from Hawkins' PD, BATF admits in ¶ 34 that Filler told Blackwood that "Hawkins would not perform certain management analyst duties related to the budget." Filler claims she was surprised by the fact that Hawkins classification changed from a GS-343 to a GS-301 as a result of the duties she removed from the PD. ¶26.  However, BATF's admission in ¶34, that Filler told Blackwood that "Hawkins would not perform certain management analyst duties related to the budget," stems from Blackwood's testimony that Filler not only said that Hawkins would not perform the analytical duties, but they would be performed by Gunther. Exh. R. Depo. Blackwood, pp. 54-55.

BATF concedes that Filler's intentions were to modify Hawkins' PD, based in part, on "Filler's future expectations." ¶24.  BATF does not cite any statute or regulation to support its view that the "future expectations" of a supervisor may play a role in an audit.  Vivian White, the head of BATF's Classification Branch during the audit, disputes BATF's claim that expected or proposed duties may play a role in a desk audit. Exh. G, Affid. White, ¶ 7.  BATF admits that Filler modified Hawkins' PD to require her to seek guidance from FMD. ¶30.  Blackwood considered this change to be significant (Exh.M Depo. Blackwood p.20), since a key element of a GS-11 or GS-12 position is the "exercise of independent judgment." See 5 U.S.C. §§5104(11) and (12).

BATF contends that it never gave any of Hawkins' duties to Gunther (¶33), and that Hawkins

10

continued to perform the same budget duties under Gunther's supervision. ¶34.  Hawkins admits that she never stopped performing the same budget duties. ¶27 of Exh. A. Affidavit Hawkins.  Rather, she notes that the duties were merely removed from her PD and she was not given credit for them. ¶ 28.  There was no reason for Filler to tamper with Hawkins' PD, since Gunther was expected to play the same role as Ross, the GS-14 who previously supervised Hawkins' budget work.  Yet, Filler changed Hawkins' PD and placed her in a miscellaneous classification series, GS-301.  The only significance of this event was to foreclose any possibility that Hawkins could claim a GS-12 based upon her management analyst duties.  As Blackwood opined, the placement of Hawkins in this series meant, "within the personnel division, it is likely that she would be in a dead-ended position." ECF Doc.#40-6, Ans. 19.  BATF evades the first part of ¶ 35, which states that Hawkins continued to perform the duties in controversy while she remained in personnel, by asserting that this claim merely reflects Hawkins' contentions and arguments.  But this assertion mirrors the admissions made by BATF in ¶¶ 33 and 46 that Hawkins continued to perform her budget duties.  A review of Filler's deposition (Exh. S, pp.25-26) also indicates that prior to the December 2005 reorganization, Gunther duties did not involve "anything financial."  Gunther also admits that she had nothing to do with the budget, while Hawkins was there. Exh. L Depo. Gunther p.15.  BATF admits that prior to the reorganization in December 2005, only Filler and Hawkins had budget responsibilities.  ¶40.  After the reorganization, all Blacks on Filler's staff were reassigned to the support unit, a fact BATF evades in its response to ¶ 41.  In ¶¶ 44 and 47, BATF admits that Gunther was too inexperienced to supervise Hawkins' budget duties.  BATF also concedes that Filler was unaware of anything in Gunther's background which could have enabled Gunther to oversee the budget when she was hired.  ¶ 48.  Rather, in ¶¶ 44 and 48, BATF admits that Filler intended to compensate for Gunther's lack of budget experience by "coaching" her.  This is noteworthy because, in ¶50,  BATF also admits that both Filler and Gunther had "very limited knowledge of the budget process and the "FRED system"

and were forced to rely Hawkins' "budget expertise." In September 2004, after Filler assumed her position as chief of personnel, Hawkins received a Special Act Award for having "done an exemplary job at maintaining the budget for Personnel during FY 2004." Exh. AA, Affid. Hawkins.

<u>ARGUMENT</u>

I.  <u>Standard For Summary Judgment</u>

In determining whether Hawkins is entitled to summary judgment, BATF may not avoid summary judgment by averring a "scintilla" of evidence or offering evidence that is colorable, but not sufficiently probative. <u>Anderson v. Liberty Lobby, Inc</u>. 477 U.S. 242, 247-252 (1986). Further, offering a factual scenario that is contradicted by the record will not defeat summary judgment. <u>Scott v. Harris</u>, ___U.S. ___, 127 S.Ct. 1769, 1775-76 (2007). The Court must view the evidence in a light most favorable to BATF only if there is a "genuine" dispute as to those facts. If no rational juror could find for the nonmoving party on the record, taken as a whole, there is no genuine issue for trial. <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586-87 (1986). When the opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury would believe it, the court should not adopt that version because it disputes the claims of the moving party. <u>Scott v. Harris</u>, supra.   In this case, a key issue concerns what may be done during a desk audit. Materiality, under <u>Liberty Lobby</u>, is "only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes." <u>Liberty Lobby</u>, supra, at 248. The BATF maintained in its motion for summary judgment, and in its opposition here, that since a supervisor may assign duties to an employee, Filler's removal of management analyst duties from Hawkins' PD could not be challenged. BATF has offered no regulation, statute, or case law to support its argument that a supervisor can modify a PD during a desk audit, based upon "proposed," or "expected" duties. If BATF's position rests on a legal point, <u>Liberty Lobby</u> holds that BATF must offer support for its

12

position beyond mere rhetoric. The question is not whether a supervisor can generally make work assignments, as set forth in 5 U.S.C. §7106(a)(2)(B), but whether a supervisor can make classification changes to an established PD based upon the whim and caprice of a manager. Chapter 51 of Title 5, speaks of classifying a position based upon **duties and responsibilities**. 5 U.S.C. §§5106(a) & 5106(b). Work assignments, which the provision cited by BATF allows, are distinct from duties and responsibilities which form the basis for classifications. Another question is whether a manager can make classification changes involving **duties and responsibilities**, in the midst of a desk audit. BATF repeatedly used phrases such as "expected" duties in its motion for summary judgment (BATF Mot. Sum. Judg. ECF pp. 4, 7, 8), but has eschewed them in its opposition. Vivian White noted in her affidavit that "expected duties" or "prospective duties" have no place in an audit, because that would defeat the purpose of an audit. Exh. G, Affid. White ¶ 7. Moreover, even if a supervisor has a right to make classification changes to the employee's PD, she may not do so on the basis of discriminatory animus. In this case, Filler told Blackwood that she wanted to remove all of the analytical budget duties from Hawkins' management analyst position and reassign them to Gunther, a person outside of the protected class. Exh. R, Depo. Blackwood, pp. 49-55.

## II.  The Authority to Assign Work Is Irrelevant

In Liberty Lobby, the Supreme Court held that the substantive law determines what facts are material, and immaterial facts are irrelevant. Liberty Lobby supra at 248. BATF defends its action by citing 5 U.S.C. §7106(a)(2)(B) in support of its position that management may make work assignments under Chapter 71. That statute states that management may "assign work." However, the key statement in that provision is "**in accordance with applicable law**," and the provision is limited to **Chapter 71**, i.e., management-labor relations. Since it is a prohibited personnel practice to obstruct an employee's right to compete for a job or to grant a preference or advantage to an

13

employee that is not authorized by law for the purpose of improving the job prospects of an employee or injuring the prospects of another employee, the taking of duties from Hawkins' PD, to beef up Gunther's PD, violated 5 U.S.C. §§2392(b)(1)(A), (b)(4) and (b)(6).

A work assignment under the above labor-management provision of **Chapter 71**, is separate and distinct from the classification of positions and assignment of grades and pay under **Chapter 51**, which deals with classifications. As noted above, the provision cited by BATF does not address duties and responsibilities, the key components of classifications. Under Chapter 51, 5 U.S.C. §5106(a) provides that "[e]ach position **shall be placed in its appropriate class**. The basis for determining the appropriate class is the **duties and responsibilities** of the position and the **qualifications** required by the **duties and responsibilities**." (Emphasis supplied). 5 U.S.C. § 5106(b) states that "[e]ach class shall be placed in its appropriate grade. The basis for determining the appropriate grade is the level of difficulty, **responsibility**, **and qualification requirements** of the work of the class." (Emphasis supplied). Those provisions speak of duties and responsibilities, terms conspicuously missing from 5 U.S.C. §7106(a)(2)(B). Moreover, the position dictates the duties and responsibilities rather than the supervisor. The cited statutes do not say anything about the prerogatives of a manager to determine and assign duties and responsibilities, or provide that the results of a desk audit can be linked to a provision found in Chapter 71 of the labor-management section of Title V. Because Filler did a cut and paste job on Hawkins' PD, it was ultimately placed in the miscellaneous series since it did not fall within any recognized classification. We submit that when a position is created and classified by an agency, it receives the blessing and stamp of approval of the agency, which has to budget the position. This is what occurred when Hawkins' original GS-343-11 position was created. The law does not vest a supervisor with unlimited authority to reject what the agency has done based on personal preference or whim. What the law requires is that the

14

classifier look at the **duties and responsibilities** of a position and make a determination of grade based upon the level of difficulty, **responsibility**, and **qualifications**. Nothing in the Title 5 allows for ad hoc changes to PDs, during a desk audit, based upon what a supervisor "expects" the employee to do. Filler has repeatedly said that her criterion for removing duties from Hawkins' PD was what she needed or expected from the job. Exh. O, Depo. Filler, pp. 40-43, 49, 57; Exh. S, Depo. Filler, pp. 35,38-39; Exh. E. Depo. Filler, p. 21. Neither 5 U.S.C. § 5106(a), nor (b), allows a supervisor to use her expectations to determine a position's classification, by the removal of duties from a PD.

In 2002, BATF classified Hawkins' position as a GS-343 Management Analyst. This was based upon the duties and responsibilities she assumed, and the qualifications she possessed. This designation was left undisturbed by BATF until the desk audit offered Hawkins a promotion. In the interim, Hawkins took on additional duties concerning the budget when Ross, the GS-14, left the agency. While Hawkins was in Personnel, no one but she was qualified to assume the duties and responsibilities. Filler reaffirmed these duties on December 20, 2004, when she signed Hawkins' GS-343 Management Analyst performance standards, and added a new critical element to her budget duties. Exh. W. p.7. It was only after Hawkins confronted Filler about the audit on May 26, 2005, that Filler took issue with her duties. Filler initially challenged the higher grade, indicating that she did not think Hawkins deserved a promotion, a claim which she repeated to Blackwood. By BATF's admission, it was only at this junction that Filler sought to ascertain what duties Hawkins performed. ¶ 5 Statement of Material Facts, Motion for Summary Judgment. See also Exh. H, Affid. Filler, pp. 4-6.[2] In the process of finding a way around the desk audit, Filler repudiated BATF's prior determination that Hawkins position should be classified as a GS-343 Management Analyst. In the course of her surgery on Hawkins' PD, Filler changed enough duties and responsibilities in Hawkins'

---

[2] Filler has admitted that she never asked Hawkins what duties in her PD she actually performed. Exh S. Depo. Filler, p. 49, lines 14-22.

PD so that she would be reclassified as a GS-301 and placed in the miscellaneous series.

### III. Direct and Circumstantial Evidence Support Hawkins' Claim for Relief

BATF opens its boilerplate defense by referring to McDonnell Douglas v. Green,[3] and its progeny and claiming it has offered a reasonable nondiscriminatory basis for its actions. However, the burden shifting format of McDonnell Douglas does not apply where there is direct evidence of discrimination. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985); Smith v. F.W. Morse & Co. 76 F.3d 413, 421 (1st Cir. 1996); Fuller v. Phipps, 67 F.3d 1137, 1141 (4th Cir. 1995); see also Teamsters v. United States, 431 U.S. 324, 358, n 44 (1977). Statements made by an employer, that trigger the challenged action are direct evidence of discrimination, when made during a key decisional process. Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991). In this case, Blackwood was told to remove the analytical duties from Hawkins' PD, despite her warning that the removal of the duties would change the classification. Exh.R, Depo. Blackwood, pp.49-55. Filler also told Blackwood that the removed duties would be performed by her management analyst. Since Hawkins was still a management analyst at the time of the conversation, it was clear to Blackwood that Filler intended to strip Hawkins of her GS-343 classification. Since Gunther (a member of the non-protected group) was the only other management analyst, Blackwood knew that Filler intended for her to have Hawkins' duties, and Filler said as much. Exh. R, Depo. Blackwood, pp. 54-56. In its response, BATF confirms this decision, with its concession in ¶ 34, that "Ms. Filler told Ms. Blackwood that Ms. Hawkins would not perform certain management analyst duties related to the budget." BATF has made no claim that Hawkins was unqualified to perform the duties, since it concedes in ¶ 50 that Filler and Gunther had a "very limited knowledge" of the budget process and relied upon Hawkins' "budget expertise." Since the classification of positions must, by law, be based on the qualifications of the

---

[3] McDonald Douglas Corp. v. Green, 411 U.S. 792 (1973).

16

person to discharge the duties and responsibilities of the job (see 5 U.S.C. §§5106(a) & (b), BATF could not reassign Hawkins' duties to Gunther because she was not qualified to perform them. Thus, there is no genuine issue of material fact with respect to whether Filler intentionally transferred duties from a member of a protected class (Hawkins) to a person outside of the class (Gunther).

IV. BATF Has Failed to Provide a Legitimate Non-Discriminatory Reason

In order to refute a reasonable nondiscriminatory reason as pretextual, a party may use circumstantial evidence to prove that management's explanation is unworthy of belief. Reeves v. Sanderson Plumbing Product, Inc., 530 U.S. 133 (2000). Mereish v. Walker, 359 F.3d 330, 336 (4ᵗʰ Cir. 2004). A judge faced with a summary judgment motion "must ask [herself] . . . whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). BATF argues that if it articulates a reasonable nondiscriminatory basis for its action, it is entitled to prevail. We submit that in this case, BATF has failed to articulate a reasonable nondiscriminatory reason for its actions.

