**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BRIGITTE R. HAWKINS,

    Plaintiff,

    v.

ERIC H. HOLDER, Jr., Attorney General,
Department of Justice

    Defendant.

Civil Action No. 07–10 (CKK)

**MEMORANDUM OPINION**
(February 8, 2009)

    Plaintiff, Brigitte R. Hawkins ("Hawkins" or "Plaintiff"), an African-American female who was previously employed in the Human Resources Division[1] of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), an agency within the Department of Justice, filed the instant suit against Defendant Eric H. Holder, Jr., in his official capacity as Attorney General (collectively with ATF, "Defendant"), alleging various claims of employment discrimination and retaliation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Hawkins' claims stem from a desk audit conducted in 2005, as a result of which her position in the Human Resources Division of ATF was reclassified from a GS-343-11 management analyst to a GS-301-11 management support specialist.

    Currently pending before the Court are Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment.  Briefing on both Defendant's and Plaintiff's

---

[1]The Human Resources Division was known as the Personnel Division prior to the Division's reorganization in December of 2005, which is discussed below. *See infra* 16-17.  For convenience, the Court shall refer to the Division, both before and after the reorganization, as the "Human Resources Division."

motions is complete, and the case is now ripe.  After a searching review of the parties' briefing,

the exhibits attached thereto, the relevant case law, and the entire record herein, the Court shall

DENY Defendant's Motion for Summary Judgment and DENY Plaintiff's Cross-Motion for

Summary Judgment, for the reasons that follow.

## I.  BACKGROUND

As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil

Rule 7(h)(1) when resolving motions for summary judgment.  *See Burke v. Gould*, 286 F.3d 513,

519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 7(h)(1), formerly 56.1,

before applying it to the case).  The Court has repeatedly advised the parties that it strictly

adheres to Rule 7(h)(1) and has stated that it "assumes that facts identified by the moving party in

its statement of material facts are admitted, unless such a fact is controverted in the statement of

genuine issues filed in opposition to the motion."  *See, e.g.,* Scheduling and Procedures Order,

Docket No. [15]; 03/07/08 Order, Docket No. [36].  Although both parties filed statements of

material facts and responses, the Court notes that the quality of such statements and responses is,

to say the least, wanting.  Upon the Court's own review of the supporting material, it is apparent

that the parties' briefing, particularly Plaintiff's, variously includes inaccurate citations to the

record as well as mischaracterizations of the supporting evidence.  In addition, Plaintiff's

Response Statement is riddled with legal citations and argument, neither of which are

appropriate.  The Court was therefore largely left to its own devices in determining the material

facts relevant to the issues at hand.  Accordingly, in setting forth the factual background below,

the Court has, for the most part, cited directly to the record.  However, where appropriate, the

Court has also cited to Plaintiff's Statement of Material Facts as included in her Cross-Motion

("Pl.'s Stmt.") or Defendant's Statement of Material Facts ("Def.'s Stmt."), unless a statement is

contradicted by the opposing party.  Where a party objects to relevant aspects of an opposing

party's proffered material fact, the Court shall cite to Plaintiff's Response to Def.'s Stmt. as

included in her Opposition ("Pl.'s Resp.") or Defendant's Response to Pl.'s Stmt. ("Def.'s

Resp."), as necessary.

     A.     *November 2002 - January 2004*

     In November of 2002, Hawkins, an African-American female, was hired by the Human

Resources Division of ATF into the position of a GS-343-11 management analyst.  Pl.'s Stmt. ¶

1.  Hawkins was initially assigned to work with the Human Resource Division's budget under the

direct supervision of Yvette Ross, GS-201-14 Supervisory Human Resources Specialist and

Chief of the Policy Planning and Special Projects Branch of the Human Resources Division in

ATF.  Pl.'s Cross-Mot., Ex. A (Hawkins Aff.) ¶ 5; *see also id.*, Ex. D (Ross Aff.) ¶¶ 2, 8-9.  She

remained under Ross' supervision until Ross retired from ATF in January of 2004.  Pl.'s Cross-

Mot., Ex. D (Ross Aff.) ¶¶ 2, 8.  During the relevant time period (*i.e.*, November 2002 to January

2004), Ross had primary responsibility for the Human Resource Division's budget.  Pl.'s Cross-

Mot., Ex. D (Ross Aff.) ¶¶ 5-6; *see also id.*, Ex. A (Hawkins Aff.) ¶ 4.

     The exact extent of Hawkins' budgetary duties during this time period is, to some degree,

unclear.  According to Hawkins, while under Ross' supervision, she assumed performance of

both Ross' budgetary duties as well as her own, with Ross' approval.  Pl.'s Stmt. ¶¶ 1-2; *see also*

Pl.'s Cross-Mot., Ex. A (Hawkins Aff.) ¶ 5.  Consequently, Hawkins asserts that, during this

time, she performed *all* analyses, including studies, related to the budget.  *Id.* ¶ 5.  Ross's

testimony  confirms that Hawkins performed *some* budgetary analyses and studies while under

her supervision, but suggests that Ross herself retained some budgetary responsibilities as well:

"Up to the date of my departure from the agency, Hawkins served as my assistant with respect to

the Division's budget, and her duties [*sic*] provided technical and analytical advice to assist me

with the day to day management of the budget."  Pl.'s Cross-Mot., Ex. D (Ross Aff.) ¶ 8.  Ross

further confirmed that Hawkins "entered information into [ATF's] automated financial

management and control system, known as FRED, and served as the Division's expert on

FRED;" "was also responsible for the preparation of some financial projections, reports and

analyses of financial data with respect to the division's budget;" and "[was] the person with

responsibility for the day-to-day oversight of the Division's budget."  *Id.* ¶¶ 9-11.

　　In addition, reference to the position description ("PD") for the GS-343-11 management

analyst position, as it existed when Hawkins was first hired into the position, provides further

support for Hawkins' assertion that she was assigned to perform at least some analyses, including

studies, related to the budget.  *See* Def.'s Notice of Filing, Docket No. [44], (hereinafter "Def.'s

Notice of Filing"), Att. 6 (1/17/08 Filler Dep.) at 36 (describing Ex. 4 to the deposition as "a

copy of [Filler]'s initial position description"); *id.*, Ex. 4 (position description for GS-343-11

management analyst).  For example, the PD provides that the GS-343-11 management analyst

"[p]erforms analyses of the financial status of the various programs managed by the Division;"

"[a]nalyzes requests for reallocation of funds, taking into consideration the needs and program

requirements/changes of the various Branches;" "[a]nalyzes and evaluates the Division's

procedures and controls;" "[p]lans and conducts studies to evaluate and recommend ways to

improve the effectiveness and efficiency of work operations;" "[p]repares reports of findings that

include identification of problems and proposed recommendations for problem resolution and/or

improvement;" "[c]oordinates and analyzes operations and long range plans;" "researches,

compiles and summarizes fiscal resource data;" "projects budget requirements;" "prepares

justifications as needed;" and "[p]repares reports, position papers and other documents as

necessary on a periodic or as-needed basis." *See id.*, Ex. 4 (position description for GS-343-11

management analyst).