BATF has given several reasons for its actions, but has withdrawn support for at least one of the reasons, which was proven invalid. For example, BATF initially argued that the desk audit did not support a GS-12 grade, because it was primarily a data entry position. See, pp.6-7, Memorandum in Support of Motion for Summary Judgment ECF pp. 8-9. In its summary judgment motion, BATF discussed Filler's alleged findings regarding Hawkins' duties and her conclusion that most of Hawkins' work was computer generated and did not require any analysis. Id. Earlier, Filler took a similar view and opined that Hawkins' duties called for little more than hitting a button. Exh. E, Depo. Filler pp. 40-42; Exh. O, Depo. Filler, p. 55; see also Exh. H, Affid. Filler, p.5. When confronted with the OPM's position on the role of automation in budget matters, BATF retreated from its earlier claim and now disputes that it denigrated Hawkins' job as a data entry position. See BATF's response to ¶14 of undisputed facts. It has been consistently held that when an employer, at different times, gives

17

different and arguably inconsistent explanations, it may be inferred that the articulated reasons are pretextual. Thurman v. Yellow Freight Sys. Inc., 90 F.3d 1160, 1167 (6th Cir. 1996), amended 97 F.3d 833 (6th Cir. 1996); Kobrin v. Univ. of Minnesota, 34 F.3d 698, 703 (8th Cir. 1994)("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."); Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir. 1992)("A jury's conclusion that an employer's reasons were pretextual can be supported by inconsistencies in or the unconvincing nature of the decisionmaker's testimony."); see also, Alvarado v. Bd. of Trustees, 928 F.2d 118, 122-23 (4th Cir. 1991); Schmitz v. St. Regis Paper Co., 811 F.2d 131, 132-33 (2d Cir. 1987). Here, Filler rejected out-of-hand the notion that Hawkins' position was a GS-12, and opined the view that the job was only a data entry position. Exh. H, Affid. Filler, p.5. In her discussions with Hawkins, Filler only wanted to discuss Hawkins' FRED duties, and by her own admission, never asked Hawkins about her other duties. Exh. S, Depo. Filler, p. 49. lines 14-22. It was on this basis that Filler told Hawkins at their meeting in May 2005, that her job was not a GS-12. ¶¶ 20, 21. BATF admits that Filler, after that declaration, met with Hawkins to find out what she did. In ¶ 5 of its statement of undisputed facts, BATF states that "[t]hereafter, Ms. Fuller [sic] asked Ms. Blackwood and the Plaintiff specific questions about Plaintiff's **actual** and expected duties." (Emphasis supplied). After Filler's initial meeting with Blackwood, Filler again met with Hawkins and asked Hawkins to explain her duties in FRED. Exh. H, Affid. Filler, p.5. Following their meeting and discussion of FRED, Filler stated that she went back to Blackwood, and told her what duties she wanted assigned to Hawkins' position. Exh. Id at p.6. In drawing her conclusions from Hawkins' explanation of what she did in FRED, Filler concluded that Hawkins' duties were primarily data entry. Id. at p.5. Thus, before Filler ever knew what Hawkins was doing, and before she began her investigation to determine what Hawkins did, Filler had come out against any promotion for Hawkins.

The importance of McDonald-Douglas lies, not in its proviso of the discrete elements of the

proof required for a prima facie case, but in its recognition of the process by which a Title VII plaintiff may satisfy her initial burden of offering proof to create an inference that the employment decision was based upon a prohibited criterion under the act. See, Teamsters v. United States, supra at 358. Hawkins has clearly shown that 1) she is a member of a protected class, 2) she was appointed to a position which was properly classified as a GS-343, 3) she was qualified for the job to which she was appointed, 4) she was performing the duties of the position in a better than a satisfactory manner, 5) despite the fact that she was performing the duties of the position in a satisfactory manner, 6) her management analyst duties were officially removed from her PD by a person outside of her protected class, 7) the removal of the duties from her PD resulted in a change of classification in her position, 8) at the time the duties were intentionally removed and transferred to a person outside of her protected class, that person was not qualified to perform the duties, and 9) she was required to continue to perform the removed duties despite the change in classification because the person to whom the duties were assigned was not qualified to perform them under circumstances giving rise to an inference of discrimination.  Another way of describing the prima facie case in this proceeding is that 1) Hawkins is a member of a protected class, 2) she applied for a promotion to a GS-343-12, 3) an independent audit determined that she was entitled to the GS-343-12, 4) management determined that she was performing the duties of the position satisfactorily, 5) despite the fact that she was performing the duties of the position in a satisfactory manner, a person outside of her protected class denied her the promotion, 6) that person told the classifier that she wanted the duties that supported a promotion to be performed by a person outside of the protected class and 7) Hawkins was still compelled to perform the same duties under a different classification and same grade.  We submit that based on the foregoing, BATF has not offered a reasonable non-discriminatory reason for its actions.

## V. BATF's Reasons For its Actions Are Pretextual

The D.C. Circuit has held that "evidence from which a jury could find that the [employers']

stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury." Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999). BATF admits on pages 5-6 of its memorandum in support of summary judgment (ECF 37, pp. 7-8) that "[i]t was not until Hawkins left the Personnel Division that Ms. Gunther began to perform the budget duties." Thus, Hawkins was forced to continue to perform the same budget duties as before, but without the benefit of a raise to which she was entitled. Accordingly, if the actual transfer of duties did not occur until after Hawkins left the division the next year, BATF cannot offer a reasonable non-discriminatory explanation for its actions in tampering with Hawkins' PD when it did. As admitted in ¶ 50 of the undisputed facts, BATF concedes that Filler and Gunther had limited budget knowledge and relied on Hawkins' budget expertise up and until she left the division. As noted above, BATF admits that Gunther did not assume Hawkins' budget duties until after Hawkins left the division. Accordingly, if Filler was removing budget duties from Hawkins because she did not want her to do them, she made no attempt to prevent Hawkins from continuing to perform the same duties. To obstruct an employee's right to compete for employment or to grant a preference or advantage to an employee that is not authorized by law for the purpose of improving the job prospects of an employee or injuring the prospects of another employee is a prohibited personnel practice. 5 U.S.C. §§2392(b)(1)(A), (b)(4) and (b)(6). Thus, Filler's was not a proper exercise of her prerogatives, since the removal of duties from Hawkins' PD changed her classification, and enabled the creation of supervisory duties for Gunther.

## VI. **It Is Immaterial That Hawkins and Gunther are not Similarly Situated**.

For reasons which are unclear, BATF argues that Hawkins' disparate treatment claim must fail because Gunther and she are not similarly situated. The fact that the two employees are at different grade levels is immaterial to the facts in this case because the disparate treatment claim does not pertain to grades, it pertained to duties. Filler told Blackwood that she wanted her management analyst (Gunther) to perform the analytical duties which her other management analyst (Hawkins) was

20

performing, and which were in Hawkins' PD, even as she was changing Hawkins' classification from a GS-343 Management Analyst to a GS-301 Management Support Specialist. Exh. R. Depo. Blackwood, pp.49-55. As noted above, BATF conceded that "Ms. Filler told Ms. Blackwood that Ms. Hawkins would not perform certain management analyst duties related to the budget." ¶ 34. The disparate treatment stems from the fact that BATF decided that a Black woman, was not going to be allowed to perform budget duties and maintain a GS-343 designation, while a White woman could be given those duties and could retain her GS-343 classification. In that regard, Filler selected a White woman to perform duties which she was not qualified to perform and barred the qualified Black woman from getting credit for her work even though she had performed the duties in an outstanding manner. Further, it is also clear that BATF was unconcerned about the lack of qualifications of the White woman (Exh. E, Depo. Filler, p. 13; Exh. P, Depo. Filler, p. 70) and intended to "coach" her in her duties. See ¶¶ 44, 48 of BATF's replies to material facts in issue. Moreover, Hawkins' duties were going to be transferred to a White woman who would not assume the duties until she left the division, even as Hawkins was then being stripped of her GS-343 classification. This is noteworthy because BATF conceded that the White woman (Gunther) had very limited knowledge of the budget process and depended on the Black woman's (Hawkins) "budget expertise." See ¶50 of BATF's response to undisputed facts. BATF's reference to Ross is equally puzzling in that BATF allowed Hawkins to be a GS-343 Management Analyst even though she was supervised by Ross, who was a GS-201-14 Human Resources Officer. Since Filler has repeatedly testified that Gunther's role was to oversee Hawkins, in much the same manner as Ross, there was no reason to tamper with Hawkins' GS-343 classification to accomplish this. We submit that the only reason for doing so was to ensure that Hawkins never asked for a desk audit again with the expectation of getting a promotion.

In making a showing of disparate treatment, Hawkins only has to show that 1) she is a member of a protected class, 2) she suffered an adverse employment action and 3) it occurred under

circumstances that give rise to an inference of discrimination. <u>Stella v. Mineta,</u> 284 F.3d 135, 145 (D.C. Cir. 2002)(quoting <u>Brown v. Brody,</u> 199 F.2d 446, 452 (D.C. Cir. 1999).   The third prong may be satisfied by a showing that she was treated differently from similarly situated persons who are not in her protected class.   <u>Holbrook v. Reno,</u> 196 F.3d 255, 261 (D.C. Cir. 1999).   In establishing the inference of discrimination, a plaintiff may show that her rejection for a position was not because of a lack of qualifications or a vacancy. See <u>Stella v. Mineta,</u> supra; <u>Teneyck v. Omni Shoreham Hotel,</u> 365 F.3d 1139, 1150-51 (D.C. Cir. 2004). In the instant case, there is no question that Hawkins was qualified to discharge the budget duties of the position of management analyst (see ¶5, Exh. AA, Affid. Hawkins ), and there was never an issue of whether there was a grade 12 available if she qualified. See also, <u>George v. Leavitt</u>, 407 F.3d 405, 412 (D.C. Cir. 2005).   Since BATF admits that it took Hawkins' budget duties from her PD, and Blackwood states that Filler told her that she wanted to give the duties to Gunther, a person outside of Hawkins' protected class, thereby stripping Hawkins of her management analyst classification, and only leaving Gunther with that classification, we submit that more than an inference of discrimination has been established.

## VII. <u>Other Acts by Filler show Discriminatory Animus</u>

BATF opines that "there is nothing nefarious in requiring an employee to seek interpretation and guidance from [FMD]" "Opp. At pp. 6-7.  This restriction was not in Hawkins' PD prior to it being inserted by Filler, and while it was insignificant to Filler, Blackwood viewed it as a significant development, because it limited Hawkins' independence of judgment. Exh.  M, Depo. Blackwood, pp. 20-21.  A key element of a GS-11 or GS-12 position is the "exercise of independent judgment." See 5 U.S.C. §§5104(11) and (12).  This situation was further aggravated when Filler had Blackwood remove all references to Hawkins consulting the Office of Management and Budget (hereinafter "OMB") guidelines removed from her PD. (Exh.  M, Depo. Blackwood pp. 14-15.  Again, Blackwood said that the action lessened Hawkins' independent judgment.  Finally, BATF notes that Hawkins'

22

current PD does not mention FRED.  As the Court will observe, the PD is dated 1998, FRED did not

come into existence until 2000-2001. Exh.AA. Affid. Hawkins.  As Hawkins noted in Exh. A, ¶ 6, the

PD she was hired under in personnel in 2002 did not refer to FRED.  BATF notes in footnote 4 that

Hawkins' current PD shows that she uses information technology and writes budget justifications.

However, Hawkins stated that she did budget justifications in personnel (Exh. A. Affid.  Hawkins, ¶

5), a claim that BATF declined to challenge in ¶ 14 of the undisputed facts.  These petty acts went

beyond the removal of duties from Hawkins' PD and suggests a pettiness to hamper and impede an

employee in whatever classification she was placed in.  Even Blackwood knew that FMD was required

to follow OMB's guidelines with respect to the budget.  Nevertheless, Filler barred Hawkins from

consulting OMB's guidelines, which had been placed by BATF in the GS-343 management analyst PD

when the job was created, and forced Hawkins to go to FMD for guidance in her GS 301 PD.

VII.  <u>Hawkins Was Constructively Demoted.</u>

BATF maintains that Hawkins was not constructively demoted because Blackwood's initial PD

was a draft.  However, the question is whether Blackwood properly performed her classification tasks

before Filler's discriminatory animus changed the scenario.  If the Court were to find that Filler

improperly tampered with the audit process, then the completed desk audit was not fair and according

to OPM regulations. The PD that Hawkins occupied contained many important duties that were

removed and transferred on the whims of Filler to Gunther.  Hawkins now performs the same duties

as a GS-343-12.  No one has said that Blackwood did not properly do her job as classifier, except for

not interviewing Filler before submitting an initial draft of the audit.  BATF has not offered any

statutory or regulatory citation to support what Filler did during the audit, since expected duties are not

to be taken into account during an audit.  If Filler could not remove duties during an audit, based on

expected duties, or in order to transfer the duties to another employee, Blackwood's audit should stand,

as there is nothing in the record to show that she did not follow proper protocols.

<u>CONCLUSION</u>

WHEREFORE, for premises considered, it is respectfully submitted that the Plaintiff's cross-motion for summary judgment should be granted.

July 4, 2008                                        Respectfully submitted


                                                   _//S//_    Charles E. Wagner
                                                   Charles E. Wagner, Esq. (Bar # 94276)
                                                   Edward L. Allen, Esq. (Bar # 375341)
                                                   Attorneys for Plaintiff
Charles E. Wagner, Esq.                            Silver Spring Centre
P.O. Box 14723
Silver Spring, Md. 20911
(202) 210-7801
E-Mail: Wagnelliot@Aol.com
Fax: 1-202-318-7185

Edward L. Allen, Esq.
1400 Locust Road NW
Washington, D.C. 20012
(202) 262-8550
E-Mail Allen200@att.net
Counsel for the Plaintiff

24

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                              <u>PAGES</u>

1.  <u>Alvarado v. Bd. of Trustees</u>, 928 F.2d 118 (4th Cir. 1991)-----------------------------------------18

2.  <u>Anderson v. Liberty Lobby, Inc</u>. 477 U.S. 242 (1986)------------------------------------12, 13, 17

3.  <u>Beshears v. Asbill</u>, 930 F.2d 1348 (8th Cir. 1991)--------------------------------------------------16

4.  <u>Brown v. Brody</u>, 199 F.2d 446 (D.C. Cir. 1999)-----------------------------------------------------22

5.  <u>Carpenter v. Fed. Nat'l Mortgage Ass'n</u>, 165 F.3d 69 (D.C. Cir. 1999)-------------------------19

6.  <u>Castleman v. Acme Boot Co.</u>, 959 F.2d 1417 (7th Cir. 1992)-------------------------------------18

7.  <u>Fuller v. Phipps</u>, 67 F.3d 1137 (4th Cir. 1995)-----------------------------------------------------16

8.  <u>George v. Leavitt</u>, 407 F.3d 405 (D.C. Cir. 2005)--------------------------------------------------22

9.  <u>Holbrook v. Reno</u>, 196 F.3d 255 (D.C. Cir. 1999)-------------------------------------------------22

10.  <u>Kobrin v. Univ. of Minnesota</u>, 34 F.3d 698 (8th Cir. 1994)-----------------------------------18

11.  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986)------------------12

12.  <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973)---------------------------------------16, 18

13.  <u>Mereish v. Walker</u>, 359 F.3d 330 (4th Cir. 2004)-------------------------------------------------17

14.  <u>Reeves v. Sanderson Plumbing Product, Inc</u>., 530 U.S. 133 (2000)-----------------------------17

15.  <u>Schmitz v. St. Regis Paper Co.</u>, 811 F.2d 131 (2d Cir. 1987)------------------------------------18

16.  <u>Scott v. Harris</u>, ___U.S. ___, 127 S.Ct. 1769 (2007)---------------------------------------------12

17.  <u>Smith v. F.W. Morse & Co.</u> 76 F.3d 413 (1st Cir. 1996)-----------------------------------------16

18.  <u>Stella v. Mineta</u>, 284 F.3d 135 (D.C. Cir. 2002)---------------------------------------------21, 22

19.  <u>Teamsters v. United States</u>, 431 U.S. 324 (1977)-------------------------------------------16, 19

20.  <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139 (D.C. Cir. 2004)----------------------------22

21.  <u>Thurman v. Yellow Freight Sys. Inc</u>., 90 F.3d 1160 (6th Cir. 1996)-----------------------------18

22.  Trans World Airlines, Inc. v.  Thurston, 469 U.S. 111 (1985)-----------------------------------16

STATUTES

1.  5  U.S.C. §§2392(b)(1)(A)------------------------------------------------------------------------14, 20

2.  5  U.S.C. §§2392(b)(4)-----------------------------------------------------------------------------14, 20

3.  5  U.S.C. §§2392(b)(6)-----------------------------------------------------------------------------14, 20

4.  5 U.S.C. §§5104 (11)-------------------------------------------------------------------------------10, 22

5.  5 U.S.C. §§5104 (12)-------------------------------------------------------------------------------10, 22

6.  5 U.S.C. §§5106(a)-----------------------------------------------------------------------13, 14, 15, 16

7.  5 U.S.C. §§5106(b)-----------------------------------------------------------------------13, 14, 15, 16

8.  5 U.S.C. §7106(a)(2)(B)--------------------------------------------------------------------------13, 14

REGULATIONS

1.  5 CFR §432.103(b)--------------------------------------------------------------------------------2, 5, 9

2.  5 CFR §432.103(h)----------------------------------------------------------------------------------2, 9

3.  FRCivP 10(c)---------------------------------------------------------------------------------------1, 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRIGITTE HAWKINS | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Civ. Act. No. 07-0010 (CKK) |
| | ) |
| ALBERTO GONZALEZ, | ) |
| ATTORNEY GENERAL | ) |
| DEPT. OF JUSTICE, | ) |
| | ) |
| Defendant | ) |

## DEFENDANT'S ANSWERS TO THE
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

1. State the full name and address of the person answering and signing the interrogatories and, if different, state the full name, address, employer, title and position of the individual providing the answers and the person signing the answers.