Defendant, for his part, offers no evidence to contradict or otherwise rebut Hawkins'

assertion that she was responsible for at least some budgetary analysis while under Ross'

supervision, which is corroborated by Ross and the PD.  *See* Def.'s Resp. ¶¶ 1-2 (stating only that

"Defendant lacks sufficient knowledge or information of the budget duties assumed by Ms.

Hawkins between 2002 and 2004").

     *B.*     *January 2004 - May 2004*

As stated above, Ross retired from ATF in January of 2004.  Pl.'s Cross-Mot., Ex. D

(Ross Aff.) ¶ 2.  According to Hawkins, after Ross left ATF in January of 2004, Hawkins

continued to perform all of the budget-related duties that she had assumed while under the direct

supervision of Ross, as well as other tasks which had previously been assigned to Ross, but she

now reported directly to the Chief of the Human Resources Division.  Pl.'s Cross-Mot., Ex. A

(Hawkins Aff.) ¶¶ 7, 11.  Again, Defendant, for his part, offers no evidence to contradict or

otherwise rebut Hawkins' assertion that she was responsible for at least some budgetary analysis

and reports in the immediate months after Ross' retirement.  *See* Def.'s Resp. ¶¶ 1-2.

     *C.*     *May 2004 - April 2006*

        1.    <u>Desk Audit</u>

In May of 2004, Diane Filler, a Caucasian female, was hired by ATF to fill the position of

Chief of the Human Resources Division.  Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at

4, 11.  At that point, Filler became Hawkins' direct supervisor.  Pl.'s Cross-Mot., Ex. H (Filler

Aff.) at 1.  Shortly after Filler was hired, Hawkins approached Filler and expressed concerns

about the grade level of her position, stating her belief that she was entitled to a promotion to the

GS-12 grade level.  *Id.* at 21, 31.  Filler responded that she "was new, [] was trying to learn the

job, the organization, who does what, that [she] needed some time to get in and settle in before

[she] really looked into anything more particular."  *Id.* at 21.  Accordingly, Filler told Hawkins

that it would be premature to consider Hawkins' request at that time, as Filler did not have the

information necessary to make that decision.  *Id.* at 31.

At some point thereafter, Hawkins again asked Filler for a promotion to the GS-12 grade

level, and also requested a desk audit in the alternative.  *See* Def.'s Notice of Filing, Att. 6

(1/17/09 Filler Dep.) at 60-61.  Filler told Hawkins that she would consider Hawkins' request for

a desk audit and approached Vivian White, Assistant Human Recourse Officer of the Human

Resources Division, to discuss Hawkins' request.  *See* Def.'s Notice of Filing, Att. 4 (11/ 27/06

Filler Dep.) at 32; Pl.'s Cross-Mot., Ex. G (White Aff.) ¶ 1.  Although Filler did not recall the

substance of her conversation with White, *see* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler

Dep.) at 32, White testified that Filler agreed to conduct the desk audit because no one knew all

the duties that Hawkins had been performing, including Filler who was relatively new to ATF at

that point.  *Id.* ¶¶ 2, 3.  Ultimately, Filler agreed to Hawkins' request to have a desk audit

conducted with respect to the GS-343-11 management analyst position.[2]  *Id.*

---

[2]The Court notes that the parties dispute the proper purpose of a desk audit.  Hawkins
maintains that a desk audit should be focused solely on the job duties currently performed by an
employee.  *See, e.g.,* Pl.'s Stmt. ¶ 12; *see also* Pl.'s Cross-Mot., Ex. G (White Aff.) ¶ 7 ("A desk
audit focuses upon current duties and not proposed duties.").  By contrast, Defendant maintains

a.      Blackwood's Initial Draft of the PD

In October 2004, White asked Barbara Blackwood, a contract position classification specialist in ATF's Human Resources Division, to conduct the desk audit.  Def.'s Stmt. ¶ 1; *see also* Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 1-2.  In requesting that Blackwood conduct the desk audit, White indicated that the desk audit was requested, at least in part, because neither she nor Filler were certain what duties and responsibilities Hawkins was performing.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 2; *id.*, Ex. G (White Aff.) ¶¶ 3, 6.  According to Blackwood, White also told her that she would not need to contact Filler, even though Filler was Hawkins' direct supervisor, because Filler was new to the Human Resources Division and therefore did not know what duties Hawkins was performing.  *See* Def.'s Notice of Filing, Att. 3 (1/17/08 Blackwood Dep.) at 23.  White, however, did not recall specifically telling Blackwood to exclude Filler from the desk audit, but guessed that Blackwood may have simply inferred from White's statement that Filler was not familiar with Hawkins' duties as an instruction not to confer with Filler.  Pl.'s Cross-Mot., Ex. G (White Aff.) ¶ 6.  Regardless, it is undisputed that Blackwood did not initially contact Filler before talking with Hawkins nor did she contact Filler before drafting a

---

that a desk audit properly considers not only what job duties an employee is currently performing but also what job duties the manager/employer expects or needs the employee to perform in the future.  *See, e.g.*, Def.'s Resp. ¶ 24 (acknowledging that Filler's future expectations were part of her criteria for modifying Hawkins' PD); s*ee also* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 40-42. 53, 57.  Defendant, in support of his argument, submitted the affidavit and deposition transcripts of Kathryn Greene, Chief of the Classification and Performance Management Branch in the ATF.  *See* Def.'s Mot., Ex. C (Greene Aff.); Def.'s Notice of Filing, Att. 7 (1/17/08 Greene Dep.).  Hawkins argues that Greene's testimony is improper expert testimony.  *See* Pl.'s Opp'n at 33-34.  The Court finds however that the determination of the proper purpose of a desk audit is not material to the instant Memorandum Opinion and therefore need not resolve the issue.  As the Court has not relied in any way on Greene's testimony in reaching its conclusions herein, the Court shall defer resolution of expert issues until motions in limine.

revised PD.  *See* Def.'s Stmt. ¶ 3; Pl.'s Resp. ¶ 3.  It is equally undisputed that her failure to do so

was a deviation from her usual procedures, in which she, as the classifier, would obtain

supervisory input prior to drafting the PD.  *See* Pl.'s Stmt. ¶ 16; Def.'s Resp. ¶ 16.  Blackwood,

however, ultimately submitted the draft PD to Filler for her review and signature, and the parties

both agree that a PD is not final or official until it is agreed to and signed off by the supervisor.

Def.'s Stmt. ¶ 4.

Upon being given the assignment to conduct the desk audit, Blackwood states that she

requested Hawkins provide her with a description of the duties that she was performing that were

not in the current GS-343-11 management analyst PD.  *See* Def.'s Notice of Filing, Att. 3

(1/17/08 Blackwood Dep.) at 23.  Hawkins did not provide Blackwood with the requested

information until December 29, 2004.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 3.