ANSWER: Diane Filler, Chief, Personnel Division, Office of Management, Bureau of Alcohol, Tobacco, Firearms and Explosives.

2. With reference to each person who had any input in any decision made by Diane Filler before or after the desk audit of complainant's position, please state their name, sex, age, race, job title, employment history, date of any input, advice, recommendation, comment, or analysis offered regarding the desk audit of Plaintiff's position, as well as the nature and content of that input, advice, recommendation, comment or analysis.

ANSWER: The Defendant herein incorporates the declarations and testimony of Barbara Blackwood and Diane Filler, contained in their depositions and the Report of Investigation prepared in the administrative case. Both contain relevant and responsive information regarding the requested information.

3. Please identify any document consulted or used by Diane Filler, with respect to the desk audit of Plaintiff's position, and state in detail the analysis and evaluation made by her using such documents in any decision she made with respect to the audit of Plaintiff's position.

ANSWER: The Defendant has identified no such documents.

4. Please identify any document consulted or used by any person advising Diane Filler, with respect to the desk audit of Plaintiff's position, and state in detail any analysis and

1

evaluation made by that person using such documents in any advice, comment, analysis or evaluation that person made with respect to the audit of Plaintiff's position.

ANSWER: The Defendant has identified no such person and no such document.

5. If Diane Filler used any form of objective evaluation to determine what duties she thought should be removed from Plaintiff's position description, state in detail and with specificity relative to each duty removed, the objective factors relied upon for the removal of each duty, and the relevance of each factor to the removed duty.

ANSWER: The position descriptions in question speak for themselves, insofar as they identify the changes in duties; the Defendant refers Plaintiff to same as they appear in the Report of Investigation and as they have been made available to Plaintiff otherwise. Diane Filler's recollections are that the changes made best described the actual duties such that the newer position description more accurately portrays these duties than the prior position description.

6. If Diane Filler used any form of subjective evaluation to determine what duties she thought should be removed from Plaintiff's position description, state in detail and with specificity relative to each duty removed the subjective factors relied upon for the removal of each duty, and the relevance of each factor to the removed duty.

ANSWER: See the response to Interrogatory 5.

7. Please describe in as much detail as possible the qualifications of the employee Diane Filler selected to perform each duty removed from Plaintiff's position description to support her final position description as a GS-0343-11. For that employee, the description of the qualifications sought are the qualifications as they existed on the date the duties were removed from Plaintiff's position description.

ANSWER: The Defendant objects to this interrogatory insofar as it proceeds from a faulty factual premise. There was no employee "selected" to perform a set of duties that were "removed" from Plaintiff's purview as a result of Ms. Filler's effort to describe Plaintiff's duties in a more accurate way. Plaintiff's job description should not have incorporated certain duties that she said she was doing.

8. Please indicate in as much detail as possible the reasons Debbie Gunther was selected to perform the removed tasks previously assigned to the Plaintiff.

ANSWER: See response to interrogatory 7.

9.  Please indicate in as much detail as possible the impact the addition of the additional duties had on the position of the employee to whom they were assigned in terms of position description, organization responsibility and management duties.

ANSWER: See response to interrogatory 7.


10.  Please describe in as much detail as possible the budget related education and experience of Diane Filler at the time she assumed the duties of personnel director of ATF.

ANSWER: Although this was not her only or primary responsibility for the job, Diane Filler had, *inter alia*, worked in a position with budget responsibilities while employed at the IRS in the late 1980's.  She likewise has attended informal training in budget since her employment began at ATF.

11.  Please describe in as much detail as possible the budget related education and experience of Debbie Gunther at the time she assumed the duties removed from Plaintiff's position description.

ANSWER: See the response to interrogatory 7.  Notwithstanding these objections, and not wishing to waive same, Ms. Gunther took courses in Accounting in college.  Please refer to Ms. Gunter's deposition on this point.

Respectfully submitted,


/s/
_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/
_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

3

_____/s/
                        _____
                        HEATHER D. GRAHAM-OLIVER
                        Assistant United States Attorney
                        Judiciary Center Building
                        555 4th St., N.W.
                        Washington, D.C.  20530
                        (202) 305-1334

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing Answers to Plaintiff's First Set of Interrogatories was served

upon Plaintiff by electronic mail at <u>wagnelliot@aol.com</u> on December 24, 2007, and by

depositing a copy of it in the U.S. Mail, first class postage prepaid, addressed to:


Mr. Charles E. Wagner, Esq.
Silver Spring Centre
P.O. Box 14723
Silver Spring, Maryland 20911


on this 26th day of December  2007.



/s/

_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


_____
BRIGITTE R. HAWKINS,                    )
                                        )
              Plaintiff,                )
                                        )        CASE NO. 07CV00010 (CKK)
              v.                        )        AFFIDAVIT OF BRIGITTE HAWKINS
                                        )
                                        )
MICHAEL B. MUKASEY,                     )
   ATTORNEY GENERAL,                    )
                                        )
              Defendant.                )
_____/


AFFIDAVIT OF BRIGITTE HAWKINS IN SUPPORT OF
CROSS MOTION FOR SUMMARY JUDGMENT

1.  I, Brigitte R. Hawkins, am an African-American female, over the age of forty (40)

years, and the Plaintiff in the above captioned case.  I am currently employed in the

Information Services Division as a **GS-343-12** Management Analyst and responsible for

budgetary duties in that organization.


2.  I have reviewed the EXHIBITS submitted by BATF in support of its opposition for

summary judgment and I make the following statement based upon personal knowledge.

I am competent to testify regarding the following if called to testify at trial.


3.  The affidavit of John Duclos is accurate as to the duties previously performed by

Yvette Ross which I later performed when she left.  At that time, I reported to Duclos

with regard to all matters related to the budget.

4.  My current management analyst position description ("PD") does not mention FRED just as the management analyst PD I was hired under in the personnel division did not mention FRED.  My current PD is dated 1998.  FRED was not introduced to the Bureau until 2000 or 2001.  Thus, my current PD makes no reference to FRED just as my PD in personnel did not refer to it.

5.  I was an accounting technician and then a lead accounting technician in the Financial Management Division ("FMD").  After I left FMD, I was a program analyst GS-343-09 in the New Building Project Office (:NBPO"), before I joined the personnel division.  As a program analyst, most of my duties were the same as when I was appointed a management analyst.  As a GS-343-09 program analyst in the NBPO, my budgetary duties included handling reimbursables, FRED and budgetary functions covering over $103,000,000 for the new BATF building on New York Avenue, as well as the new lab in Maryland.  My duties in the NBPO were much the same as my management analyst duties in the personnel division. I received a Special Act Award in September 2004.  The award citation read: **"Ms. Hawkins has done an exemplary job at maintaining the budget for  Personnel during FY 2004**."

6.  When I spoke to Ms. Filler regarding my duties, after I approached her about the audit, she was unconcerned about the actual duties of my PD that I was performing and only wanted to learn what I did in FRED.  During our discussions regarding my duties, she

indicated that she did not view my work in FRED to be of any significance because the budget reports were generated by the computer.

7. I continued to perform all of Yvette Ross' duties as well as the ones originally assigned me until I left the personnel division, and I reported to Filler rather than Debbie Gunther with respect to those duties.

8. I continue to perform the same duties as I performed in the personnel division in my current position, but is graded as a GS-343-12 management analyst.

June 29, 2008

I, Brigitte R. Hawkins, swear under Penalty of Perjury that the foregoing statement is true to the best of my knowledge and belief.

*Brigitte R. Hawkins*

Brigitte R. Hawkins, Affiant

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIGITTE R. HAWKINS,                        )
                                            )
                 Plaintiff,                 )
                                            )      CASE NO. 07CV00010 (CKK)
v.                                          )      OPPOSITION TO MOTION FOR
                                            )      SUMMARY JUDGMENT
                                            )
MICHAEL B. MUKASEY,                         )
   ATTORNEY GENERAL,                        )
                                            )
                 Defendant.                 )
_____/

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

Standard for Summary Judgment

The purpose of summary judgment is to isolate, and then terminate any claims for relief that are not factually supported. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In this regard, summary judgment is proper when the opposing party is unable to show a genuine issue exists as to a material fact on which that party will bear the burden of proof at trial, Nebraska v. Wyoming, 507 U.S. 584, 589 (1993), and the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could find in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). The moving party has the initial burden of showing the lack of a genuine issue of material fact. A fact is material if it might affect the outcome of the case. Id. Since the Court must not weigh the evidence, the evidence of the opposing party will be construed in a light most favorable to that party and accepted as true. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992).

The Defendant's Statement of Material Facts

With respect to the Defendant's statement of Material Facts, Hawkins asserts that the

statement of material facts does not preclude trial on the merits inasmuch as the asserted facts are immaterial or irrelevant, and therefore cannot meet the test for materiality. We will address his claims ad seriatim:

1. Admit that a desk audit was conducted at Plaintiff's work station by Barbara Blackwood.

2. Admit that Blackwood understood that she did not have to interview Filler because Filler did not know what duties Hawkins was performing, a key element to proper participation of the supervisor in a desk audit. (Exh. C, Affid. Blackwood, p. 2).

3. Admit that Blackwood prepared an initial draft Position Description without discussion with Filler.

4. Admit that the draft position description (PD) indicated that the position was a GS-12. Admit that Filler was expected to comment on the new PD and that it was not official until she indicated agreement by signing off on it.

5. Admit that the draft PD was dated February 10, 2005, and indicated that the position should be upgraded to a GS-12 from a GS-11. Admit that Filler provided her first comments to Blackwood on June 21, 2005, and that thereafter, Filler asked Blackwood and the Plaintiff specific questions about the Plaintiff's actual duties, but **deny** that Filler asked Blackwood and Plaintiff about Plaintiff's **expected** duties. Admit that Filler directed changes to be made to the draft position description, but **deny** that the changes were based upon what **she knew** the position to be.

6. Admit that management has the right to comment and make assignments, but **deny** that this right may be exercised during the middle of an audit to change the classification series of the employee. Admit that the final evaluation statement indicated that the position was still a GS-11.

7. Admit.

Comment on Defendant's Material Facts not in Issue

1.    No comment.

2.    White does not recall telling Blackwood that she did not have to speak to Filler, but opines that Blackwood may have interpreted her remarks to mean that inasmuch as, Filler did not know what Hawkins did, and that is the reason for supervisory input. (Exh. G, Affid. White).   The interpretation that Filler did not need to be interviewed, made sense to Blackwood in light of the purpose of a desk audit, i.e., to ascertain an employee's current duties. (Exh. Q, Depo. Blackwood p. 21; See also, Exh. I, Depo. Greene, pp. 14-15, 39).  If, as noted in Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999), an agency can waive a desk audit, it necessarily follows that it can also waive a component of a desk audit.  White had authority to waive the supervisory interview.

3.    While the initial draft PD statement was prepared before Blackwood spoke to Filler, **that fact is irrelevant** since, **as the Defendant argues, the audit was not completed until Filler signed off on it.  Filler was given a full opportunity to comment before the audit was complete.** (Exh. C, Affid. Blackwood, p.4).  The fact that the audit was not final until Filler approved it, does not mean that it was not properly conducted in the first place. What seems to irk the defendant is the fact that the classifier reached conclusions before Filler could forestall them.  While claiming that grade was not an issue when she first discussed the audit with Hawkins (Exh A, Affid. Hawkins p.5), Filler told Hawkins that she did not believe that she should be promoted. (Exh. A, Affix. Hawkins. ¶ 18).   This opposition by Filler to the results of the audit raises the question of whether Filler's subsequent conduct was intended to achieve the grade result she felt was appropriate, and changing the duties of the PD was merely a means to an end. Although Filler was not interviewed by Blackwood before she submitted her first draft PD, Blackwood prepared a second draft PD and Evaluation Statement **after speaking to Filler**. (Exh. C, Affid. Blackwood, p.6).  After Blackwood spoke to Filler a second time, **Filler made more changes to the PD.**  These changes caused Blackwood to warn Filler that her new changes would modify the position's classification.  In the wake of these new changes, Hawkins

could no longer be classified as a GS-343 management analyst. **The issue is not whether Filler should have been interviewed before the initial draft was filed. Nor is the issue whether a manager has a right to assign duties to an employee.** Rather, the issue is whether Filler, under the guise of commenting, may use this opportunity to discriminate, i.e., may Filler remove duties from a properly classified GS-343 position, during a desk audit, for improper reasons, to harm an employee's chances for promotion? Where Filler continued to require Hawkins to perform the same pre-audit duties, her claims that the new PD reflected the duties she wanted her to perform are suspect. Since Filler told Blackwood that she wanted her management analyst (the White employee) to perform the duties, could a reasonable juror conclude that the job assignments were discriminatory since Filler was taking the management analyst classification from Hawkins? Were Filler's reasons pretextual since the White employee admitted that she was not prepared to perform the duties and she did not assume the duties until Hawkins left the division? Finally, since Filler told Blackwood that she wanted Debbie Gunther (the White employee) and not Hawkins to perform the duties, was this per se discriminatory? No determination was ever made as to whether the continued performance by Hawkins of the duties removed, albeit under the supervision of a GS-14 (Gunther), should have resulted in a change of classification or lower grade. Nor was any determination made as to whether Hawkins was still entitled to the promotion because she continued to do the same work for Filler until she left the division. (Exh. O Depo. Filler, p. 18; Exh. S, Depo. Filler pp. 26-28; Exh. L, Depo. Gunther, pp.14-15, 28, 45; Exh. F. Depo. Gunther, pp. 33-34,42). The crux of Filler's claim, as to the final audit grade, is that Filler did not want Hawkins to perform the pertinent duties. However, merely removing duties from a PD, standing alone, did not alter the landscape where the actual duties being performed were the same. Hawkins performance of the duties was never an issue until the desk audit offered a promotion. An examination of the last page of Exhibit W, Hawkins' performance standards for the year 2005, reveals that Filler not only signed off on Hawkins' GS-343 management analyst position on **December 20, 2004**, but she added

4

an addendum to her old critical elements that required Hawkins to "[d]emonstrate accountability and cost-effective use of taxpayer funds, while operating within appropriated levels." Filler added "[t]his goal is directly linked to PMA, Budget and Performance Integration." Exh. W, p.7. Performance standards are basic performance contracts between managers and employees. During the audit Filler signed off on a performance contract that required Hawkins to work as a GS-343 management analyst with an additional critical element pertaining to the budget. Filler's actions in changing the classification of Hawkins, later in the desk audit, were tantamount to a repudiation of the performance contract she had executed with Hawkins at the start of the desk audit. Because Filler had input before the desk audit was finalized, the lack of initial input is wholly irrelevant. (Exh. G, Affid. White ¶ 6). No OPM regulation bars the auditor from drawing conclusions based upon data supplied by the employee. The unofficial audit showed that Hawkins was entitled to a higher grade before Filler's bias came into play.