Blackwood then set up a time to meet with Hawkins on January 26, 2005, to discuss her duties

and to review samples of Hawkins' work product.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at

3.  Based upon Blackwood's notes from that meeting, the then-current PD for the GS-343-11

management analyst position, and the list of duties that Hawkins had provided, Blackwood

developed a draft PD.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 4.  Blackwood submitted the

draft PD to Filler for review on February 10, 2005.  *Id.*  The draft PD indicated that the position

was a GS-343-12.  Def.'s Stmt. ¶ 4; Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 4.

In late May of 2005, approximately four months after Blackwood had submitted the draft

PD to Filler for her review, Hawkins had still not received the audit results and therefore asked

Filler about the desk audit.  *See* Pl.'s Cross-Mot., Ex. A (Hawkins Aff.) ¶¶ 17-18.  In response,

Filler met with Hawkins to discuss in more detail Hawkins' job duties.  *See* Def.'s Notice of

Filing, Att. 4 (11/27/06 Filler Dep.) at 49.

It is undisputed that at that meeting, Filler told Hawkins that she did not believe the position should be classified as a GS-12.  Pl.'s Stmt. ¶ 20; Def.'s Resp. ¶ 20.  Later at deposition, however, Filler testified that in reviewing the draft PD, "[she] was paying no attention and no focus on the grade level that was proposed."  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 49-50.  In particular, when asked "did you have questions regarding the grade that was proposed by Ms. Blackwood," Filler responded: "Oh, no.  Grade had nothing to do with it."  *Id.* at 49.  In addition, it was Blackwood's opinion that "from the beginning Ms. Filler did not feel that a promotion was warranted."  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 10.

Thereafter, on June 21, 2005, still having received no response from Filler, Blackwood emailed Filler to tell her she was going on vacation and to inquire whether Filler wanted to meet with her to discuss the desk audit.[3]  Pl.'s Cross-Mot., Ex. C (Blackwood Aff. at 4).  Filler and Blackwood met later that same day to discuss the desk audit and draft PD.  *Id.*  Noticeably, Defendant, in his briefing, does not attempt to explain the approximately five month gap of time between the date Filler received the draft PD in February 2005 and the date when she met with Blackwood in June of 2005.  *See generally* Def.'s Mot.; Def.'s Reply/Opp'n.  This absence of an explanation is particularly noteworthy given that Filler stated at deposition that "she knew right away when I saw the duties that were described on the paper that those were not accurate for what she was doing or what I needed her to do and the kind of assignments I would direct for her to do."  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 35.

According to Blackwood, at the June 21, 2005 meeting, she and Filler went over the draft

---

[3]In contrast, the Court notes that, at deposition, Filler stated that after receiving the draft PD, Filler herself "sought [Blackwood] out" to talk to her about the desk audit and the fact that Filler had not been consulted.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 38.

PD line by line.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 5.  Although Filler testified that she

asked Blackwood to explain how she arrived at the conclusions stated in the draft PD, *see* Def.'s

Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 43, Blackwood's testimony disputes this

contention, asserting that Filler did not ask her any questions about how she arrived at her

conclusions, *see* Def.'s Notice of Filing, Att. 3 (Blackwood Dep.) at 9.  Based on Filler's

comments and changes, which are addressed in detail below, Blackwood emailed a new revised

draft of the PD to Filler on June 23, 2005.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 6.  In that

revised draft, Blackwood noted that the position was still classified as a 343 series, but did not

re-calculate the grade level because she wanted to make sure Filler was satisfied first.  Pl.'s

Cross-Mot., Ex. C (Blackwood Aff.) at 6.

On July 18, 2005, Filler responded to Blackwood with additional changes.  Pl.'s Cross-

Mot., Ex. C (Blackwood Aff.) at 6-7.  Blackwood made those changes and prepared a final PD,

which was emailed to Filler on August 2, 2005.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 7.

As a result of these changes, the position as described in the final PD was classified as a GS-301-

11.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 7.  That is, the grade level remained at an

11—rather than the grade level 12 that Blackwood had initially recommended in the draft

PD—and the series changed from a 343 to a 301.  Although Blackwood testified that she had

advised Filler that her changes to the PD—in particular, her removal of the language indicating

that Hawkins performed analytical studies—would impact the series, *see* Pl.'s Stmt. ¶ 26; *see*

*also* Def.'s Notice of Filing, Att. 3 (Blackwood Dep.) at 54, Filler denied at her deposition that

Blackwood ever told her that the changes would affect the series, *see* Def.'s Resp. ¶ 26 (Filler

was surprised when the position was changed to the a 301 series); *see also* Pl.'s Def.'s Notice of

Filing, Att. 4 (11/27/06 Filler Dep.) at 68; *see also id.*, Att. 6 (01/17/08 Filler Dep.) at 46 ("We

had no such conversation.").

      b.     Filler's Changes to the Initial Draft of the PD

Filler objected to several job duties included in the draft PD.  *See generally* Pl.'s Cross-

Mot., Ex. C (Blackwood Aff.) at 7).  For example, Filler removed language indicating that

Hawkins "[p]rojects budget requirements and prepares justifications as needed."  *See* Def.'s

Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 53; *see also id.,* Ex. 4 (draft of PD with Filler's

cross-outs).  According to Filler, the "program owners of initiatives completed that requirement,"

not Hawkins.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 53, 58 (reiterating that

Hawkins did not prepare any budget justifications); *see also id.,* Ex. 4 (draft of PD with Filler's

cross-outs).  In addition, Filler removed language indicating that Hawkins "plans and conducts

studies to evaluate and recommend ways to improve the effectiveness and efficiency of work

operations," as well as "[p]repares reports of findings that include identification of problems and

proposed recommendations for problem resolution and/or improvements."  *See* Def.'s Notice of

Filing, Att. 4 (11/27/06 Filler Dep.) at 55; *see also id.,* Ex. 4 (draft of PD with Filler's cross-

outs).  Still yet, Filler deleted language indicating that Hawkins "analyzes operations and long

range plans."  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 37.  Finally, Filler

added language to the draft PD that required Hawkins to "seek interpretations and guidance from

the FMD for budget analysis."  Pl.'s Stmt. ¶ 30; Def.'s Resp. ¶ 30; *see also* Def.'s Notice of

Filing, Att. 3 (01/17/08 Blackwood Dep.) at 19.