4. A manager has a right to comment during an audit. However, the right assumes she is properly situated and adequately informed to exercise that right in accordance with its purpose. (Exh. G, Affid. White, ¶ 6). In ¶5 of the Defendant's material facts, he admits that after the audit, Filler asked Hawkins and Blackwood about Hawkins' "**actual**" duties. Implicit in the Defendant's own admission is the fact that Filler did not know enough about Hawkins's duties. Further, Filler has repeatedly said that, if she had input earlier, she would have informed Blackwood, not of the duties actually being performed by Hawkins, but of the duties **she expected of the position**. (Exh. O, Depo. Filler, pp. 40, 53). Filler's position reflects an ignorance of the purpose of an audit. Since an audit focuses on current duties, prospective duties are not a part of the process. (Exh. G, Affid. White ¶ 7). Moreover, if a supervisor could change the duties of a position, based upon future duties, during an ongoing audit, there would be nothing to gain from doing the audit in the first place. (Exh. G, Affid. White ¶ 7). A manager could simply say that I don't want the employee to perform those duties anymore. Filler neither obtained her "understanding" of the purpose of an audit from any OPM manual, nor did she know how she came to have this understanding. (Exh. O,

Depo. Filler, pp. 43).   As a review of Exhibit W indicates, Filler adopted critical element number # 4, in the performance standards she issued to Hawkins on December 20, 2004, as a standard to measure Hawkins' performance. (Exh. W).   The element's outstanding component required analyses by Hawkins of "processes and procedures" and required Hawkins to make "sound recommendations for improving office and team productivity."  It was this element that Filler repudiated in the audit when she insisted that all reference to analyses be removed.  Finally, as noted above, not only did Filler ratify Hawkins' status as a GS-343 management analyst on December 20, 2004, she added an addendum to her critical elements that required Hawkins to "[d]emonstrate accountability and cost-effective use of taxpayer funds, while operating within appropriated levels." Exh. W, p.7.

 5.  Filler demanded changes to the draft PD based upon her misunderstanding of the impact of automation on Hawkins' position, as well as the new limitations she decided to place on Hawkins' position.  Filler denies that Blackwood told her that her removal of duties from the PD would impact upon Hawkins' grade and title of the job (Exh P, Depo. Filler p.68).  This claim is challenged by Blackwood.  (Exh. R. Depo. Blackwood, pp. 53-55).  In Aka v. Washington Hosp. Center, 156 F.3d 1284, 1293 (D.C. Cir. 1998), the Court said that "[i]f the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie, that should provide even stronger evidence of discrimination. . . . a lie is evidence of consciousness of guilt.  The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent." Citing Shager v. Upjohn Co., 913 F.3d. 398, 401 (7th Cir. 1990)("if the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one . . . may be rationally drawn"); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1400 (7th Cir. 1997)."  Filler also stated that she is not sure when she determined that Gunther would have an oversight role. (Exh. P, Depo. Filler, p.68-69).  However, Gunther testified that she was told in her job interview that her duties would include a budget oversight role. (Exh. F, Depo. Gunther, P.15).  This example of mendacity on the part of Filler calls into question her credibility, because at the time Gunther was hired in May 2005,

and before Filler spoke to Hawkins and Blackwood, Hawkins' budget role was under attack. The removal of job duties is an adverse employment decision, and cannot be done merely because the supervisor wants to do it. See, <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987). Moreover, a supervisor cannot remove duties from one employee's PD and transfer them to another employee's PD in order to enhance the latter's PD. (5 U.S.C. §§2302(b)(4), (6), and (12)).

6. This claim is more in the nature of a legal assertion[1], than a fact. To the extent the statement may be interpreted as a fact, we submit that management may lawfully participate, comments, and make assignments in accord with the law. An assignment in violation of the Merit Systems Principles for the purpose of enhancing another employee is a "Prohibited Personnel Practice." If a manager takes away duties which would qualify an employee for a higher grade if the job had been properly classified, retention of that employee in another position is a demotion, even if the employee remains at the same grade.[2]

7. When Hawkins left the Human Resources Division in 2006 and voluntarily took a downgrade to a GS-9, she was no longer a GS-343 series management analyst. Hawkins was soon promoted back to a **GS-343**-12 in the Information Services Division. (Exh. A,

---

[1] Whether a manager can make assignments or has the right to sign off on job actions before they become official, are in the nature of legal conclusions, masquerading as facts. Whether Filler had the right to sign off on a job action may establish that Blackwood's initial determinations were unofficial. If that was where the matter ended, we would not be in court. But, Filler went beyond asserting her right to input and began taking duties from a lawfully established position, thereby raising the issue of whether the action was motivated by racial bias.

[2] "A constructive demotion is simply any assignment away from a position that should have been classified at a higher grade–either because it was previously classified erroneously or because new classification standards should have been applied, rather than because of the addition of duties or responsibilities through a planned management action–where the employee met the legal and qualification requirements for promotion to the higher grade." <u>Bittner v. National Credit Union Administration</u>, 76 , M.S.P.R. 380, 383 (1997); see also <u>Beaudette v. Dep't of Treasury</u>, 100 M.S.P.R. 353 ¶ 13 (2005); <u>Russell v. Dep't. of Navy</u>, 6 M.S.P.R. 698, 711 (1981). "Because, in such a situation, the employee was entitled to a noncompetitive promotion prior to his reassignment, his assignment away from that position had the effect of a demotion." <u>Bittner v. National Credit Union Administration</u>, supra.

Affid. Hawkins ¶¶ 1, 30).  It is noteworthy that the Defendant does not indicate the classification when he refers to the grades.

<u>Material Facts in Issue for Which a Trial is Required</u>

In the view of the Plaintiff, the following material facts require a trial:

1.  In or about November 2002, Brigitte Hawkins, ("Hawkins"), an African-American woman, was appointed to the position of Management Analyst **GS-343**-11, in the Personnel Division of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF") of the Department of Justice. (Exh. A, Affid. Hawkins ¶ 3).

2.  Prior to her appointment, Hawkins had been a **GS-343**-09 Program Analyst in the Financial Management Division ("FMD"). (Exh. A, Affid. Hawkins ¶3; Exh. B, Affid. Hawkins page 2).

3.  At the time of her appointment in the Personnel Division, the position to which she was appointed was properly classified in the GS-343 series, as had been her earlier position as a GS-343 series program analyst in the FMD.  Hawkins' position met the Office of Personnel Management ("OPM") requirements for the GS-343 analyst series.  Because the position was new, it was to be reviewed within one year. ( Exh. B, Affid. Hawkins page 5).

4.  Following her selection as a GS-343-11 Management Analyst, Hawkins was assigned duties over the next couple of years that officially fell within the PD of Yvette W. Ross, a GS-201-14 Supervisory Human Resources Specialist (Exh. A, Affid. Hawkins ¶ 4). Ross was Chief of the Policy Planning and Special Projects Branch of the Personnel Division. (Exh. D. Affid. Ross ¶ 3).

5. One of Ross' major duties was overall responsibility for the Division's budget. Hawkins assisted Ross with her budget duties and became the person primarily responsible for preparing the Division's budget.  While serving as Ross' assistant with respect to the budget, Hawkins was responsible for financial projections, reports and analyses of financial data with respect to the agency's budget. (Exh. D. Affid. Ross ¶¶8, 10; Exh. U, Affid. Weaver ¶ 6).  Sometimes Hawkins would attend budget meetings, and make "presentations in lieu of her supervisor." Exh. V, p.3.

6.   In addition to preparing financial projections, reports and analyses, Hawkins was responsible for entering data into FReD, the automated financial management computer for BATF, and generating reports from FReD.  (Exh. D. Affid. Ross ¶9).

7.   The above accretion of duties occurred with the approval of the Defendant's management staff. (Exh. B, Affid. Hawkins pages 1-2).  The defendant has never asserted that Hawkins did not assume Ross' duties (the GS-201-14). (Exh. A, Affid. Hawkins ¶ 5).

8.   When Ross retired in January 2004, Hawkins continued to perform her budget duties with the tacit approval of management. (Exh. A, Affid. Hawkins ¶7;  Exh. B, Affid. Hawkins pages 1-2); Exh. U, Affid. Weaver ¶ 6).

9.   Hawkins received an "outstanding" rating with respect to her performance of these budget duties immediately prior to Diane Filler's ("Filler") appointment as chief of personnel. (Exh. A, Affid. Hawkins ¶ 10; Exh. V).

10.   When Filler, a GS-15 Caucasian female, became Chief of the Personnel Division in May 2004, she was in the dark about the duties being performed by Hawkins. (Exh. A, Affid. Hawkins ¶20; Exh. O, Depo. Filler, pp. 21, 31; Exh. S, Depo. Filler, pp. 31-32, 44).

11.   At that time, Hawkins was the only employee in the Personnel Division assigned to work on the budget. (Exh. A, Affid. Hawkins ¶ 11; Exh. E. Depo Filler, pp 34-35; Exh. S-1, Depo. Filler, p. 72).

12.   Shortly after Filler's appointment as Chief, Hawkins approached her regarding her grade, noting that her duties had increased since her initial appointment, and that her grade was too low for the duties she performed.  Filler spoke with Vivian White, who had served as Acting Chief immediately prior to Filler's appointment, regarding Hawkins' request. (Exh. G, Affid. White ¶2).  White oversaw the classification branch of the personnel office and was the logical person to resolve any issues related to classification. (  (Exh. G, Affid. White, ¶1; Exh. A, Affid. Hawkins ¶¶ 13, 14; Exh. C, Affid. Blackwood, p. 2; Exh. O, Depo. Filler, p.22).

13.   White explained to Filler her options, which included a desk audit or advertising the position for a GS-12 and have Hawkins compete for it.  Filler selected the desk audit

option.[3] (Exh. G, Affid. White ¶ 30.

14.  In October 2004, White selected Barbara Blackwood to conduct the desk audit. Filler did not want a BATF classifier to do the audit since they might be biased in favor of Hawkins. Accordingly a classifier under contract (Blackwood) was selected to do the audit. (Exh. G, Affid. White, ¶ 4).  (Exh. C, Affid. Blackwood, p. 2; Exh. O, Depo. Filler, p.22).

15.  By virtue of her position as an Assistant Chief of the Personnel Division, in charge of classifications, Vivian White had the knowledge, competence and experience to determine the protocols for a proper desk audit. (Exh. R. Depo. Blackwood pp. 71-72; Exh. O, Depo. Filler, p.22).  Filler had no experience as a classifier. (Exh. S, Depo. Filler, p. 40)

16.  By virtue of her position as an Assistant Chief of the Personnel Division, it was within the range and scope of Vivian White's authority to determine whether to waive any aspect of a desk audit.[4]

17.  White told Blackwood that Filler could not help with the audit since she was new to her job and did not know what Hawkins' duties were. (Exh. G, Affid. White, ¶¶ 5, 6; Exh. C, Affid. Blackwood, p. 2; Exh. R. Depo. Blackwood p. 71).

18.  Blackwood acknowledged that White's instructions made sense, in that Filler could not provide the proper or meaningful input of a supervisor as to the current duties of the employee if she did not know what employee did.[5] (Exh. Q, Depo. Blackwood p.21; Exh.

---

[3]  A desk audit is intended to determine what duties an employee is currently performing in his/her position. See, <u>Yartzoff v. Thomas</u>, supra, at 1373(desk audit is used to review job duties prior to assigning a higher grade); <u>Holcomb v. Powell</u>, 433 F.3d 889, 902 (D.C. Cir. 2006)(desk audit confirmed that employee was performing duties 5 grades below classification of current job).  A misclassification of a federal employment position is a "prohibited personnel action," as the term is defined by the Civil Service Reform Act. See, 5 U.S.C. §2302(a), (b); <u>Houlihan v. OPM</u>, 909 F.2d 383, 384 (9th Cir. 1990). Desk audits are usually ordered when there has been a change in duties and management wants to know whether there is classification with respect to the duties an employee id currently performing. Exh. Q, Depo. Blackwood p. 13.

[4]  <u>Barbour v. Browner</u>, 181 F.3d 1342, 1346 (D.C. Cir. 1999)(EPA had waived desk audits in the past as a prerequisite for a promotion).

[5]  The Defendant admits that Filler did not know what Hawkins was doing in his statement of material facts not in issue.  In ¶ 5 of the statement, the Defendant states that

R. Depo. Blackwood p.71).

19.  A desk audit is intended to focus on the current duties of an employee, and not duties a manager foresees an employee doing in the future. (Exh. G, Affid. White, ¶¶ 6, 7; Exh. I, Depo. Greene, pp. 14-15, 39; Exh. Q, Depo. Blackwood p. 13).

20.  Filler has repeatedly stated that she viewed Hawkins' position in the context of what she expected out of the position, and how she wanted that position to perform in the future. (Exh. O, Depo. Filler, pp. 40-43, 49, 57; Exh. S, Depo. Filler, pp. 35,38-39).

21.  Filler had never asked to have a position audited, nor had she ever participated in an audit. (Exh. O, Depo. Filler, pp.36, 43; Exh. S, Depo. Filler, p. 40).