      Hawkins, for her part, disputes Filler's various conclusions that Hawkins did not perform

certain duties.  For example, Hawkins disputes Filler's conclusion that Hawkins did not perform

budget justifications.  Pl.'s Cross-Mot., Ex. A (Hawkins Aff.) ¶ 5 ("I did the budget

justifications").  Blackwood's testimony also confirms that, "at the time of [the] desk audit,

[Hawkins] was responsible for 'projecting budget requirements and preparing justifications as needed,'" but further provides that this "was not considered a primary responsibility because it was on an as needed basis." Def.'s Reply, Att. 1 (Blackwood Aff.) ¶ 3.  There is also evidence to dispute Filler's conclusion that Hawkins did not prepare studies related to the budget. *See, e.g.,* Pl.'s Cross-Mot., Ex. U (Affidavit of Sophia Smith-Weaver) ¶ 6 ("I am aware that [Hawkins] prepared a large volume of reports and studies associated with the budget" while under Ross' supervision).

More significantly, however, it appears that Filler's primary concern was Hawkins' job duties as they related to the financial computer system, FRED.  According to Filler, Hawkins' only duties as they related to working with the financial system were the work Hawkins did with FRED inputting information into the financial system.  Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 32.  In Filler's opinion, the FRED system did not require any analytical experience or skill and was "more of a data entry system." *See* Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 41.  Overall, Filler stated that she envisioned Hawkins' role as simply involving data collection and entry, and not one involving budget analysis. *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 55.

Hawkins disputes Filler's general conclusion that Hawkins' duties primarily involved data entry rather than analysis.  For example, as Hawkins points out, in the closeout performance feedback memorandum that Hawkins' supervisor[4] completed in June 12, 2006, in which the supervisor provided feedback on her assessment of Hawkins' performance from December of 2005 until May of 2006, the supervisor provided: "Based on your budget analysis, we turned

---

[4]Hawkins' supervisor at this time was Debra Gunther, who is discussed *infra* 15-16.

back $300,000 to OM to address the salary shortfall." Pl.'s Cross-Mot., Ex. T (Closeout

Performance Feedback Mem.) at 2. Hawkins also offers other evidence that she was considered

an expert in the budgetary area, which would tend to refute Filler's claim that Hawkins' duties

were strictly limited to data entry. For example, the closeout performance feedback

memorandum discussed above also stated that the supervisor "depended on [Hawkins'] expertise

in providing the Chief, Human Resources Divsion an accurate account of the HR budget." Pl.'s

Cross-Mot., Ex. T (Closeout Performance Feedback Mem.) at 2; *see also* Pl.'s Cross-Mot., Ex. U

(Affidavit of Sophia Smith-Weaver) ¶ 7 ("I am also aware that Brigitte Hawkins was considered

an expert on budget matters by the budget personnel from other divisions, because I observed

budget persons from other division visiting with Mrs. Hawkins to seek her counsel and advice on

budget issues.")

        c.      Effect of Filler's Changes to the PD

The changes Filler made to the PD impacted the grade level as well as the title and series

of the position. Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 7. In particular, the deletion of

language indicating that Hawkins engaged in "analysis," which is one of the key requirements of

the 343 series, impacted the series and grade level assigned to the position. *See* Def.'s Notice of

Filing, Att. 3 (01/17/08 Blackwood Dep.) at 15, 53. The addition of the language requiring

Hawkins to seek guidance from the FMD for budget analysis also impacted to some degree the

series as well. *See* Def.'s Notice of Filing, Att. 3 (01/17/08 Blackwood Dep.) at 54.

According to Filler, she deleted from the draft PD only those "duties described in the

position description that had never been nor did I ever expect to or anticipate [Hawkins]

performing." *See* Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 20-21. "Because there

were things that were described in there [that] she never did," Filler testified that she did not, as a

practical matter, actually take or reassign any of Filler's job duties.  *See* Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 20-21; *see also id.*, Att. 6 (01/17/08 Filler Dep.) at 30.  The Court notes, however, that, although Filler repeatedly testified that she removed only those job duties from the draft PD that Hawkins did not perform, Filler also variously explained that she removed job duties from the draft PD that were "not work that I needed for her to do."  *See, e.g.,* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 37; *see also id.*, Att. 5 (12/18/07 Filler Dep.) at 21 (testifying that it was more accurate to say that she "re-described [Hawkins'] position to more accurately reflect what I needed her to do"); *see also id.*, Att. 6 (01/17/08 Filler Dep.) at 46 ("it did not accurately reflect what I needed [Hawkins] to do"); Pl.'s Cross-Mot., Ex. H (Filler Aff.) at 4 ("I told [Blackwood] about duties in the draft that I did not expect of that position and duties that [Hawkins] was not actually performing.").

Filler admitted at deposition that she did not discuss any of these changes with Hawkins before she made the changes outlined above.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 61.  Indeed, Filler admitted that she initially made some of those changes before she even spoke to Hawkins about her job duties, although she did not finalize the changes until after speaking with her.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 62.  Moreover, although Filler testified that "[she] found no evidence of [Hawkins] ever being asked to perform [certain] tasks," Pl.'s Cross-Mot., Ex. H (Filler Aff.) at 7, Filler conceded that she had no recollection of ever asking Hawkins whether she had, at any time, performed any of the duties that Filler deleted from the PD description, Def.'s Notice of Filing, Att. 7 (01/17/08 Filler Dep.) at 49, and that she had "no knowledge of what [Hawkins] did" before Filler began at ATF.  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 39.

According to Hawkins, the change in series as well as the decision not to promote her to

the GS-12 adversely affected her.  As is specific to the change in series, Hawkins contends that it "would place [her] in a different series with no promotion potential to GS-12."  Pl.'s Cross-Mot., Ex. B (Hawkins Aff.) at 7; *see also* Pl.'s Resp. ¶ 55 ("Blackwood assessed that the change in classification would thrust Hawkins into a 'dead-ended [*sic*] position.'").  Blackwood's testimony, to some extent, supports Hawkins' claim that the change in series had negative repercussions on Hawkins:  "[W]ithin the [Human Resources] Division, it is likely that [Hawkins] would be in a dead-ended [*sic*] position" because of the change in series.  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 9.  However, Blackwood also testified in her deposition that the 343 series is not better or worse than the 301 series because "they are both professional series." Def.'s Notice of Filing, Att. 3 (Blackwood Dep.) at 52.  Defendant does not offer any evidence to rebut Blackwood's initial statement that the position is a "dead-ended" [*sic*] one.[5]

 2.    Debra Gunther

In May of 2005, while the desk audit was still pending, Debra Gunther, a Caucasian female, was hired by the Human Resources Division of ATF as a GS-343-14 management and policy analyst.[6]  Pl.'s Stmt. ¶ 37; *see also* Def.'s Notice of Filing, Att.8 (12/18/07 Gunther Dep.) at 16.  According to Gunther, she was informed in her interview that "they wanted [her] to oversee the budget," as well as perform other duties.  *See* Def.'s Notice of Filing, Att. 8 (12/18/07 Gunther Dep.) at 15.  However, as Hawkins emphasizes, Blackwood testified that Filler, in deleting the language in Hawkins' PD that indicated the position was responsible for

------

[5]The Court notes that Defendant provided no response to Hawkins' Response Statement of Facts, as provided in her Opposition.