22.  Filler did not consult any OPM regulations regarding desk audits and her perception of an audit was based upon her "understanding" of what was to occur, although she could not say where she got this understanding. Exh. O, Depo. Filler, p.43).

23.  On December 20, 2004, Filler and Hawkins signed Hawkins performance standards for 2005.  The standards were for a GS-343 management analyst.  As an addendum to the critical elements to the performance standards, Filler required Hawkins to "[d]emonstrate accountability and cost-effective use of taxpayer funds, while operating within appropriated levels."  Filler added "[t]his goal is directly linked to PMA, Budget and Performance Integration." Exh. W, p.7.

24.  Blackwood performed the audit in accordance with OPM guidelines and assigned points to the factor levels to determine the grade.  From the assigned points, She concluded that Hawkins duties exceeded the factor levels for a GS-12. (Exh. N, Depo. Blackwood pp-79; Exh. R. Depo. Blackwood pp. 45-47; Exh. K, classification report).  Blackwood noted that the assignment of points, and the use of illustrations for that purpose, was largely a judgment call on the part of the classifier. (Exh. M, Depo. Blackwood pp. 29, 39-41; Exh. N, P.42).

---

"Ms. Filler asked Blackwood and the Plaintiff specific questions about the Plaintiff's actual and expected duties.

25. Blackwood verified that Hawkins was a GS-343 management analyst because her job supported the accomplishments of principal mission of a program of the agency. (N, Depo. Blackwood p.48; Exh. K).

26. The audit was completed on February 10, 2005 and immediately sent to Filler.

27. While the audit was being conducted, Filler decided to hire a management and policy analyst to oversee the budget. (Exh. F. Depo. Gunther, p.15). Although Filler later claimed that she could not recall when the decision to place Gunther over the budget (Exh. P, Depo. Filler, pp. 68-69), Gunther testified that during her interview for the job, she was told that she would oversee the budget. (Exh. F, Depo. Gunther, P.15).

28. After Filler received the audit report on February 10, 2005, she did not act on the audit results for more than four months after it had been completed. (Exh. A, Affid. Hawkins ¶ 17). By then Debbie Gunther had been hired for the purpose of overseeing the budget. (Exh. F, Dep. Gunther, p.15).

29. Because Filler had not spoken to her about the audit, on May 24, 2005, Hawkins contacted Filler regarding the results. (Exh. A, Affid. Hawkins, ¶17).

30. Although White told Hawkins that the audit was positive, Hawkins did not learn of the grade until May 24, 2005.[6] (Exh. A, Affid. Hawkins ¶ 17).

31. Before learning the basis for the auditor's report, or before sitting down with Hawkins to discuss her duties, Filler told Hawkins that she did not think her position warranted a GS-12.[7] (Exh. A, Affid. Hawkins ¶ 18).

---

[6] In January 2005, White advised Hawkins that the results of the audit were in and congratulated her. White told Hawkins that Filler had to sign off on the audit. Hawkins assumed that the audit had concluded that she was functioning at a grade above GS-11, because White congratulated her. However, she did not know whether the grade was a GS-12 or 13. Exh. A, Affid. Hawkins ¶16.

[7] If Filler did not believe that the position warranted a GS-12, and that Blackwood had not done a satisfactory job, she could have asked OPM to audit the position. Instead, without examining the reasons why Blackwood reached the conclusion she did, Filler took duties from the PD on the grounds that she did not envision Hawkins performing the tasks in the future. Hawkins continued to perform the same duties until she left the division. "If the jury can infer that the employer's explanation is not only a mistaken one

32.  The first time Filler attempted to ascertain what Hawkins' duties were was at the post audit meeting. (Exh. O, Depo. Filler, p. 49).

33.  When Blackwood interviewed Hawkins for the audit, Hawkins provided proof of the duties she was performing.  However, when Blackwood later met with Filler, Filler's account regarding Hawkins' duties clashed with the proof Hawkins provided. (Exh. Q, Depo. Blackwood pp. 27, 38-39).  Filler later testified that she never asked Hawkins whether she performed certain duties. (Exh. S, Depo. Filler, p. 49).

34.  Filler had never had the responsibility for preparing a budget before becoming Chief of Personnel.  (Exh. O, Depo. Filler, pp. 12-14).

35.  Gunther testified that budget justifications were prepared at her level, with the person who replaced Hawkins doing the "grunt" work (Exh. L, Depo. Gunther pp. 31-34). Hawkins stated that she had been responsible for the work later done by Gunther and Wood. (Exh. A, Affid. Hawkins ¶5), Nevertheless, Filler testified that she decided to delete such duties from the proposed PD because Hawkins did not do justifications (Exh. O, Depo. Filler, p. 49), and Hawkins was limited to data collection. (Exh. O, Depo. Filler, p. 55).  Filler testified that before Gunther assumed the budget duties, she oversaw Hawkins' budget work. (Exh. S, Depo. Filler, pp. 27-28).

36.  Filler did not call Blackwood to discuss the desk audit.  However, on June 21, 2005, Blackwood called Filler regarding the audit, as she was about to go on vacation. (Exh. C, Affid. Blackwood, p. 4; Exh. N, Depo. Blackwood pp. 62-63).

37.  When Blackwood finally met with Filler, Filler told Blackwood that she was concerned that the position had turned out to be a GS-12. (Exh. R. Depo. Blackwood p. 48).

38.  It was clear to Blackwood from her discussions with Filler that Filler and Hawkins "were not on the same page about the duties of the position." (Exh. C, Affid. Blackwood, p.10; Exh. Q, Depo. Blackwood pp. 27, 36-39).

---

in terms of the facts, but a lie, that should provide even stronger evidence of discrimination." <u>Aka v. Washington Hosp. Center</u>, 156 F.3d 1284, 1293 (D.C. Cir. 1998).

39.  Before Filler and Blackwood met for the first time, Filler made changes to the draft PD Blackwood had sent her. (Exh. O, Depo. Filler, pp. 61-62).

40.  At their meeting on June 21, 2005, Filler told Blackwood that the only significant change that she saw between Hawkins' old PD and the draft PD, was Hawkins' work with the FReD financial automated system. (Exh. C, Affid. Blackwood, p. 5; Exh. R. Depo. Blackwood p. 48).  Filler told Blackwood that Hawkins did not generate reports, although Blackwood told her that she had seen such reports and suggested that Filler should speak to Hawkins. (Exh. C, Affid. Blackwood, p.5; Exh. Q, Depo. Blackwood, pp. 37-38).

41.  Blackwood knew that Hawkins had performed the COTR duties as well as other duties related to supplies, because she had personally dealt with her on those matters. ( (Exh. M, Depo. Blackwood p. 29; Exh. Q, Depo. Blackwood, pp. 35-36).

42.  From the beginning Blackwood believed that Filler did not feel that a promotion was warranted. (Exh. C, Affid. Blackwood, p.10).

43.  Filler had neither worked as a classifier, conducted an audit, nor asked for an audit.  (Exh. S, Depo. Filler, p. 40).

44.  Based upon her experience as a classifier, Blackwood stressed "that supervisors don't always know everything an employee does to accomplish assigned duties and responsibilities. They don't know the judgment and initiatives involved in accomplishing administrative responsibilities or the guidelines the employee uses and various steps required to perform a task. That is why [she] said it was unusual for duties and responsibilities to be taken away when the position was occupied." (Exh. C, Affid. Blackwood, p.10).

45.  Because she did not know Hawkins' duties, Filler asked Hawkins to explain how she did her job and to identify her duties. (Exh.  A, Affid. Hawkins ¶ 18).  Filler never asked Hawkins whether she had performed certain duties in the past. ( Exh.  S. Depo. Filler, p.49).

46.  Filler concluded from her conversation with Hawkins that, since Hawkins' job primarily related to FReD, a computerized financial management system, her duties were more akin to data entry, in which she inputted data to generate reports, and therefore did not

warrant a higher grade.[8] (Exh. E. Depo Filler, pp 40-42). However, as Gunther later confirmed, Hawkins' duties, which she inherited, included budget justifications, which were prepared and went largely unchanged from her level to the Acquisitions office. (Exh. L, Depo. Gunther pp. 31-34; see also Exh. A, Affid. Hawkins ¶5). Gunther also confirmed that Hawkins had been the division's funds analyst. (Exh. F, Depo. Gunther p.41).

47. On June 24, 2005, Blackwood sent Filler the changes that she had requested on a new PD draft. (Exh. C, Affid. Blackwood, p.6). Blackwood did not give the new PD a grade because she wanted to make sure that Filler was satisfied with the changes, however, she noted that the changes that Filler had made would impact on the grade. (Exh. C, Affid. Blackwood, p.6)

48. Filler made additional modifications to Hawkins PD based upon her future plans for that position (Exh. E. Depo Filler, p.21), and not upon Hawkins' current duties, which is the criterion for a desk audit. Filler told Hawkins that she did not want her to do certain things any longer and wanted to change her classification series. (Exh. B, Affid. Hawkins page 7).

49. Filler met twice with Blackwood concerning the desk audit. At both meetings, Filler ordered Blackwood to remove critical duties from Hawkins' PD. (Exh. R. Depo. Blackwood p. 57).

50. On July 18, 2005, Filler sent Blackwood the final version of the PD with more changes she wanted made. These changes further diluted the budget duties. (Exh. C, Affid. Blackwood, p.6). The changes impacted both the grade and the title of the position. It also changed the classification of the position from the GS-343 series to the GS-301 series.

51. The removal or transfer of job duties is a personnel action under 5 U.S.C. §2302(a)(2)(A)(xi) and an adverse employment decision. Yartzoff v. Thomas, supra 809 F.2d

---

[8] This view did not take into account the Office of Personnel Management ("OPM") classification guide for budget personnel which notes that budget work formerly done by hand is now done by computers, and no deductions should be made relative to the grade because of the automation.

at 1376.  Blackwood noted that it was unusual for a manager to remove duties from an encumbered position.  Blackwood further stated that such an action is usually done when the position is vacant, to prevent any adverse impact on the employee. (Exh. C, Affid. Blackwood, p.9).  Kathryn Greene, a Human Resources manager, who is Chief of the Classification and Performance Management Branch of the Human Resources Division, and the current boss of Blackwood, testified that she had never heard of a supervisor removing duties from a PD after it had been audited. (Exh.  I. Depo Greene, pp. 26, 30, 35, 43, 44).

52.  Blackwood warned Filler that the removal of the duties would impact on the position's classification, and change it from a management analyst classification to a miscellaneous administrative program series classification, which is a catchall series for any duties for which no specific classification is recognized. (Exh.  N, Depo. Blackwood pp. 54-55; Exh.  R. Depo. Blackwood pp. 53-55) ).

53.  Blackwood testified that Filler wanted all analytical duties taken from Hawkins' PD. (Exh.  R. Depo. Blackwood pp. 53-55). Blackwood testified that the analytical duties supported the classification of the position. (Exh.  N, Depo. Blackwood pp. 54-55; Exh.  R. Depo. Blackwood, pp. 53-55).  Blackwood removed the analytical duties from the PD.

54.  Filler denied that she was warned by Blackwood that the removal of duties would impact on the classification of the position. (Exh.  P, Depo. Filler, pp.68).

55  Blackwood assessed that the change in classification would thrust Hawkins into a "dead-ended position."  (Exh. C, Affid. Blackwood, p.9)

56.  Filler told Blackwood that she wanted the analytical duties identified in Hawkins' job to be performed by the management analyst on her staff, whom she identified as Gunther. (Exh.  R. Depo. Blackwood pp. 54-55).  Before the changes to her PD, Hawkins had been classified as a management analyst.  Hawkins had also served as funds analyst for the Division, as Gunther acknowledged in her deposition of December 18, 2007 (Exh.  F, Depo. Gunther p.41).

57.  The transfer of duties, being satisfactorily performed by an employee, from that employee to another employee, for the purpose of enhancing the job prospects of the latter

employee is a violation of the Merit System Principles (5 U.S.C. §§2301(b)(1) and (6)), and is a prohibited personnel practice (5 U.S.C. §§2302(b)(4), (6), and (12)).

58.  Filler placed a requirement in Hawkins' PD which required Hawkins to go to the FMD for guidance, when budget issues arose. (Exh. M, Depo. Blackwood pp. 20-21, Exh. N, pp. 59-60).

59.  The restriction impacted adversely upon the ability of Hawkins to do her job, by limiting her independence and decision making discretion, (Exh. M, Depo. Blackwood pp. 20-21). A key element of a GS-11 or GS-12 position is the "exercise of independent judgment." See 5 U.S.C. §§5104(11) and (12).

60. Blackwood testified that never in her career had a supervisor removed duties from an encumbered position after an audit. Nor had she ever heard of such a thing. (Exh. R. Blackwood, pp. 65-66).

61.  Filler ordered the removal of the reference to Hawkins adhering to Office of Management and Budget ("OMB") guidelines and directives from the draft PD, because Hawkins, she said, was to follow guidelines and directives set by FMD rather than OMB. However, as Blackwood noted, all federal agencies and their personnel must adhere to OMB guidelines with respect to the budget. (Exh. M, Depo. Blackwood p. 14).

62.  At the time the duties were being removed from Hawkins' PD, there was no one else available in the Human Resources Division to assume the stripped duties.

63.  At the time the duties were removed, Gunther, a GS-343-14, to whom the duties would be assigned the next year after the reorganization, did not have the knowledge, skill or experience needed to perform the budget duties that Filler was assigning her. (Exh. A, Affid. Hawkins ¶ 29), (Exh. E. Depo Filler, p.13) (Exh. F, Depo. Gunther, p. 34)(Exh. L, Depo. Gunther p. 36).

64.  Filler did not consider Gunther's budget background when she decided to transfer the budget duties to her. (Exh. E. Depo Filler, pp. 13, 27-28; (Exh. P, Depo. Filler, p.70, 73). A transfer of duties from a qualified employee to an unqualified employee violates the Merit Systems Principles. 5 U.S.C. §§2301(b)(1) and (6).

65.  Filler sent Blackwood the final version of the PD on August 2, 2005. (Exh. C, Affid. Blackwood, p.7)

66.  Although Filler had no knowledge as to how to perform the duties she was assigning Gunther, when asked how she expected Gunther to perform the duties, Filler said that she would "**coach**" her. (Exh.  E. Depo Filler, p.13).

67.  Although Gunther did not immediately assume any of Hawkins' budget duties, she did assume Hawkins' duties associated with training and oversight of space moves. (Exh. B, Affid. Hawkins page 7).

68.  From the time she raised the issue of a grade increase with Filler in August 2004, until she left in March 2006, Hawkins was solely responsible for getting the budget information to Filler.  (Exh. A, Affid. Hawkins ¶¶ 19, 27; Exh. F, Depo. Gunther, pp. 33-34, 41-42; Exh. L, Depo. Gunther pp. 15-16, 28; Exh. S, Depo Filler, pp. 26-28).