[6]Filler was on vacation or away on business on the date Gunther was hired, and the actual decision to hire Gunther was made by Filler's co-worker, Helen Oates.  *See* Def.'s Notice of Filing, Att.8 (12/18/07 Gunther Dep.) at 16.

"analysis," explained that such analysis would be performed by Gunther, not Filler.  *See* Pl.'s

Cross-Mot., Ex. R (12/18/07 Blackwood Dep.) at 54-55.  Nonetheless, when Gunther was first

hired and until the reorganization, as described below, she had "nothing to do with anything

financial."  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 25-26 ("She was not

responsible for anything financial.  That didn't occur until after she took responsibility for the

human resources' support staff during the reorganization.").  Rather, she was effectively "like an

assistant to [Filler]."  *See* Def.'s Notice of Filing, Att.8 (12/18/07 Gunther Dep.) at 16.  Indeed,

Gunther confirmed that until Hawkins left the Human Resources Division, Hawkins remained

responsible for the budget.  *See* Def.'s Notice of Filing, Att.8 (12/18/07 Gunther Dep.) at 43.

> 3.   <u>Reorganization of the Human Resources Division</u>

When the Human Resources division was reorganized in December of 2005, Gunther

took on supervisory responsibilities over three support staff, including Hawkins.  *See* Def.'s

Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 69; *see also* Def.'s Notice of Filing, Att.8

(12/18/07 Gunther Dep.) at 26.  According to Defendant, this change in Gunther's duties,

however, was not a promotion and Gunther remained in the same grade and series.  *See* Def.'s

Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 69; *see also* Def.'s Notice of Filing, Att.8

(12/18/07 Gunther Dep.) at 16.  Thereafter, Hawkins was assigned to report directly to Gunther,

rather than Filler, and Gunther became responsible for budgetary oversight.  *See* Def.'s Notice of

Filing, Att. 4 (11/27/06 Filler Dep.) at 69; *see also id.*, Att. 5 (12/18/07 Filler Dep.) at 12-13.

Hawkins voluntarily left ATF in April of 2006.  Pl.'s Cross-Mot., Ex. A (Hawkins Aff.) ¶

28.  As stated above, until that time, the parties agree that Hawkins—and not

Gunther—continued to have primary responsibility for all budget work.  *See* Def.'s Notice of

Filing, Att. 4 (11/27/06 Filler Dep.) at 69.  Gunther's oversight was limited only to ensuring

Hawkins' work was completed in a timely manner.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06

Filler Dep.) at 69.  As Gunther confirmed, she did not do much if any work on the budget until

after Hawkins departed.  *see* Def.'s Notice of Filing, Att. 9 (1/17/09 Gunther Dep.) at 15.  The

position vacated by Hawkins was ultimately filled by Lesa Wood, who was competitively

selected to fill the GS-301-9/11 human resources support staff position.  Def.'s Reply/Opp'n,

Att. 4 (Filler Aff.) at 2.

      *D.*     *Procedural Background*

      Hawkins filed the instant lawsuit on January 4, 2007, alleging various claims of

employment discrimination for disparate treatment and retaliation in violation of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.*  *See generally* Compl., Docket No. [1].  Specifically,

Hawkins alleges that Defendant improperly removed duties from the PD for her position, as a

result of which she was improperly denied a promotion to the GS-12 grade level and reclassified

into a 301 position that had no opportunity for future promotion.  *See id.* ¶¶ 30-45.  She also

alleges that certain unfair and false statements were made in her closeout appraisal in retaliation

for her EEO activity.  *See id.* ¶¶ 36-51.

      Currently pending before the Court are Defendant's Motion for Summary Judgment

("Def.'s Mot."), Docket No. [37]; Hawkins' Opposition to Defendant's Motion ("Def.'s Opp'n"),

Docket No. [40]; Hawkins' Cross-Motion for Summary Judgment ("Pl.'s Cross-Mot."), Docket

No. [41]; Defendant's combined Opposition to Hawkins' Cross-Motion and Reply in Support of

Defendant's Motion ("Def.'s Opp'n/Reply"), Docket No. [42]; and Hawkins' Reply in support of

her Cross-Motion ("Pl.'s Reply"), Docket No. [46].  Before turning to the substance of the

parties' arguments, the Court emphasizes that neither party's briefing addresses or otherwise acknowledges Hawkins' claim for retaliation, as set forth in her Complaint.  Accordingly, the Court's Memorandum Opinion is limited only to a discussion of Hawkins' claims for discrimination based on disparate treatment.

## II.  LEGAL STANDARDS

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, a party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d

1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251-52 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials of the adverse party's pleading are not enough to prevent the issuance of summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing FED. R. CIV. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), *aff'd*, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases).  "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the

speedy and inexpensive resolution of every case." *Marshall*, 276 F. Supp. 2d at 47 (quoting

*Celotex Corp.*, 477 U.S. at 327).   Accordingly, the Court reviews both Defendant's Motion and

Hawkins' Cross-Motion under a "heightened standard" that reflects "special caution."  *Aka v.*

*Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal quotations omitted),

*overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).   Nonetheless, while this

special standard is more exacting, it is not inherently preclusive.   Although more circumspect, the

Court shall continue to grant a motion for summary judgment in which the nonmoving party has

failed to submit evidence that creates a genuine factual dispute and the moving party is entitled to

a judgment as a matter of law.

## III.  DISCUSSION

Title VII of the Civil Rights Act prohibits the federal government from discriminating in

employment on the grounds of race, 42 U.S.C. § 2000e-16.   To prove a violation of Title VII, a

plaintiff must demonstrate by a preponderance of the evidence that the actions taken by an

employer were "more likely than not based on the consideration of impermissible factors."  *Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (internal quotation marks and

citation omitted).   Furthermore, a plaintiff may prove his claim with direct evidence,[7] and absent

direct evidence, he may prove his claim using indirect evidence pursuant to the burden-shifting

---

[7] Hawkins asserts in her Opposition that "[i]n this case, [she] has direct evidence of discrimination."  Pl.'s Opp'n at 29.  Hawkins, however, is wrong as a legal matter.  Direct evidence "is evidence that, if believed by the fact finder, proves the particular fact in question *without any need for inference*."  *Brown v. Small*, 437 F. Supp. 2d 125, 130 n. 7 (D.D.C. 2006) (emphasis in original) (citing *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)).  As Hawkins' citations to allegedly "direct" evidence in support of this claim demonstrate, she is, in fact, citing only to indirect and circumstantial evidence of discriminatory animus.  *See* Pl.'s Opp'n at 29.  The Court's own independent review of the record in this case reveals confirms that Hawkins has not provided any direct evidence of discrimination.

analysis created by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Carpenter v. Fed'l Nat'l Mort. Assoc.*, 165 F.3d 69, 72 (D.C. Cir. 1999).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to employ the familiar *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). Under this paradigm, a plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case. *McDonnell Douglas*, 411 U.S. at 802. If he succeeds, the burden shifts to the defendant to articulate some legitimate, non-discriminatory or non-retaliatory reason justifying its conduct. *Id.* If the defendant is successful, then "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted).