69.  The budget and other duties Filler took from Hawkins and reassigned to Gunther, enhanced Gunther's PD, who went from being a management and program analyst to being a supervisory management and program analyst, and constituted a prohibited personnel practice since this was done at the expense of Hawkins, whose budget duties were moved to Gunther. (5 U.S.C. §§2302(b)(4), (6), and (12)).

70.  In a closeout memorandum, Gunther conceded that she lacked the budget expertise that Hawkins had of the budget process and FReD, and that she and Filler had been relying upon the budget expertise of Hawkins.  Gunther also conceded that she and Filler had relied upon Hawkins' "budget analysis."(Exh. T, p. 2, ¶ 1).

71.  Filler testified that Gunther was placed in charge of Hawkins, not to do the substantive work, but to make sure that Hawkins turned in her work in a timely fashion. (Exh.  P, Exh.  Depo. Filler, pp. 71-72).

72.  Because of the manner in which she had been treated and the stress under which she was working, Hawkins left the Human Resources Division in April 2006, and took a downgrade to a GS-9 in the Safety Programs Division.  Within a month she was again promoted to a GS-11.  (Exh. A, Affid. Hawkins ¶¶ 3, 30).

73.  After spending three months in the Safety Programs Division, Hawkins competed for and was selected for a **GS-343-12** position in the Information Services Division of BATF, where she is responsible for the same type budgetary duties that she performed for Filler in the Human Resources Division.  (Exh. A, Affid. Hawkins ¶¶ 3, 30).

<u>Factual Background</u>

Hawkins is an African-American female, who is currently employed in the Information Services Division of BATF as a **GS-343-12** Management Analyst, and involved in its budget.  (Exh. A, Affid. Hawkins ¶1).  In November 2002, Hawkins applied and competed for the position of Management Analyst GS-343-11 in the Personnel Division. (Exh. A, Affid. Hawkins ¶ 3).  This position had been duly constituted and classified at the GS-343-11 level. (Exh. R. Depo. Blackwood, p. 54).  At that time, Yvette Ross, a **GS-201-14** Supervisory Human Resources Specialist, was primarily responsible for the division's budget. (Exh. A, Affid. Hawkins ¶4).  Ross hired Hawkins to be her budget person. (Exh. D, Affid. Ross).  Although Hawkins was only a GS-11, Ross delegated many of her budget duties to Hawkins.  Hawkins assumed the day-to-day responsibility for all facets of the Division's budget, including "preparation of some financial projections, reports and analyses of financial data with respect to the Division's budget." (Exh. D. Affid. Ross ¶9; Exh. A, Affid. Hawkins ¶ 5).  By the time Ross had left BATF in January 2004, Hawkins had mastered the intricacies associated with oversight of the division's budget.  Even Gunther and Filler acknowledged that Hawkins had an expertise in the budget that they lacked. (Exh. T, p.2 ¶ 1).   Hawkins was the sole employee responsible for doing the work, which previously fell under the oversight of a GS-201-14 (Ross). (Exh. A, Affid. Hawkins ¶ 5). At the time of Ross' departure from the agency, things were in a state of flux and the position of Acting Chief of the division was assigned on a rotating basis.  Ross gave Hawkins a performance appraisal of "outstanding." (Exh. A, Affid. Hawkins ¶10).  (Exh. V).

Hawkins' GS-343-11 PD was silent on the use of the FReD financial automated system (Exh. A, Affid. Hawkins ¶6; Exh. C, Affid. Blackwood, p.5). The FReD system is a computerized financial management program upon which all of the agency's financial management and reporting occurred. Hawkins was an expert on the FReD system. (Exh. A, Affid. Hawkins ¶6). As a management analyst, Hawkins interacted with other management analysts in the other BATF divisions. She noted that other budget analysts were performing the same duties as she, but were being paid at the grade level of GS-13 or higher. Hawkins obtained and examined copies of the PDs of those management analysts and noted that their GS-343-14 and GS-343-13 PDs were nearly identical to hers or reflected the duties she is now performing. Because of the new duties she had acquired from Ross, as well as other functions was performing, Hawkins concluded that if the other GS-343's were graded at a level commensurate with at least a GS-343-13, she should be graded at that level as well, or at least a GS-12. When Filler, a Caucasian female, was appointed chief in May 2004, Hawkins approached her and shared her concern that her position was not properly graded. (Exh. A, Affid. Hawkins ¶ 13). Hawkins advised Filler that she was willing to submit to a desk audit, or if Filler preferred, she would be willing to compete for the position if they advertised it at the higher grade. (Exh. A, Affid. Hawkins ¶ 13).

Because she was new to her job (Exh. S. Depo. Filler 31-32; Exh. O Depo. Filler p. 31), Filler conferred with Vivian White. (Exh. G, Affid. White, ¶ 2; Exh. A, Affid. Hawkins ¶14). Contrary to the claim set forth in the Agency's factual account, White **never** agreed that the purpose of the audit was "to reflect the duties **expected** of Plaintiff's job," as set forth on page 5 (page 7 of ECF) of the Agency's argument. (Emphasis supplied). In fact, White states that she "did not have any discussions with Filler regarding 'expected' duties," since the purpose of an audit was to identify and grade current duties. (Exh. G, Affid. White¶ 7, see also, Exh. I, Dep. Greene, pp. 14-15, 39).

20

In or about September 2004, Hawkins was told that a decision had been made to audit her position. (Exh. A, Affid. Hawkins ¶ 15). Barbara Blackwood, a contract employee with more than 27 years of experience as a classifier, was selected to perform the audit. Ms. Blackwood had performed more than 50 desk audits during her career. Blackwood worked for White, who oversaw the classification branch. White told Blackwood that there was no reason to follow the usual protocol and interview Hawkins' supervisor because the supervisor was new and was unaware of Hawkins' current duties and responsibilities. (Exh. R. Depo. Blackwood p. 72)

Hawkins cooperated with the desk audit and supplied the Blackwood with proof of the budget duties she had been performing. (Exh. K, classification report). Just before White left BATF in January 2005, she spoke to Hawkins and advised her the audit had been completed, although White did not tell Hawkins the results of the audit. (Exh. A. Affid. Hawkins ¶16). Hawkins assumed it was for a higher grade because White had congratulated her. White also told Hawkins that Filler would have to sign off on the audit. (Exh. A. Affid. Hawkins ¶16). On December 20, 2004, Filler and Hawkins signed new performance standards 2005. The standards were for a GS-343 management analyst, and added a new critical element with respect to the budget. (Exh. W, p.7).

Although Hawkins met with Filler on a daily basis, Filler never mentioned the audit, or her intent to reject its findings. After waiting more than four months and on or about May 24, 2005, Hawkins confronted Filler about the audit. (Exh. A, Affid. Hawkins ¶ 17). Filler confirmed that she had received the results of the audit, but advised Hawkins that she was not satisfied with the results, especially the grade. (Exh. A, Affid. Hawkins ¶17). While Filler indicated that she had no problem signing off on the audit, she stated that she had to speak to her immediate supervisor, Candace Mobley, before doing so. (Exh. A, Affid. Hawkins ¶18). By this time, Gunther had already been hired and informed that her duties would include oversight of the budget. (Exh. F, Depo. Gunther, p.15).

21

After speaking with Mobley, Filler told Hawkins that her supervisor had told her that it was her (Filler's) call to say "yes" or "no." Filler told Hawkins that she did not believe the position should have been reclassified as a GS-12, and in her opinion, the current grade was adequate for the position. Filler did not give Hawkins a reason for her opinion. Filler also explained that she did not understand the duties Hawkins was performing and that she wanted to sit with her, in her office, so that Hawkins could explain to her exactly what she (Hawkins) did in the FReD system. (Exh. A, Affid. Hawkins ¶18). Because the financial management system of the Bureau was now fully automated, in order for anyone to perform any financial duties or generate any type of financial report, a person had to have expertise or knowledge of the FReD system. (Exh. A, Affid. Hawkins ¶6).

From her conversation with Filler, Hawkins deduced that Filler did not seem to understand the nature of the budget work and the role that automation played in discharging the duties of her position. In her conversations with Filler, Hawkins observed that Filler sought to minimize the duties Hawkins performed by noting that the bulk of her budget duties, consisted of entering data into the FReD system, which she did not consider to be supportive of a higher grade. (Exh. A, Affid. Hawkins ¶20). It is apparent that Filler had not consulted any OPM manuals or documentation to arrive at this conclusion. It is also apparent that Filler did not confer with any knowledgeable budget persons who could have advised her on this matter. (Exh. O, Depo. Filler, p. 43). In fact, this was the first audit with which Filler had been affiliated. Filler told Hawkins that she saw her (Hawkins) job as a data entry position which did not deserve to be graded higher than a GS-11. Filler told Hawkins that she (Filler) no longer wanted her (Hawkins) to perform certain duties in her PD. (Exh. B Affid. Hawkins page 7).

The Federal financial reporting and tracking system has become fully automated, and the importance or complexity of the work being performed by Hawkins should not have been minimized by Filler solely because it involved an automated system. (Exh. Y). Hawkins was

aware that the classification series for budget analysts noted that no points should be deducted from a classification because the person is working with an automated system, since everything was being automated, and requires specialized knowledge as to what entries are to be included to get the correct results. (Exh. A, Affid. Hawkins ¶21).

Filler received the auditor's report on February 10, 2005, but did not contact her. Nor did she call Blackwood after her meeting with Hawkins on the 24th of May, even though she had already informed Hawkins that she did not think the job merited a GS-12. Because Blackwood was about to go on vacation, she decided to contact Filler in June 2005, to see if Filler had any questions concerning the audit. Although Filler did not advise Blackwood that she had already hired Gunther in May to oversee Hawkins' budget work (Exh. F, Depo. Gunther page 15), and Blackwood was unaware of what Filler had told Hawkins about the grade, Blackwood suspected that Filler did not want to promote Hawkins, because never in her 27 years of service had a supervisor failed to respond quickly to the results of an audit. (Exh. R. Blackwood, p. 47-48).

When Blackwood finally met with Filler in June, Filler told her that she did not believe that the job warranted a GS-12. (Exh. C, Affid. Blackwood, p.10; Exh. R. Blackwood, p. 48). Blackwood told Filler that Hawkins had provided her with proof of her work and that Filler should speak to Hawkins to resolve the conflict. (Exh. C, Affid. Blackwood, p.5). Filler advised Blackwood that she wanted certain items removed from the proposed PD. Blackwood removed the selected items from the PD, as requested by Filler, and returned the documents to Filler. At this point, the position could still be classified as a GS-343-11. (Exh. C, Affid. Blackwood, p.6)

When they met the second time, Filler told Blackwood that she wanted additional duties removed from the PD. (Exh. C, Affid. Blackwood, p.6). Blackwood notes that never in her career had a manager removed duties from a PD after she had audited it. (Exh. R. Blackwood, pp. 65-66). Moreover, she had **never heard** of a manager doing such after an

audit.  Blackwood notes that whenever duties were removed from a PD, it was always done while the position was vacant to prevent any adverse effect to the employee. (Exh. C, Affid. Blackwood, p.10; Exh. R. Blackwood, p. 66).  The agency official, to whom Blackwood now reported, Kathryn Greene, also testified that she had never heard of a scenario wherein a supervisor removed duties after a position had been audited.  Additionally, Filler took the opportunity during the second meeting to further dilute Hawkins' PD by requiring her to seeking guidance from FMD regarding budget issues. (Exh. M. Blackwood, pp. 20-21).

When Filler told Blackwood of the additional items she wanted removed from the PD, Blackwood told her that the duties that she wished to remove would have an adverse impact on the position's classification, and that the changes demanded by Filler would remove Hawkins' position from the management analyst series (GS-343) and place it in the miscellaneous administrative and program series (GS-301). (Exh. R. Blackwood, pp. 53-55). The 301 series is a catchall with no prescribed titles, and thus can be called by any name the agency gave it.  In this case, they called it a management support specialist.  Filler advised Blackwood that she did not care that the duties she was removing impacted on the classification of the position.  Rather, she told Blackwood that she wanted the duties performed by Gunther "the management analyst." (Exh. R. Blackwood, pp. 53-55).

For the next six months, Hawkins's duties continued as before without change. (Exh. A, Affid. Hawkins ¶27).  As noted earlier, when Filler would meet with Hawkins on the budget, she would have Smith from FMD to sit in on the meeting. In December 2005, the Personnel Division became the Human Resources Division.  A support unit was created under Gunther and all of the Black employees, who had previously reported to Filler, were reassigned to this unit, including Hawkins.

Even though oversight of the budget duties was now included in her PD, Gunther did not assume any responsibility for the budget.  Rather, Hawkins continued to perform the same budget responsibilities and report directly to Filler. (Exh. S. Depo. Filler, pp. 26-28;

Exh. F, Depo. Gunther p. 33-34; Exh. L., Depo. Pp. 14-16). The reason Gunther did not assume any budget oversight was that she was unfamiliar with the FReD system, and other budget related matters. (Exh. F, Depo. Gunther, pp 33-34, 42-43). Her budget role, at this juncture, was limited to ensuring that Hawkins submitted her work on time. (Exh. F, Depo. Gunther, p. 33). Gunther did not assume direct oversight for the division's budget until after Hawkins left the division. (Exh. F, Depo. Gunther, p. 43; Exh. I, Depo. Gunther, pp. 15-16).

Because of the stress associated with the job and the lack of any prospect for advancement, Hawkins took a downgrade to a GS-343- 09 position in another office. Within three months, she competed for a management analyst GS-343-12 position in the Information Services Division of BATF. She is currently performing the same duties she was required to perform in the Human Resources Division, except, she has been promoted to a GS-343-12.

## POINTS AND AUTHORITIES

### ARGUMENT

#### A.    What is a Material Fact?

A fact is material if it might affect the outcome of the case. A genuine dispute is shown to exist if sufficient evidence is presented that a reasonable fact finder could decide the issue in favor of the nonmoving party. Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006); Sweats Fashions, Inc. v. Pannill Kntting Co., 833 F.1560, 1562 (Fed. Cir. 1987). In doing so, the nonmoving party must produce evidence that there is a triable issue on that fact as to an element essential to that party's claim. Celotex Corp. V. Catrett, supra, 477 U.S. at 322; Arrington v. United States, supra, at 335. With respect to materiality, "the substantive law identifies which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). "Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., supra,

477 U.S. at 248; <u>Arrington v. United States,</u> supra, 473 F.3d at 333. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." <u>Anderson v. Liberty Lobby, Inc</u>., supra, 477 U.S. at 255; <u>Arrington v. United States,</u> supra, 473 F.3d at 333. "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied." <u>Johnson v. Jones</u>, 515 U.S. 304, 307-08 (1995); <u>Arrington v. United States,</u> supra, at 338. In ruling on the motion, the court may not embrace a factual scenario that is clearly contradicted by the summary judgment record. See <u>Scott v. Harris</u>, ___ U.S. ___; 127 S. Ct. 1776 (2007). Where direct evidence of discrimination is presented, summary judgment is improper. See <u>TWA, Inc. v. Thurston</u>, 469 U.S., 111, 121 (1985); <u>Endow v. Salem-Seizer Yellow Cab Co., Inc.</u>, 389 F.3d 802, 808 (9th Cir. 2004).