For a claim alleging disparate-treatment discrimination, a plaintiff makes out a prima facie case by showing (1) that she is a member of a protected group; (2) that she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Wiley v. Glassman*, 531 F.3d 151, 155 (D.C. Cir. 2007); *Mastro v. Potomac Elec. Power.* Co., 447 F.3d 843, 850 (D.C. Cir. 2006). The D.C. Circuit has clarified, however, that the *McDonnell Douglas* prima facie factors are "almost always irrelevant" and are "largely [an] unnecessary sideshow" *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 492-93 (D.C. Cir. 2008). Where an employer asserts a legitimate, non-discriminatory reason for its challenged conduct, thereby doing "everything that would be required of [it] if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." *Id.*, 520

F.3d at 494 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983));

*see also Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008) (holding that the prima facie

inquiry "is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for

an adverse employment action").   "And by the time the district court considers an employer's

motion for summary judgment or judgment as a matter of law, the employer ordinarily will have

asserted a legitimate, non-discriminatory reason for the challenged decision—for example,

through a declaration, deposition, or other testimony from the employer's decisionmaker."

*Brady*, 520 F.3d at 493.  In such circumstances, a district court's inquiry collapses into a single

question: "[h]as the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-discriminatory reason was not the actual reason and that the employer

intentionally discriminated against the employee on the basis of race, color, religion, sex, or

national origin?"  *Id.* at 494.

Based on this guidance, the D.C. Circuit has stated in no uncertain terms that a lower

court should not evaluate whether a plaintiff has established a prima facie case where a defendant

sets forth a legitimate, non-discriminatory reason for its conduct: "the district court need not

—*and should not*—decide whether the plaintiff actually made out a prima facie case under

*McDonnell Douglas*."  *Id.* at 495 (emphasis in original); *see also Adeyemi*, 525 F.3d at 1226 n.1

("the prima facie case is ultimately *irrelevant* here") (emphasis added); *Wiley,* 511 F.3d at 156

(D.C. Cir. 2007) ("[g]iven this record [which includes articulated, non-discriminatory reasons]

we 'need not address the Government's contentions that [appellant] failed to make out a prima

facie case'") (quoting *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005)).

Nevertheless, the Supreme Court also advised lower courts in *Reeves v. Sanderson*

*Plumbing Products, Inc.* that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." 530 U.S. 133, 148 (2000). That is, the Supreme Court suggested that the evidence used to establish a prima face case could be used to aid a jury's determination on "the issue of whether the defendant's explanation is pretextual." *Id.* at 143 (quoting *Burdine*, 450 U.S. at 255 n.10). *See also Brady*, 520 F.3d at 495 (explaining *Reeves* requires lower courts to "determin[e] whether summary judgment or judgment as a matter of law is warranted . . . [by] consider[ing] all relevant evidence presented by the plaintiff and defendant"). Accordingly, because Defendant in this case has asserted a legitimate, non-discriminatory reason for his challenged conduct, all of the evidence in the record shall be considered, including that which would be used to establish Hawkins' prima facie case (but not for the purpose of evaluating whether a prima facie case has been established), to address the ultimate question of discrimination or retaliation *vel non*.

As explained above, Hawkins claims that she was discriminated against on the basis of her race. Hawkins' allegations focus on Defendant's decision to reclassify her position as a GS-11 in the 301 series. Although Hawkins' briefing is less than a model of clarity and fails to clearly set forth the exact claims she seeks in the instant lawsuit, it appears from the Court's own review of Hawkins' complaint and briefing that Hawkins has attempted to set forth two different theories of discrimination based on disparate treatment. Specifically, Hawkins alleges that Defendant impermissibly modified her PD, based upon discriminatory animus, in order to: (1) deny Hawkins a promotion to the GS-12 grade level; and (2) constructively demote Hawkins by

placing her into the 301 series at the GS-11 grade level.[8]   In response, Defendant explains that it

denied the promotion to the GS-12 grade level based on the results of a desk audit.   Because

Defendant has proffered a legitimate, nondiscriminatory reason for its conduct, whether Hawkins

has established a prima facie case of discrimination is "irrelevant."   *Adeyemi*, 525 F.3d at 1226.

Accordingly, the Court's inquiry collapses into the single question of whether Hawkins has

produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-

discriminatory reason was not the actual reason for Defendant's conduct, and that the real reason

was based on discrimination.   *See Brady*, 520 F.3d at 493.

    A.    Hawkins' Non-Promotion Claim

    As explained above, Hawkins claims that her position should have been classified as a

GS-12 and that ATF's decision to classify the position as a GS-11 impermissibly denied

Hawkins a promotion to the GS-12 grade level.   Defendant asserts that it properly placed

Hawkins in the GS-11 grade level based upon the results of a desk audit.

---

[8]The Court notes that at times, Hawkins appears to also allege that Defendant impermissibly discriminated against Hawkins when it removed certain job duties from Hawkins. *See, e.g.,* Compl. ¶¶ 40-45; Pl.'s Cross-Mot. at 28 ("removal of job duties is an adverse action"). Although the removal of job duties may, in some instances, be an adverse action, Hawkins does not, as a factual matter, claim that Defendant actually removed any job duties from her.  Rather, Hawkins alleges that Defendant removed job duties from her PD—not from Hawkins herself. Indeed, Hawkins argues that she continued to perform the same job duties even after her position was reclassified. *See, e.g.,* Pl.'s Opp'n at 36- 37 ("Hawkins Continued to Perform Same Duties"); Pl.'s Reply at 10 ("It is undisputed that duties were ultimately removed from Hawkins' PD, just as it is undisputed that Hawkins continued to perform the same budget duties as before."); *id.* at 20 ("Thus, Hawkins was forced to continue to provide the same budget duties as before, but without the benefit of a raise to which she was entitled."). Accordingly, the Court reads Hawkins' argument as asserting that Defendant deleted *language* indicating that Hawkins performed certain job duties from her PD, not that Defendant removed the *actual* job duties from Hawkins herself.  As such, these allegations are not a separate claim, but rather support Hawkins' assertion that Defendant improperly modified Hawkins' PD in a manner that impermissibly denied Hawkins a promotion to the GS-12 grade level and reclassified the position into the 301 series.