## B. <u>There Are Material Facts at Issue</u>.

The starting point for identifying the material facts in a Title VII action is to identify the facts which support the Plaintiff's prima facie case. The most commonly used method of proving discrimination is by the use of circumstantial evidence under the three-step, or burden shifting, "pretext" method enunciated by the Supreme Court in <u>McDonald Douglas v. Green/ Burdine;</u> [9] <u>Reeves v. Sanderson Plumbing Product, Inc</u>., 530 U.S. 133 (2000)(discrimination may be proved by circumstantial evidence); See also, <u>Hill v. Lockheed Martin Logistics Management, Inc</u>., 314 F.3d 657, 663 (4th Cir. 2003).

The Court noted in <u>McDonald Douglas</u> that since fact patterns will change from case to case, the standards for a prima facie case may vary from case to case. <u>McDonald Douglas</u>, at 802 n.13. The fact pattern in this case is unique and does not easily lend itself to strict application of the traditional <u>McDonald Douglas</u> formula. Because a number of adverse actions occurred in this case, i.e., Hawkins was denied the raise she sought following a

---

[9] 411 U.S. 792 (1971);<u>Texas Dep't of Community Affairs v. Burdine,</u> 450 U.S. 248 (1981)

**favorable desk** audit by a person outside her protected class. That person caused her to be reassigned to a different classification, with less promotion potential, and took duties from her PD and gave them to a lesser qualified Caucasian female. Thus, a modification of the traditional McDonald Douglas prima facie test may be appropriate. Hawkins can make a prima facie case of discrimination by showing that she 1) is a member of a protected class (Exh. A, Affid. Hawkins ¶1), 2) she suffered an adverse employment decision at the hands of a person outside her class (denial of a promotion and change of her position classification), and 3) under circumstances giving rise to an inference of discrimination (the White supervisor indicated that she wanted the duties she was denying Hawkins to be performed by the White management analyst). See Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999); Terry v. Ashcroft, 336 F.3d 128, 138 (3d Cir. 2003). Under this scenario, the material facts that require trial are 1) whether Hawkins was a properly classified GS-343 management analyst when Filler changed her classification, 2) whether Filler could change the duties of an employee in the midst of a desk audit, 3) whether Filler can bar an employee in a protected group from performing duties in her PD and assign those duties to another employee outside the protected group, and 4) whether Filler told Blackwood that she wanted Gunther, who was not qualified to perform the budget duties, to assume the duties she was denying Hawkins. (Exh. R. Depo. Blackwood pp. 54-55). Filler's claim that she did not expect Hawkins to perform the duties can be shown to be pretextual because Hawkins ended up performing the duties anyway, even after they were removed from her PD. (Exh. Exh. L, Depo. Gunther, p. 15). Similarly, a prima facie case can also be shown by proof that 1) Hawkins is a member of a protected class, 2) she was qualified to perform the additional duties of her position that gave rise to her request for a desk audit,[10] (Exh. A, Affid. Hawkins

_____

[10] Our appellate Court has opined that if an employee can satisfactorily perform duties that related to grades higher than that occupied by the employee, it necessarily follows that she can perform duties associated with a lower grade. Barbour v. Browner, 181 F.3d 1342, 1446 (D.C. Cir. 1999. Accordingly, if Hawkins was performing the

¶1) 3) she satisfactorily performed the additional duties of the position (Exh. A, Affid. Hawkins ¶10), 4) despite the fact that she satisfactorily performed the duties of her position, the duties were taken away from her and she was reclassified and 5) the duties removed from her position description ("PD") were assigned to a lesser qualified person outside of the protected class. See Quarantine v. Tiffany & Co., 71 F.3d 58, 64 (2d Cir. 1995). The removal of job duties is an adverse employment decision. Yartzoff v. Thomas, supra, 809 F.2d at 1376. It can result in a change of classification, as it occurred in this case, or later result in a demotion where the remaining duties are not commensurate with the grade. To remove duties from an employee and assign the duties to another employee, who is not qualified to assume them, as noted above, violates the Merit Systems Principles and is a Prohibited Personnel Act.

Filler waited more than four months to discuss the audit results. By then, Filler had hired Gunther to supplant Hawkins's role in the organization. (Exh. F, Depo. Gunther, page 15). A reasonable jury could infer that the reason why Filler did not contact Hawkins or Blackwood was that she had decided to reject the desk audit, because raising Hawkins' grade would threaten or diminish Gunther's oversight role. In order to prove her claim, Hawkins may rely upon circumstantial evidence showing the timing of Filler's hiring of Gunther for the oversight role over the budget, Filler's refusal to discuss the audit with Hawkins and Blackwood, and her immediate rejection of the audit results and challenge to the duties that Hawkins was performing which would have supported a grade increase.

The McDonald Douglas test is **inapplicable** where the Plaintiff presents direct evidence of discrimination. TWA, Inc. v. Thurston, supra; Teamster v. United States, 431 U.S. 324, 358, n.44 (1977); see also, Cardona Jimenez v. Bancomercio De Puerto Rico, 174 F.3d 30, 40 (1ˢᵗ Cir. 1999); Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1434 (4ᵗʰ Cir.

---

duties associated with Ross' GS-201-14, she was obviously functioning at a GS-343-12 level. Further, since Filler saw fit to assign these duties to a GS-343-14 (Gunther), it is clear that the initial desk audit was properly done.

1989)(direct evidence of discrimination obviated the need for a separate showing that employer's articulated reason for discharge was pretextual). In this case, Hawkins has direct evidence of discrimination. When Filler was stripping duties from Hawkins' PD, she advised Blackwood that she wanted her management analyst to perform those duties. (Exh. R. Depo. Blackwood pp. 54-55). Since there were only two management analysts in the office at the time, one Black and one White, the decision to remove management analyst duties from Hawkins' PD raises the inference that Filler wanted only the White employee in a position to compete for the duties. Since Blackwood said that Filler mentioned Gunther's name for the first time during this exchange, it was clear that Filler intentionally favored the White employee for the duties. This event also provides additional direct evidence of racial animus. (Exh. R. Depo. Blackwood pp. 54-55). This change in classification lowered the status of Hawkins by transferring her to a less prestigious position. Further, barring a Black employee from performing grade enhancing duties, while limiting the duties to a White employee, is direct evidence of discrimination. Where there is direct evidence of an improper motive, there is no need for a jury to infer the existence of an improper motive. Accordingly, as to the removal of the duties from Hawkins' PD and the change of her classification from the management analyst series to the miscellaneous analyst program series, summary judgment for the Defendant must be denied.

### C.  The Material Facts at Issue Bar Summary Judgment

In identifying and isolating the material facts in dispute which, if a reasonable juror found in Hawkins' favor on these facts, could result in a verdict in her favor, we need to look no further than the fact that the Defendant hired Hawkins as a GS-343-11 in the year 2002, and no one challenged the propriety of that classification until Filler ordered changes to her PD. Moreover, Filler reaffirmed the GS-343-11 classification when Hawkins and she signed the 2005 performance standards for a GS-343 management analysts. (Exh W).  As Blackwood noted, the establishment and classification of Hawkins' position when she was

hired, presumptively meant that she was properly classified initially as a GS-343- 11 Management analyst. (Exh. R, Depo. Blackwood, p. 54). If Hawkins was a properly classified GS-343-11 when she was hired in 2002, a reasonable juror could find that Filler's decision to take away her GS-343 management analyst duties during a desk audit, which would have supported a higher grade, and converting it to a GS-301, was improper. From the fact that Filler issued performance standards to Hawkins in December 2004 for a management analyst at the start of the audit, including an addendum with a new critical element, and then challenged the duties supporting that classification after the audit results were in, a reasonable jury could conclude that the duties did not concern Filler, but the promotion. As Filler told both Hawkins and Blackwood when she first met with them about the audit, she did not think the job deserved a GS-12 grade. From the fact that Filler could not cite any law for her actions, and did not seek advice or examine OPM regulations before doing so, a reasonable juror could find this action to be arbitrary and capricious.

Human nature and common sense undercut the Defendant's claim that Filler's conduct was appropriate.  **No reasonable employer or supervisor** would likely object to any employee performing more duties than those identified in his or her PD unless 1) the employee is performing the duties badly, 2) there is someone at hand who can do the job better, or as well, with no increase in cost, or 3) the employer would be forced to pay the employee more money for the services than the employer believes appropriate.  In this case, no one said that Hawkins was incompetent or did her job poorly.  In fact, Filler continued to require Hawkins to perform the duties as before, because there was no one who could do the job better, or in fact able to do the job period, other than Hawkins.  (Exh. O Depo. Filler, p. 18; Exh. S, Depo. Filler pp. 26-28; Exh. L, Depo. Gunther, pp.14-15, 28, 45; Exh. F. Depo. Gunther, pp. 33-34,42).  Thus, the only reason that makes sense is that Filler did not want to pay her, i.e., give her a promotion.  This was Filler's initial reason for dissatisfaction with the audit that she expressed to both Hawkins and Blackwood, prior to her surgery on

Hawkins' PD. (Exh. R. Depo. Blackwood p. 48; Exh. A, Affid. Hawkins ¶ 18).

There are other material facts on which the outcome of the case could turn where a reasonable finder-of-fact could find in Hawkins' favor:

1) The fact that Filler delayed her discussions with Blackwood, concerning the audit, for more than four months, and only discussed the audit then after being confronted by Hawkins and Blackwood. From this fact, a reasonable juror could infer that Filler delayed any confrontation over the audit because she did not have any legitimate reasons to oppose it, and had to contrive reasons after being confronted by Hawkins and Blackwood. The fact that Filler told Hawkins and Blackwood, at the outset of their meetings, that the position was not a GS-12, before she sat down with Hawkins to ascertain her duties, a reasonable juror could conclude that everything that Filler said and did after her rejection of the grade was designed to ensure that the grade never rose above a GS-11. Stripping the PD of significant duties would ensure that result. It is noteworthy that Blackwood inferred from Filler's delay that she did not want to promote Hawkins. Blackwood testified that never had a manager waited that long to get back to her on an audit. As noted above, Filler told Hawkins, when she initially met with her about the audit, that she did not think the job warranted a GS-12. This confession was made at a time when Filler did not know what Hawkins' duties were. A reasonable juror could conclude that Filler had elected to go the desk audit route because she was confident that the grade would remain the same, or she would see that it would.

2). The fact that Filler did not ask Blackwood how she arrived at her conclusions suggests that Filler saw those reasons and facts to be irrelevant for what she wanted to accomplish, i.e., deny the Black woman a promotion. (Exh. M, Depo. Blackwood, pp.9-10). The total lack of legitimate interest in the basis for the conclusions drawn by the classifier give rise to the inference that Filler did not have any legitimate arguments that could refute the conclusions drawn by the classifier.

3). A reasonable juror could infer from the fact that Filler continued to strip duties

from the PD after Blackwood told her that she was about to change the classification from a GS-343 to a GS-301 that Filler wanted to ensure that Hawkins would never be in a position to seek a desk audit for a promotion as a GS-343, and wanted her in the miscellaneous analyst program series where the prospects of a higher grade were fewer.

4).    A reasonable juror could conclude from the fact that Filler limited the independence of Hawkins by specifically requiring her to go to FMD, if she was confronted by a unique budget issue, rather than going to her supervisors, Filler knew that she and Gunther were not qualified to answer budget questions that Hawkins was qualified to resolve and did not want this fact disclosed.  Similarly, a juror could conclude that since the criteria for a GS-11 and 12 required the "exercise of independent judgment" (See 5 U.S.C. §§ 5104(11)(a) & (b) and (a) & (12)(b)), Hawkins would never qualify for a promotion based upon assigned duties, since she lacked the independence to decide budget issues on her own.

5).    The fact that Hawkins continued to perform the duties that formed the basis of the desk audit throughout her remaining tenure in the Human Resources Division, could lead a reasonable juror to conclude that Filler had no aversion to having Hawkins perform the duties, as she argued in support of her decision to remove them from the PD.  Rather, the juror could conclude that Filler was only averse to paying more money for Hawkins to do the removed duties, or allowing Hawkins to remain independent of oversight.

6).    Since Filler had concluded that she would have to "**coach**" Gunther on her budget duties (Exh.  E. Depo Filler, p.13), a juror could infer from that fact that Filler was not concerned about Gunther's lack of experience and competence.  Rather, Filler did not want a Black woman holding this much control over her budget.  This view can be inferred from the fact that when Filler met with Hawkins about the budget, she had Karen Smith, a White budget analyst from FMD, sit in on the meetings.  (Exh.  B, Affid. Hawkins pages 8-9).

7).    The fact that Filler transferred all of her Black employees to the support unit, and made them all report to Gunther rather than her, could cause a reasonable juror to conclude

that Filler was uncomfortable around Black people and preferred not wanting to deal with them.

8).    A reasonable juror could infer from the fact that Filler told Blackwood that she wanted only Gunther, her White management analyst, to perform the duties she was taking from Hawkins' PD, meant that she wanted only a White person to do the job since she was stripping Hawkins of her management analyst title.

9).    A reasonable juror could infer from the fact that the Defendant told Gunther that she would have budget oversight when she was hired in May 2005 (Exh.  F. Depo. Gunther p.15), that Filler's rejection of the audit results, and the stripping of duties from Hawkins' PD, furthered this decision by placing the duties in Gunther's PD.

10).    Since Filler played down the importance of the work that Hawkins did with FReD, the financial management system, and viewed her job as a data entry position, despite the fact that OMB stated that positions should not be downgraded because a computer is involved, a reasonable juror could infer that Filler did not know her job, and that the claim she advanced for opposing the promotion was a pretext for discrimination.

11).    A reasonable juror could also infer that since the only persons who had ever had budget responsibility in the Personnel/Human Resources Division were GS-201-14 (Ross) and GS-343-14 (Gunther), Hawkins should have at least qualified for a GS-12 if she performed those duties.

12.    The fact that Hawkins was promoted by the Defendant to a GS-343-12 within 4 months after leaving the Human Resources Division, while performing the same duties she had under Filler, a reasonable juror could infer that the fuss that Filler made over this desk audit was a pretext for discrimination.

### D.    The Agency May Not Offer Expert Testimony

The agency extensively cites the affidavit of Kathryn Greene in its argument to support its claim as to the purposes and requirements of a properly conducted audit. See page

11 of argument (or p.13 of ECF).  This expert testimony is offered to prove that the audit conducted by Blackwood was flawed, and what the prerogatives are for management in a desk audit.  We invite attention to the controversy associated with the Defendant's refusal to cooperate and participate in discovery in this case.  When the Agency did not file an FRCP 26(b)(4) statement in response to the one filed by Hawkins, and further sought to frustrate Hawkins' access to discovery, the Court ruled that the time for the Defendant to designate an expert witness had long passed. See page 6, Discovery order.  Accordingly, we submit that **since Greene did not participate in the desk audit in question**, her comments regarding the propriety of the steps taken by Blackwood, based upon information supplied to or made known to her after the fact, are in the nature of expert testimony since based upon specialized knowledge and not personal knowledge.  Having failed to comply with the Court's discovery order, and failing to secure the Court's permission to designate an expert to be deposed, we submit that the agency may not now offer through slight-of-hand, backdoor expert testimony.