"A plaintiff such as [Hawkins] may try in multiple ways to show that the employer's stated reason for the employment action was not the actual reason (in other words, was a pretext)." *Id.* at 495. In particular, a plaintiff may do so by "attempt[ing] to demonstrate that the employer is making up or lying about the underlying facts that formed the predicate for the employment decisions." *Id.* For example, a plaintiff may point to inconsistencies in the record and the corresponding doubts raised as to the credibility of a defendant's asserted legitimate non-discriminatory explanations, which could be regarded by a reasonable jury as pretext for a discriminatory motive. *See id.* at 495 n.3. Although the question of whether Hawkins has presented sufficient evidence from which a reasonable jury could infer that Defendant's conduct was motivated by a discriminatory animus is a close one, the Court ultimately concludes that Hawkins has proffered sufficient evidence to demonstrate that there are genuine, material facts in dispute and to cast doubts on Defendant's proffered explanation (*i.e.*, whether it is pretextual), and whether Defendant's true reason for Hawkins' non-promotion was discriminatory.[9]

First, Hawkins has introduced evidence sufficient to demonstrate that there are genuine issues of material fact in dispute. For example, Filler alleges that she deleted from the draft PD only those duties that "[Hawkins] never did." *See* Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 20-21. But Hawkins has presented evidence that, contrary to Defendant's assertions, she

---

[9]Defendant argues in part that Hawkins' claims of disparate treatment should be dismissed because Hawkins and Gunther were not "similarly situated." *See* Def.'s Reply/Opp'n at 7- 9. Hawkins, however, has not argued that she and Gunther are similarly situated individuals. *See* Pl.'s Reply at 26. Although a plaintiff may, of course, proffer evidence that her employer has treated similarly situated individuals outside her protected class more favorably, a plaintiff is not required to do so. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850-51 (D.C. Cir. 2006). Rather, as the D.C. Circuit has recognized, "[a] plaintiff such as [Hawkins] may try in multiple ways to show that the employer's stated reason from the employment action was not the actual reason (in other words, was pretext)." *Brady*, 520 F.3d at 495.

in fact performed budget justifications and prepared budget studies.  *See, e.g.,* Pl.'s Cross-Mot.,
Ex. A (Hawkins Aff.) ¶ 5 ("I did the budget justifications"); Pl.'s Cross-Mot., Ex. U (Affidavit of
Sophia Smith-Weaver) ¶ 6 ("I am aware that [Hawkins] prepared a large volume of reports and
studies associated with the budget" while under Ross' supervision).  Hawkins has also proffered
evidence to support her claim that she assumed at least some of the budgetary and analytical
duties previously performed by her supervisor, Ross, a GS-14, and that she continued to perform
those duties after Ross left ATF and through the date of the desk audit.  *See supra* discussion 3-5.
Significantly, Defendant has not presented any evidence rebutting Hawkins' claims that, while
under Ross' supervision, she performed budget analysis that had previously been performed by a
GS-14 grade level position.  *See* Def.'s Resp. ¶¶ 1-2.  Given that Defendant has also failed to
present any evidence that Hawkins' job duties *changed* over time, the Court concludes that there
is sufficient evidence in the record from which a jury could find that Hawkins continued to
perform analytical budget work even after Filler joined ATF.

Similarly, Defendant has also asserted that Hawkins' job duties strictly involved data
collection and entry, rather than budget analysis.  *See, e.g.,* Def.'s Notice of Filing, Att. 4
(11/27/06 Filler Dep.) at 53, 58 (reiterating that Hawkins did not prepare any budget
justifications).  Hawkins, however, has provided evidence that she did perform analytical work
and was not limited to data entry only.  *See, e.g.,* Pl.'s Cross-Mot., Ex. T (Closeout Performance
Feedback Mem.) at 2 (Gunther commenting that the Division returned money to OM "[b]ased on
[Hawkins'] budget analysis" and that Gunther "depended on [Hawkins'] expertise in providing
the Chief, Human Resources Divsion an accurate account of the HR budget."); Pl.'s Cross-Mot.,
Ex. U (Affidavit of Sophia Smith-Weaver) ¶ 7 ("I am also aware that Brigitte Hawkins was

considered an expert on budget matters by the budget personnel from other divisions, because I observed budget persons from other division visiting with Mrs. Hawkins to seek her counsel and advise on budget issues.").  Accordingly, there is a genuine dispute as to whether Hawkins' job duties—at the time of the desk audit—involved only "data entry" or whether she was in fact performing budget analysis typical of a GS-12 position or higher.

Defendant responds that even if Hawkins did in fact perform such work, it is immaterial so long as Filler "honestly believes in the reasons offered."  Def.'s Reply/Opp'n at 4 (citing *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).  The Court finds, however, that Hawkins has also proffered sufficient evidence to cast doubts on whether Filler in fact "honestly believe[d] in the reasons [she] offers."  *See id.*  For example, although Filler testified that "[she] was paying no attention and no focus on the grade level that was proposed," s*ee* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 49-50, it is undisputed that she told Hawkins during their meeting to discuss Hawkins' job duties that she did not believe the position should be classified as a GS-12.  Pl.'s Stmt. ¶ 20; Def.'s Resp. ¶ 20.  Moreover, it was Blackwood's opinion that "from the beginning Ms. Filler did not feel that a promotion was warranted."  Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 10.  Similarly, although Blackwood testified that she advised Filler that her changes to the PD would impact the series, *see* Pl.'s Stmt. ¶ 26; *see also* Def.'s Notice of Filing, Att. 3 (Blackwood Dep.) at 54, Filler denied that such a conversation ever took place, *see* Def.'s Resp. ¶ 26; *see also* Pl.'s Def.'s Notice of Filing, Att. 4 (11/27/06 Filler Dep.) at 68; *see also id.*, Att. 6 (01/17/08 Filler Dep.).  Accordingly, Hawkins has proffered sufficient evidence to cast doubt on Filler's testimony that she was not concerned with the grade level of the position and was not aware that her changes would affect either the

grade level or series.

Moreover, although Filler testified that "[she] found no evidence of [Hawkins] ever being asked to perform [certain] tasks" that she removed from the draft PD, Pl.'s Cross-Mot., Ex. H (Filler Aff.) at 7, Filler conceded that she had no recollection of ever asking Hawkins whether she had, at any time, performed any of the duties that Filler deleted from the PD description, Def.'s Notice of Filing, Att. 7 (01/17/08 Filler Dep.) at 49, and that she had "no knowledge of what [Hawkins] did" before Filler began at ATF.  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 39.  In addition, Defendant does not explain in its briefing why Filler waited more than five months to contact Blackwood about the results of the desk audit, although Filler claimed that "she knew right away when I saw the duties that were described on the paper that those were not accurate for what she was doing or what I needed her to do and the kind of assignments I would direct for her to do."  *See* Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 35.  Accordingly, the Court concludes that there is sufficient evidence from which a reasonable jury could conclude that Filler's testimony is not credible.  *See Anderson v. Zubieta*, 180 F.3d 329, 345 (D.C. Cir. 1999) ("[t]he question is whether the plaintiffs have cast such doubt on [the defendant's] credibility that a reasonable juror could regard it as pretext and infer a discriminatory motive").