E.  <u>White's Decision to Waive the Supervisory</u><br>
<u>Interview cannot be assailed</u>

White states that she does not recall telling Blackwood not to interview Filler.  Rather, she appreciates the fact that Blackwood might have interpreted her remarks to mean that it was pointless to interview Filler since she did not know what Hawkins' did, i.e., the whole purpose of an audit. (Exh. G. Affix, White, ¶¶ 3, 6).  The Defendant cannot negate any genuine issue regarding the desk audit, by arguing that the initial results of the audit were not official because Filler was not interviewed, since that fact is irrelevant.  The rules only require that the auditor speak to the supervisor at some time during the audit.  The purpose of the management interview is to verify what the employee is telling the auditor. (Exh. G. Affix, White, ¶ 6).  Since Filler spoke to the auditor before the audit was finalized, the issue is moot.  All that we know is that Blackwood did not interview Filler prior to preparing her report, an irrelevant point since the parties are fighting over what occurred after she had input.   Assuming that the interview occurred because of White's instructions, or a

34

misinterpretation of them, if White was acting within the scope of her authority at the time she gave the instructions, as set forth in ¶2 of the Defendant's statement of material facts, the initial interview was waived. The correctness of this decision is established in ¶5 wherein Defendant admits that after the initial release of the desk audit, Filler "asked Ms. Blackwood and the plaintiff specific questions about the Plaintiff's actual and expected duties." Since a desk audit is supposed to focus upon the employee's current duties (Exh. G. Affix, White, ¶¶ 6, 7), and it is clear that Filler did not know what duties Hawkins actually performed, because she had to later ask what they were. From this fact a reasonable juror could find that the audit was properly done. See, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, supra; <u>Arrington v. United States,</u> supra, at 335. See, <u>George v. Leavitt</u>, 407 F.3d 405, 413 (D.C. Cir. 2005); see also, <u>United States v. One Parcel of Real Prop.</u>, 960 F.2d 200, 204 (1st Cir. 1992).

The fact that a manager may assign duties to an employee is not per se unassailable, as the Defendant would have the Court to believe. If Hawkins was satisfactorily performing the duties of the position at the time the desk audit was completed, a manager's prerogatives cannot serve as a shield for discriminatory action. White recognized that Filler had no substantive information as to what Hawkins was doing and could not provide confirmation of the duties assigned to Hawkins that the auditor needed. (Exh. G. Affix, White, ¶¶ 2, 3, 5, 6). Of course, expected duties, to which Filler repeatedly refers, are not the proper subject of a desk audit unless you are creating a new position. (Exh. G. Affix, White, ¶6). As Filler candidly admitted to White and Hawkins, she was new to her job and did not know what duties were included in Hawkins' position. (Exh. S. Depo. Filler pp. 31-32). It was only after the audit had been completed that she asked Hawkins to explain to her what her duties consisted of. However, this post audit education as to the range and scope of Hawkins' duties followed Filler's conclusory comments to Blackwood and Hawkins that she did not believe the position warranted a GS-12. It was with the goal of limiting the grade that Filler

35

directed that duties be taken from Hawkins' PD on the grounds that Filler **did want Hawkins to perform** the duties at issue, not that Hawkins had not been performing, which is the criterion for a desk audit.  Since the purpose of a desk audit is to ascertain what the employee is currently doing and whether the PD for that position is properly classified, (Exh. I, Depo. Greene, pp. 14-15, 39), that purpose would be defeated if a supervisor were to structure the audit on the duties the supervisor no longer wanted the employee to perform or expected the employee to perform in the future. (Exh. G. Affix, White, ¶ 7).  The Defendant has not asserted that White was acting beyond the scope of her authority if she told Blackwood not to interview Filler.  In the absence of such a claim, or a showing from an OPM manual that an audit conducted without supervisory input is per se invalid, the agency claims are irrelevant.

### F.   Hawkins Continued to Perform the Same Duties

The Achilles heel of the Defendant's reasonable nondiscriminatory reason for its action can be found in the papers the agency submitted in support of its motion for summary judgment.  Filler repeatedly justified the removal of duties from Hawkins' PD on the basis that she did not want Hawkins to perform those in the future.  On pages 4-5 of its motion, despite Filler's claim that the duties she removed from Hawkins' PD were things that she did not want Hawkins to do, the agency **admits** that Gunther, to whom she intended to transfer the duties, never assumed any budget duties previously performed by Hawkins until after Hawkins left the agency.  Thus, despite the agency's claim that there was a need for Filler to have input in the audit in order that the PD reflected the duties Filler wanted Hawkins to perform, an improper basis for an audit, the fact remains that Hawkins continued to perform the same duties as when Filler arrived.  Because  Gunther needed to be coached on the duties Filler was assigning her, she was not a proper person to reassign the duties to. (Exh. E. Depo Filler, p.13).  Further, the heart of Filler's (and the agency's) claims, that a GS-12 was not warranted in this case, is shown on page 7 of the motion.  There the agency opines that "most

of the reports were system generated and did not require analysis." However, this reason is undercut by the OPM classification regulations for budget personnel, which states that the fact that automation is involved should not lessen the grade or impact on the classification since all reports are now computer generated. The crux of the Defendant's argument is, a supervisor has the right to bar an employee from performing duties that she had discharged in an outstanding fashion, over the past two years, in order to transfer those duties to an employee not capable of discharging the duties. As Gunther acknowledged on page 2 of her close out memo, she had a very limited knowledge of the budget process and the FReD system and depended on Hawkins' expertise. (Exh. T, p.2). In the same paragraph, Gunther makes another admission, i.e., that Filler and she depended upon Hawkins' "budget analysis" to know how much money was still in the budget. (Exh. T, p.2 ¶ 1). This admission undercuts any excuse that Filler had for removing analyses from Hawkins' PD and changing her classification from a GS-343 management analyst to a GS-301 management support specialist.

### G.   Filler Did Not Want the Black Woman to Be Promoted

When Filler told Blackwood that she wanted the duties taken from Hawkins' PD to be performed by her management analyst, she was in effect stating that she wanted the duties performed by a White woman, since Gunther was the only other management analyst in the office. (Exh. R, Depo. Blackwood, p. 53-55). Filler even mentioned Gunther's name, which Blackwood said she heard for the first time. (Exh. R, Depo. Blackwood, p. 55). Since Gunther was hired in May 2005 to oversee the budget, Filler was satisfied with the changes she was making on Hawkins' PD. Filler made this determination despite the fact that only Hawkins had the requisite expertise with the budget that Gunther and Filler did not have. (Exh. E. Depo Filler, pp. 11-13; Exh. F, Depo. Gunther, p. 34).

Until Filler, no one had ever questioned whether the duties satisfied the criteria for the management analyst series, and the PD was reviewed by a classifier prior to the position

being filled in 2002. (Exh.  R. Depo. Blackwood, p. 54).  For two years, Hawkins performed her duties, which included duties previously performed by Ross, with the approval of the Defendant's managers.  When Filler challenged the results of the desk audit, she also challenged the pre-November 2002 decision to classify the position as management analyst. Other than saying that these were not duties she expected Hawkins to perform, Filler never offered any reasonable nondiscriminatory reason for removing the duties other than she wanted to do it.  Blackwood testified that Filler wanted all analytical duties taken from Hawkins' position and assigned to Gunther. (Exh. R, Depo. Blackwood pp. 53-55).  Yet, in June 2006, long after she had left personnel, Filler and Gunther criticized Hawkins for not giving them an accurate "budget analysis." (Exh. T, p.2, ¶ 1).

Filler took enough significant duties from Hawkins that she altered Hawkins' classification from the management analyst series (GS-343), to the miscellaneous administrative and program series (GS-301).  A reasonable juror could infer from the fact that no one had ever questioned Hawkins' status as a GS-343 management analyst, that the whole world was comfortable with Hawkins performing the duties of a GS-343 management analyst.  If Filler was the only person to object and sought a change to Hawkins' classification, after she had reaffirmed it with new performance standards (Exh. W, p.7), it was because Filler did not want to promote Hawkins.  Although warned by Blackwood that the duties she was taking from the PD would alter the classification, Filler told Blackwood that she wanted the duties performed by the management analyst, a label that only fit Gunther. (Exh.  R, Depo. Blackwood, pp. 53-55).

## H.  Hawkins Was Constructively Demoted

Because Hawkins was qualified, by virtue of her duties, for a higher grade, a classification error had occurred with respect to the GS-343-11 grade to which Hawkins had been assigned.  A constructive demotion occurs when the classifier recognizes that an error had been made, and the error is not corrected, and the employee is left at the old level.  The

law treats the employee's situation as if it had been rectified and the employee would have been at the higher grade but for the agency action. The Merit Systems Protection Board holds that "if a position was classified erroneously or a change in classification standards would have mandated a change in the grade, it is proper to view the employee as if the error had been rectified, so that the employee would be occupying a position with a higher grade than he actually had. The employee's grade therefore was reduced when the employee was reassigned at the same grade because, had the position been properly classified at the higher grade, that assignment would have reduced the grade." Artmann v. Dep't. of Interior, 926 F.2d 1120, 1123 (Fed. Cir. 1991). See, also, Hogan v. Dep't. of Navy, 218 F.3d 1361, 1364-65(Fed. Cir. 2000); Walker v. Dep't. of Navy, 106 F.3d 1582, 1584 (Fed. Cir. 1997). Bittner v. National Credit Union Administration, 76 M.S.P.R. 380, 383 (1997); see also Beaudette v. Dep't of Treasury, 100 M.S.P.R. 353 ¶ 13 (2005); Russell v. Dep't. of Navy, 6 M.S.P.R. 698, 711 (1981). The changes in Hawkins' classification could be viewed as a constructive demotion, inasmuch as, had the classification error been corrected and she had been promoted to a GS-343-12, the later reassignment to a GS-301-11 would have been a demotion. Artmann v. Dep't. of Interior, supra. Applying the McDonald Douglas prima facie test to these facts: **1)** Hawkins was a member of a protected class; **2)** she was entitled to a higher classification because of her duties as a GS-343-11 encompassed duties previously performed by a GS-201-14 and GS-201-13; **3)** she sought a promotion to at least a GS-343-12 based upon an accretion of duties; **4)** a desk audit was properly conducted of her current duties and resulted in a finding that Hawkins was entitled to a GS-343-12; **5)** a supervisor who was outside of the protected class, disagreed with the findings of the audit and proceeded to take duties from the PD in order to change the grade and the classification of the position and bar future prospects for a promotion; **6)** Hawkins was reassigned to another classification outside of the GS-343-series, by a person outside of her protected group, **7)** at the time Hawkins was reassigned, she was satisfactorily performing the duties

39

of her earlier classified position at a level that met the employer's reasonable expectations,
**8)** following her reclassification, her responsibilities for those duties were shifted to another
person outside of her protected group, **9)** that person was selected to perform those duties
despite the fact that she admitted that she was not then qualified to perform the chores and
10) despite the ostensible reason for removing the duties, Hawkins was required to perform
the duties anyway.  It is noteworthy that the Defendant does not argue that the duties were
removed because Hawkins was not qualified to perform them.  We submit that if a
reasonable jury could find that Blackwood had performed the audit properly, and that Filler's
objections were pretextual because Hawkins continued to perform the duties, and Gunther
was incapable of assuming the duties, summary judgment is improper.

<u>CONCLUSION</u>

WHEREFORE, for premises considered, it is respectfully submitted that the
Defendant's motion for summary judgment should be denied

June 5, 2008                                             Respectfully submitted

                                                         //S//    Charles E. Wagner
                                                        Charles E. Wagner, Esq. (Bar # 94276)
                                                        Edward L. Allen, Esq. (Bar # 375341)
                                                        Attorneys for Plaintiff
Charles E. Wagner, Esq.                                 Silver Spring Centre
P.O. Box 14723
Washington, D.C. 20911
(202) 210-7801
E-Mail: Wagnelliot@Aol.com
Fax: 1-202-318-7185

Edward L. Allen, Esq.
1400 Locust Road NW
Washington, D.C. 20012
(202) 262-8550
E-Mail Allen200@att.net
Counsel for the Plaintiff

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRIGITTE HAWKINS,                    )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )          07CA0010 (CKKK)
                                     )
MICHAEL MUKASEY,                     )
                                     )
DEPARTMENT OF JUSTICE,               )
                                     )
                    Defendant.       )
                                     )

## DECLARATION OF BARBARA BLACKWOOD

I, BARBARA BLACKWOOD, hereby declare, as provided that:

1. The term "budget justification" is defined as documents submitted in support of a budget request. The justification typically explains changes between the current appropriation and the amounts requested for the next fiscal year. (This definition was found in a GAO publication - Glossary of Terms Used in the Federal Budget Process. GAO-05-734SP dated September, 2005).

2. It is within management's discretion to assign work. As part of the desk audit process it is management's right to agree with the duties as stated or add or remove duties and responsibilities. The results of a desk audit are not official until the manager certifies the results.

3. At the time of Ms. Hawkins desk audit, she was responsible for "projecting budget requirements and preparing justifications as needed." This was not considered a primary responsibility because it was on an as needed basis meaning

it was not a regular and recurring task and I did not get a sample of any budget justifications. Also it should be noted that Ms. Hawkins was not considered a budget analyst and the responsibilities she was performing concerning the budget were basic as they related to the needs of the HR Division. The budget tasks were performed in conjunction with other administrative responsibilities.

I declare under penalty of perjury that the foregoing is true and correct.

_Barbara Blackwood_    _6/20/08_
Barbara Blackwood                          Date

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIGITTE R. HAWKINS     )
        Plaintiff,  )
            ) CASE NO. 07CV00010 (CKK)
            )  ORDER
            )
      v.    )
MICHAEL B. MUKASEY,    )
 ATTORNEY GENERAL,    )
       Defendant.  )
_____ /

## ORDER

   This matter having come before the Court on the Cross-Motion of the Plaintiff for
Summary Judgment, and the Court having been advised of the grounds therefor and the
opposition to the motion, it is therefore:

   ORDERED, that the Plaintiff's Cross- Motion for Summary Judgment be granted for the
reasons set forth in the accompanying findings of fact and conclusions of law.


Date: _____, 2008      _____
               Judge Colleen K. Kotelly
               U.S. District Judge


Parties to be served:
Heather Graham-Oliver, Esq.
Assistant U.S. Attorney
Office of U.S. Attorney,
555 4th Street NW
Washington, D.C.  20530

Charles E. Wagner, Esq.
P.O. Box 14723
Silver Spring, Maryland 20911