Filler herself has also provided contradictory testimony about why she removed duties from Hawkins' PD.  For example, at times Filler testified that she removed only job duties that "[Hawkins] never did."  *See* Def.'s Notice of Filing, Att. 5 (12/18/07 Filler Dep.) at 20-21; *see also id.*, Att. 6 (01/17/08 Filler Dep.) at 30.  However, at other times, Filler explained that she removed job duties from the draft PD that were "not work that I needed for her to do."  *See, e.g.,*

Def.'s Notice of Filing, Att. 6 (01/17/08 Filler Dep.) at 37; *see also id.*, Att. 6 (01/17/08 Filler

Dep.) at 46 ("it did not accurately reflect what I needed [Hawkins] to do.").  For example, as to

the question of whether Hawkins was performing budget analysis, Filler told Blackwood that the

language indicating that Hawkins was responsible for "analysis" should be removed because

Filler wanted Gunther, not Hawkins, to perform all "analysis"—not because Hawkins was not

then-performing those duties.[10]  *See* Pl.'s Cross-Mot., Ex. R (12/18/07 Blackwood Dep.) at 54-

55.  Accordingly, Filler's own testimony introduces conflicting evidence as to the reasons given

for the removal of certain duties, such that a reasonable jury could conclude the stated reasons

were pretextual.  *See Sw. Merchandising Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995)

("vague and shifting testimony" could allow a reasonable jury to "infer that the company's

explanations were pretextual and shielded an illicit motive").  Accordingly, the Court denies

Defendant's Motion for Summary Judgment as to Hawkins' claim for non-promotion.

  B.  <u>Hawkins' Constructive Demotion Claim</u>

  Hawkins also claims that she was constructively demoted.  At the outset, the Court notes

that, although unclear to some extent, the Court reads Hawkins' briefing as asserting two theories

to support her claim that she was constructively demoted.  First, it appears that Hawkins has

alleged that the position into which she was reclassified in the 301 series was a "dead-ended [*sic*]

position" without opportunity for future promotion.  *See* Pl.'s Resp. ¶ 55.; Compl. ¶¶ 38-39.  As

evidence of this claim, Hawkins points to testimony by Blackwood that, "within the [Human

Resources] Division, it is likely that [Hawkins] would be in a dead-ended [*sic*] position" because

---

[10]Indeed, the evidence is clear that Hawkins—and not Gunther—continued to have
primary responsibility for all budget work.  *See* Def.'s Notice of Filing, Att. 4 (11/27/06 Filler
Dep.) at 69.

of the reclassification into the 301 series.  Pl.'s Resp. ¶ 55 (citing Pl.'s Cross-Mot., Ex. C (Blackwood Aff.) at 9); *see also* Pl.'s Cross-Mot., Ex. B (Hawkins Aff.) at 7 (the reclassification "would place [Hawkins] in a different series with no promotion potential to GS-12.").  Although Defendant asserts that the series change is not adverse because both the 301 and 343 series are professional series that can both involve the performance of budgetary analysis, *see* Def.'s Resp. ¶ 36, Defendant does not specifically provide evidence rebutting Blackwood's testimony that the series change resulted in reassigning Hawkins to a "dead-ended [*sic*] position."  *See* Pl.'s Resp. ¶ 55; *see generally* Def.'s Mot.; Def.'s Reply/Opp'n.  Accordingly, the Court finds that, although Hawkins has presented very little evidence to support her claim that the change to the 301 series was an adverse action, the minimal evidence that is in the record conflicts as to whether Hawkins' placement into the 301 series was an adverse action.  *Cf. Alexander v. Tomlinson*, 507 F. Supp. 2d 2 (D.D.C. 2007) ("a lateral transfer must have materially adverse job-related consequences to qualify as an adverse action, for 'purely subjective injuries . .. are not adverse actions'") (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002)).  The Court therefore finds that there is a genuine issue of material fact in dispute that precludes summary judgment on Hawkins' claim that she was constructively demoted by being placed into the GS-301-11.

In addition, although the question is an extremely close one, the Court ultimately concludes, for the same reasons discussed above, that Hawkins has proffered sufficient evidence to cast doubt on the Defendant's explanation that it placed Hawkins into the reclassified position as a result of the desk audit, and whether Defendant's true reason for Hawkins' non-promotion was discriminatory.  *See supra* discussion 26-29.

Second, Hawkins alleges that she was constructively demoted because her position as a management analyst should have been classified as a GS-12 grade level. *See* Pl.'s Cross-Mot. at 14-16*;* Pl.'s Opp'n at 39.   In support of this theory, Hawkins relies on a series of cases from the Merit Systems Protection Board (the "Board") and the Federal Circuit. *See* Pl.'s Cross-Mot. at 14-16; Pl.'s Opp'n at 39.   In reviewing these decisions, however, it is clear that these cases are inapposite to the matter at hand.  As Defendant points out, these cases involve an agency's decision to "reassign[] an employee out of a position that is subsequently upgraded [although] the employee met the requirements for promotion at the time of reassignment." *Hogan v. Dep't of Navy*, 218 F.3d 1361, 1364 (Fed. Cir. 2000).  That is, they involve situations in which an employee was reassigned from a position that was *reclassified* at a *higher* grade level and awarded to a different employee. *See id.* at 1364-65; *see also Manlogon v. EPA*, 87 M.S.P.R. 653, 658-59 (M.S.R.P. 2001) ("an employee's argument that his position 'should have been reclassified' does not give rise to a constructive demotion claim.").  These cases are therefore inapposite to the facts in this matter, as it is undisputed that the position previously occupied by Hawkins remains today a GS-301-11.  Def.'s Reply/Opp'n, Att. 4 (Filler Aff.) at 2.

However, as discussed above, Hawkins has offered sufficient evidence to raise issues of material facts in dispute and to cast doubt on the Defendant's proffered nondiscriminatory reasons as to her placement into the 301 series.  Accordingly, the Court denies Defendant's Motion for Summary Judgment as to Hawkins' claim of constructive demotion to the extent Hawkins alleges that Defendant's decision to reclassify her position into the 301 series was discriminatory.

C.      Hawkins' Cross-Motion for Summary Judgment

Finally, the Court notes that Hawkins has filed a Cross-Motion for Summary Judgment as well as an Opposition to Defendant's Motion for Summary Judgment.  Interestingly, Hawkins' Opposition and Cross-Motion rely primarily on the same set of facts.  That is, on the one hand, Hawkins asserts in her Cross-Motion for Summary Judgment that certain facts are not material facts in dispute, while on the other hand, Hawkins argues in her Opposition that many of those very same factual statements are, to the contrary, material facts in dispute precluding summary judgment.  Accordingly, the Court easily dispenses with Hawkins' Cross-Motion for Summary Judgment, finding that the presence of genuine issues of disputed material facts—as *conceded* by Hawkins herself—precludes an award of summary judgment in her favor.  Hawkins' Cross-Motion for Summary Judgment is therefore denied.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall DENY Defendant's Motion for Summary Judgment and shall DENY Plaintiff's Cross-Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

Date:   February 8, 2009

_/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge